IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CALLWAVE COMMUNICATIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-1701-RGA |
| | ) | |
| AT&T INC., AT&T MOBILITY, LLC, and GOOGLE INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| CALLWAVE COMMUNICATIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-1702-RGA |
| | ) | |
| SPRINT SPECTRUM L.P., SPRINT COMMUNICATIONS COMPANY L.P., and GOOGLE INC., | ) | |
| | ) | |
| Defendants. | ) | |
| CALLWAVE COMMUNICATIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-1704-RGA |
| | ) | |
| VERIZON SERVICES CORP., CELLCO PARTNERSHIP, D/B/A VERIZON WIRELESS, and GOOGLE INC., | ) | |
| | ) | |
| Defendants. | ) | |
| BROADSOFT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 13-711-RGA |
| v. | ) | |
| | ) | |
| CALLWAVE COMMUNICATIONS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**JOINT CLAIM CONSTRUCTION BRIEF (CALL PROCESSING)**

PEPPER HAMILTON LLP
Edmond D. Johnson (# 2257)
James G. McMillan, III (#3979)
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
(302) 777-6539
*johnsone@pepperlaw.com*
*mcmillaj@pepperlaw.com*

*Attorneys for Plaintiff*
*CallWave Communications, LLC*

OF COUNSEL:

William D. Belanger
Noah V. Malgeri
Leah R. McCoy
Christopher Boundy
Suparna Datta
(all admitted *pro hac vice*)
Pepper Hamilton LLP
125 High Street
19th Fl. High Street Tower
Boston, MA 02110
(617) 204-5100

Gregory S. Bishop
(admitted *pro hac vice*)
Pepper Hamilton LLP
333 Twin Dolphin Drive
Suite 400
Redwood City, CA 94065
(650) 802-3600

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Paul Saindon (#5110)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
psaindon@mnat.com

*Attorneys for Defendant Google, Inc.*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Karen Jacobs (#2881)
Stephen J. Kraftschik (#5623)
Eleanor G. Tennyson (#5812)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
kjacobs@mnat.com
skraftschik@mnat.com
etennyson@mnat.com

*Attorneys for Sprint Spectrum L.P. and Sprint*
*Communications Company L.P.*

SEITZ ROSS ARONSTAM & MORITZ LLP
Collins J. Seitz, Jr. (#2237)
Benjamin J. Schladweiler (#4601)
100 S. West Street, Suite 400
Wilmington, DE  19801
(302) 576-1600
cseitz@seitzross.com
bschladweiler@seitzross.com

*Attorneys for Defendants Verizon Services
Corp. and Cellco Partnership d/b/a Verizon
Wireless*

December 10, 2014

ASHBY & GEDDES
John G. Day (#2403)
Tiffany Geyer Lydon (#3950)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
jday@ashby-geddes.com
tlydon@ashby-geddes.com
amayo@ashby-geddes.com

*Attorneys for Broadsoft, Inc.*

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1
      A.    Plaintiff's Opening Position.............................................................................. 1
      B.    Defendants' Answering Position ....................................................................... 1
      C.    Plaintiff's Reply Position .................................................................................. 4
      D.    Defendants' Sur-Reply Position ....................................................................... 4

II.   THE PATENTED TECHNOLOGY .......................................................................... 5
      A.    Plaintiff's Opening Position.............................................................................. 5

III.  ANALYSIS/ CONSTRUCTION OF DISPUTED CLAIM TERMS ......................... 5
      A.    Call.................................................................................................................... 5
            1.    Plaintiff's Opening Position................................................................... 5
            2.    Defendants' Answering Position ............................................................ 8
            3.    Plaintiff's Reply Position ..................................................................... 11
            4.    Defendants' Sur-Reply Position ........................................................... 13
      B.    Outcall............................................................................................................ 14
            1.    Plaintiff's Opening Position................................................................. 14
            2.    Defendants' Answering Position .......................................................... 16
            3.    Plaintiff's Reply Position ..................................................................... 18
            4.    Defendants' Sur-Reply Position ........................................................... 18
      C.    Placing / place a[n] [first/new/second/third] [out]call / outcall is placed ............ 19
            1.    Plaintiff's Opening Position................................................................. 19
            2.    Defendants' Answering Position .......................................................... 20
            3.    Plaintiff's Reply Position ..................................................................... 22
            4.    Defendants' Sur-Reply Position ........................................................... 23
      D.    Switched network............................................................................................ 23
            1.    Plaintiff's Opening Position................................................................. 23
            2.    Defendants' Answering Position .......................................................... 24
            3.    Plaintiff's Reply Position ..................................................................... 26
            4.    Defendants' Sur-Reply Position ........................................................... 29
      E.    Bridging the … [out]call and the … [out]call/ causing … to be bridged ............ 30
            1.    Plaintiff's Opening Position................................................................. 30
            2.    Defendants' Answering Position .......................................................... 30
            3.    Plaintiff's Reply Position ..................................................................... 32
            4.    Defendants' Sur-Reply Position ........................................................... 34
      F.    Forward[ed]..................................................................................................... 34
            1.    Plaintiff's Opening Position................................................................. 34
            2.    Defendants' Answering Position .......................................................... 36
            3.    Plaintiff's Reply Position ..................................................................... 38
            4.    Defendants' Sur-Reply Position ........................................................... 40
      G.    Transfer[ring].................................................................................................. 40
            1.    Plaintiff's Opening Position................................................................. 40
            2.    Defendants' Answering Position .......................................................... 42

|  |  | 3. | Plaintiff's Reply Position | 43 |
|  |  | 4. | Defendants' Sur-Reply Position | 46 |
| H. | Call handling |  |  | 46 |
|  |  | 1. | Plaintiff's Opening Position | 46 |
|  |  | 2. | Defendants' Answering Position | 47 |
|  |  | 3. | Plaintiff's Reply Position | 49 |
|  |  | 4. | Defendants' Sur-Reply Position | 50 |
| I. | Call redirection instruction |  |  | 51 |
|  |  | 1. | Plaintiff's Opening Position | 51 |
|  |  | 2. | Defendants' Answering Position | 53 |
|  |  | 3. | Plaintiff's Reply Position | 54 |
|  |  | 4. | Defendants' Sur-Reply Position | 55 |
| J. | Causing the first entity call to be selectively connected to one of a plurality of potential second entity terminal destinations |  |  | 55 |
|  |  | 1. | Plaintiff's Opening Position | 55 |
|  |  | 2. | Defendants' Answering Position | 57 |
|  |  | 3. | Plaintiff's Reply Position | 59 |
|  |  | 4. | Defendants' Sur-Reply Position | 60 |
| K. | Subscriber specified rule; subscriber instruction |  |  | 61 |
|  |  | 1. | Plaintiff's Opening Position | 61 |
|  |  | 2. | Defendants' Answering Position | 62 |
|  |  | 3. | Plaintiff's Reply Position | 65 |
|  |  | 4. | Defendants' Sur-Reply Position | 66 |
| L. | [a / the] network |  |  | 66 |
|  |  | 1. | Plaintiff's Opening Position | 66 |
|  |  | 2. | Defendants' Answering Position | 67 |
|  |  | 3. | Plaintiff's Reply Position | 69 |
|  |  | 4. | Defendants' Sur-Reply Position | 70 |
| M. | Call processing system |  |  | 71 |
|  |  | 1. | Plaintiff's Opening Position | 71 |
|  |  | 2. | Defendants' Answering Position | 72 |
|  |  | 3. | Plaintiff's Reply Position | 74 |
|  |  | 4. | Defendants' Sur-Reply Position | 75 |
| N. | Substantially real time |  |  | 76 |
|  |  | 1. | Plaintiff's Opening Position | 76 |
|  |  | 2. | Defendants' Answering Position | 77 |
|  |  | 3. | Plaintiff's Reply Position | 78 |
|  |  | 4. | Defendants' Sur-Reply Position | 79 |

# TABLE OF AUTHORITIES

Page(s)

## CASES

*01 Communique Lab., Inc. v. LogMeIn, Inc.*,
  687 F.3d 1292 (Fed. Cir. 2012)................................................................22

*CAE Screenplates v. Heinrich Fiedler GmbH*,
  224 F. 3d 1308 (Fed. Cir. 2000)..............................................................46

*Dresser Indus. Inc. v. United States*,
  432 F.2d 787 (Ct. Cl. 1970) ...................................................................37

*Funai Elec. Co. v. Daewoo Elec. Corp.*,
  616 F.3d 1357 (Fed. Cir. 2010)...............................................................54

*In re Gulack*,
  703 F.2d 1381 (Fed. Cir. 1983)...............................................................57

*Hakim v. Cannon Avent Group, PLC*,
  479 F.3d 1313 (Fed. Cir. 2007)...............................................................71

*Imperium (IP) Holdings, Inc. v. Apple Inc.*,
  No. 4:11-163, 2012 WL 6949611 (E.D. Tex. July 2, 2012), *report and
  recommendation adopted as modified*, No. 4:11-163, 2013 WL 322053 (E.D. Tex.
  Jan. 28, 2013).......................................................................................68

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
  327 F.3d 1364 (Fed. Cir. 2003)...............................................................80

*Joao Bock Transaction Sys., LLC v. Jack Henry & Assocs., Inc.*,
  Case No. 12-1138-SLR at 3 (D. Del. Jun. 30, 2014) ......................................37, 40

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996)................................................................................5

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005).............................................................18, 46

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
  520 F.3d 1367 (Fed. Cir. 2008)...............................................................67

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008)...............................................................21

*Oatey Co. v. IPS Corp.*,
  514 F.3d 1271 (Fed. Cir. 2008).............................................................35, 72

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003)........................................................................25, 36, 71

*Ormco Corp. v. Align Tech., Inc.*,
  498 F.3d 1307 (Fed. Cir. 2007)...............................................................................24

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)...............................................4, 5, 18, 43

*Schering Corp. v. Amgen Inc.*,
  222 F.3d 1347 (Fed. Cir. 2000)................................................................................37

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
  375 F.3d 1341 (Fed. Cir. 2004)................................................................................49

*Uship Intellectual Props., LLC v. United States*,
  714 F.3d 1311 (Fed. Cir. 2013)................................................................................68

*Wi-LAN, Inc. v. Acer, Inc.*,
  712 F. Supp. 2d 549 (E.D. Tex. 2010)...............................................................64, 74

## OTHER AUTHORITIES

1, Annabel Z. Dodd, *The Essential Guide to Telecommunications* 166 (2d ed. 2000).................10

*Newton's Telecom Dictionary* (15th ed. 1999).........................................37, 39, 42, 78

*Newton's Telecom Dictionary* (16th ed. 2000)................................................29, 24

## I.    INTRODUCTION

### A.    Plaintiff's Opening Position

Plaintiff CallWave Communications, LLC ("CallWave") submits its Opening Claim Construction Brief in support of its claim construction for U.S. Patent Nos. 7,397,910 (the "'910 Patent"), 7,555,110 (the "'110 Patent"), 7,636,428 (the "'428 Patent"), 7,822,188 (the "'188 Patent"), 8,064,588 (the "'588 Patent"), 8,325,901 (the "'901 Patent"), and 8,351,591 (the "'591 Patent") (collectively, the "Call Processing Patents").  The disputes the Court must resolve are straightforward.  CallWave contends that the language of the claims, which is consistent with the intrinsic evidence, should be followed.  In contrast, Defendants urge new limitations in a manner incongruous with the claim language in a scattershot attempt to find non-infringement positions.

### B.    Defendants' Answering Position

Each of the seven asserted Call Processing patents ("CP Patents") has rootsn a common problem that existed in 1999, when the earliest of these applications was filed, but no longer exists today.  At that time, people accessing the Internet often did so using a "dial-up" connection (i.e., using a commercially available modem over their telephone line).  JA-CP 146 at 1:52-61.[1]  When accessing the Internet in this manner, the user's phone line would be busy, and incoming calls could not reach the user.  *Id*.  CallWave sought to address this problem by providing those accessing the Internet using a dial-up connection the ability to "screen"

---

[1] Throughout this brief, the citations to a patent are exemplary for each of the patents for which the particular term is being construed.  While the specifications of the CP Patents are not identical, they share relevant disclosures and underlying concepts.  To arrive at each of these specifications, the prosecutors engaged in a cut-and-paste exercise with each subsequent application, in which either the entirety, or portions, of previous specifications were cobbled together.  The '188 Patent, which amasses portions from the specifications of each of the other CP Patents, clearly demonstrates this point.  This haphazard combination of specifications complicates claim construction by adding material in a manner that is not always consistent with the remainder of the specification, or the claims.  Defendants have done their best to ascribe a uniform meaning to most terms across the several disparate patents.

incoming calls by sending information about the caller (e.g., phone number or other information) to the computer being used to access the Internet.  JA-CP 147 at 4:54-57.  The user could then decide whether to let the call go to voicemail, disconnect from the Internet session and answer the call, or redirect the call to be answered on another phone line.

To manage this functionality, CallWave proposed the use of a Call Processing System ("CPS") to answer and manage subscribers' incoming calls.  Subscribers could arrange for calls to be forwarded to the CPS when their phone line was in use.  JA-CP 149 at 7:62-63.  When a call placed to a subscriber encountered a "busy" condition, the CPS received signaling information from, and proceeded to establish a voice path with, the calling party.  This signaling information and voice path between the CPS and calling party was the first call leg (shown in blue below).  JA-CP 152 at 13:18-21; JA-CP 154 at 17:42-46.  The CPS then sent signaling information to the subscriber's computer terminal to facilitate screening.  JA-CP 152 at 13:36-45; JA-CP 154 at 17:40-42.  If that call was accepted, the CPS then established a new voice path to the called party, to create a second call leg (shown in green below).  JA-CP 152 at 14:36-40; JA-CP 154 at 17:65-18:4; 18:10-12.  The CPS then proceeded to "bridge" the first call leg and the second call leg (shown in red) to allow the calling party and called party to speak.  JA-CP 152 at 14:49-56; JA-CP 154 at 18:14-18.



FIG. 16

To facilitate screening, the CP Patents proposed an interface ("Command Center," shown below) for use on the subscriber computer logged into the Internet (i.e., occupying the telephone line). The interface provided the subscriber with several "call handling" operations to handle an incoming call, including dropping the Internet connection and accepting the call, or transferring the call to an unoccupied phone line. JA-CP 149 at 7:65-8:2.

The subscriber could decide which call handling operation to choose—i.e., how to connect the "screened" call—based on the identity of the caller. The CP Patents identify several types of call screening information that could be used to convey the identity of the calling party, or the purpose of the call. One technique included providing the calling party's telephone number to the subscriber's interface. JA-CP 155 at 19:30-40. In the alternative, a voice recording (e.g., an audio message) from the calling party could be recorded and sent to the

subscriber in "substantially real-time" to allow the subscriber to (1) identify the calling party, and (2) determine the purpose of the call.  JA-CP 154 at 17:59-64.  The subscriber could choose how to handle the call based on this call screening information.



C.     Plaintiff's Reply Position

Defendants' responsive brief is replete with attempts to import limitation into the claims from the specification or from other claims.  The specifications describe many embodiments, yet defendants consistently ignore embodiments inconsistent with their position to advance their limiting constructions.   Often, the only "evidence" Defendants provide is the unsupported argument of its attorneys.  Defendants' transparent attempt to create noninfringement positions by ignoring solid claim construction principles is improper.

D.     Defendants' Sur-Reply Position

In 40 pages of briefing CallWave does not once describe its invention.  This is striking given that claims must be construed in view of the invention disclosed in the specification.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc).  Instead, CallWave has construed the disputed claim terms in a vacuum, arguing that without a disclaimer, the terms should be afforded their broadest possible meaning.  This is incorrect.  Plaintiff's constructions

and arguments, altogether divorced from the intended invention and disclosure of the Call Processing Patents ("the CP Patents"), fail to define these terms "in a way that comports with the instrument as a whole." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389 (1996).

## II.      THE PATENTED TECHNOLOGY

### A.      Plaintiff's Opening Position

The Call Processing Patents disclose systems, methods, and articles of manufacture for providing expanded telecommunication services and call screening. Embodiments of expanded telecommunications services are found throughout the Call Processing Patents, and include, e.g., call redirection, find-me/follow-me and multi-cast functionality (allowing the called party to receive calls in different locations), and processing of calls on telephone and IP devices. The Call Processing Patents also disclose various embodiments of call screening, e.g., systems, methods, and articles of manufacture for call screening based on call signaling information and/or the transmission of audible sound.

## III.     ANALYSIS/ CONSTRUCTION OF DISPUTED CLAIM TERMS[2]

### A.      Call

#### 1.      Plaintiff's Opening Position

"Call" is a common word that any judge or jury will readily understand, and it requires no construction beyond its plain and ordinary meaning. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). Furthermore, the intrinsic evidence does not attach a specific definition or otherwise limit "call" from its plain and ordinary meaning.

If construction is required, "call" should be construed as understood by a person of ordinary skill in the art at the time of the invention to mean a "connection or request for a

---

[2] Different claims and patents are asserted against different defendants. Each Defendant joins in this brief with respect to the claims asserted against it.

connection."  (Lucantoni Dec. at ¶ 11.)   Such a definition is consistent with the plain and ordinary understanding of "call," albeit a more technical definition.  For instance, one might use "call" to refer to a "connection" as follows:  "I just finished a call ["connection"] with a friend." Similarly, "call" can also refer to a "request for a connection":  "I placed a call ["request for a connection"], but no one answered."  While the understanding of one of ordinary skill is more technically precise, these examples demonstrate the congruence between the understanding of a lay person and what one of ordinary skill in the art would understand "call" to mean.

The intrinsic evidence further supports CallWave's proposed construction that "call" can mean a "connection or a request for a connection", depending on the context.  For example, claim 12 of the '901 Patent allows a party to "accept" or "not accept" a call.  Thus, the "call" is first a request for a connection, and becomes a connection if accepted.  Similarly, Fig. 23 of the '188 Patent shows step 2302 in which "a call is placed by a caller to the called party" (*i.e.,* a request for a connection).  (JA-CP 0163 at 35:29-30.)  Then, in step 2314, the call is <u>connected</u>. (JA-CP 0163 at 35:40-52.)  Thus, a call can be in a connected state or an unconnected state.

Numerous other examples confirm that the specifications use "call" interchangeably with "connected" and support CallWave's proposed construction.  For example, the '188 Patent specification interchangeably uses the terms "<u>connect</u> duration" and "<u>call</u> duration" to refer to the length of various type of calls.  (JA-CP 0161 at 32:39-67.)  The '188 Patent specification again uses "call" and "connection" interchangeably when describing the instance in which a "<u>call</u>" is placed from a wireless phone and the "caller's <u>connection</u> is of poor quality," necessitating a <u>new call</u> to be originated.  (JA-CP 0165 at 40:5-13[3].)  Similarly, "the new <u>call</u> can be directed back to the caller's cell phone, which may be desirable if the caller's <u>connection</u> had

---

[3] Emphasis is added in all quotes unless otherwise specified.

dropped…." (JA-CP 0165 at 40:20-25.) In each case, the patentee used "call" in the same manner that one of ordinary skill in the art would understand it to mean – "connection or request for a connection."

In contrast to the plain and ordinary meaning of "call," Defendants incongruously limit "call" to "a voice path and signaling information." Such a construction is contrary to the claims language and specification. The '188 Patent specification discloses that a call is not limited as Defendants urge, but may include "voice, data, and/or signaling information." (JA-CP 0165 at 39:64-40:2.) The use of "and/or" shows that a call can consist of any one of these types of information or any combination of these types of information. This is confirmed by the plain language of the claims. For example, claim 17 of the '188 Patent recites that "the second outcall is associated with signaling information." (JA-CP 0182 at 73:28-45.) Defendants' construction regarding signaling information would make that phrase a nullity, which is improper.

Similarly, Defendants' requirement that a "call" requires a "voice path" is not correct. The '188 Patent specification explains that "a communications line is referred to as 'busy' when the communication line is being utilized in such a way that a conventional incoming call will not be connected to the communications line." (JA-CP 0150 at 9:40-43.) In other words, the incoming call exists whether or not there is a voice path established.

Moreover, Defendants' construction makes no sense when inserted into the claims. For example, claim 1 of the '901 Patent recites "receiving … a first call from a calling party . . . ." (JA-CP 0262 at 50:9-26.) It makes no sense to receive a voice "path from a calling party." A voice path is not received from a calling party but rather a request for connection is received from a calling party. (Lucantoni Dec. at ¶ 12.)

Furthermore, Defendants' use of the phrase "voice path" in the context of these patents is

ambiguous and confusing.   The claims and the patent specification describe calls over both circuit switched networks and packet switched networks, such as calls using Voice over Internet Protocol (VoIP).   (JA-CP 0151 at 11:56-65.)   For example, Figure 1 in the '428 Patent specification illustrates the call management subsystem 108 "coupled into the PSTN 104 through voice trunk circuits 118 directly interfacing with the Inter Exchange Carrier's (IXC) circuit switched or packet switched telephony network."  (JA-CP 0095 at 6:12-15; *see also* JA-CP 0096 at 7:7-27, JA-CP 0097 at 9:67-10:3, and JA-CP 0101 at 18:24-27.)   "Voice path" may imply to a jury that a call requires a dedicated path, as would be the case for a circuit switched network. (Lucantoni Dec. at ¶ 13.)   However, in a packet switched network such as the Internet, a voice call is broken into discrete packets and each packet may take a different route from the caller and callee.   Thus, there is no discrete path for the voice communications, and each packet may travel by a different path.   (Lucantoni Dec. at ¶¶ 14-15.)   Therefore, including the phrase would unnecessarily introduce ambiguity and invite juror confusion about what constitutes a "voice path."

## 2.    Defendants' Answering Position

The asserted patents are expressly directed toward call processing systems and consistently use the term "call" in the sense of a phone call.  *See e.g.* JA-CP 84 at Abstract ("An incoming call is forwarded to a call management system that asks the caller to leave a voice message."); JA-CP 107 at Abstract.  Defendants' construction—"a voice path and associated signaling information"—is firmly rooted in the claim language and the specification of the CP Patents, and is fully consistent with the understanding of "call" from the perspective of one of ordinary skill in the art.

The  claim  language  and  the  specification  leave  no  doubt  that  a  "call"  involves exchanging voice communications, and that a "voice path" is required for such an exchange.  For

example, the claims recite "causing a . . . **talk path** to be established . . . so that the user can hear the caller" (JA-CP 183 at 76:51-53), "receiving a **voice** communication" (JA-CP 103 at 22:67), "transmitting . . . an audible **voice** communication" (JA-CP 20 at 8:55-56), "the called party can audibly listen to the **voice** communication" (JA-CP 21 at 9:33-34), and "transmitting the **speech**" (JA-CP 102 at 19:24-25)[4].   While CallWave asserts that "the phrase 'voice path' . . . is ambiguous and confusing," that precise phrase and synonymous phrases such as "talk path," "audio path," and "communication path" appear numerous times throughout the patents (e.g., 34 instances in the '188 Patent alone).   The specification describes, for example, establishing a talk path of a call between the caller and the subscriber (JA-CP 147 at 3:46-49), tearing down an audio path of a call (JA-CP 158 at 25:66-26:1), and muting a voice path of a call (JA-CP 166 at 42:22-27).   In fact, a call must include a voice path for the call participants to converse.   *See* JA-CP 178 at 65:51-53 ("[A] two-way talk path is established . . . so that the caller and subscriber can converse.").

CallWave's expert criticizes Defendants' use of the singular form of the word "path" in the phrase "voice path," because he alleges that voice communications for a VoIP call may travel over several different paths rather than just one discrete path.   *See* Lucantoni Dec. ¶¶ 14-15. Nevertheless, CallWave's own patents characterize the voice communications for a VoIP call as a "path" in singular.   *See e.g.* JA-CP 147 at 3:46-49 ("causing . . . a full duplex talk **path** to be established between the computer-based telecommunications client application and the caller so that the caller and the subscriber can converse"); JA-CP 152 at 13:59-61 ("the audio return **path** over the Internet channel to the CM subsystem").

---

[4] Emphasis in the quoted material is added unless otherwise noted.

In addition to a voice path, a "call" includes "associated signaling information." A caller cannot pick up a phone and start talking until a voice path is first established by a series of signals—e.g., signals associated with on-hook and off-hook events, dialed phone number, ring tones, busy signals, etc. *See* Ex. 1, Annabel Z. Dodd, *The Essential Guide to Telecommunications* 166 (2d ed. 2000). Moreover, the independent claims make clear that a call includes signaling information. The oft-recited steps of placing a call, receiving a call, and connecting a call necessarily involve exchanging signaling information. *See id.* CallWave argues that the step of receiving a call only involves receiving a request for connection, without a voice path. While the signaling information associated with a call is received first, a voice path is subsequently set up to establish a call (i.e., the call is answered). *See id.* The patents describe this well-known fact. For example, Fig. 26 of the '188 Patent depicts a call flow where a voice path is set up (step 1108A) after a call is received from the calling party (step 1100A) and answered by the called party (step 1104A). *See* JA-CP 137; *see also* JA-CP 170 at 49:21-48 ("[A] call . . . is received . . . . [T]he subscriber selects an option to take the call. The Call Processing System 1124 opens the talk path . . . and the conversation between the caller and called party begins."). Indeed, the steps of the claims often indicate whether the signaling portion of a call or the voice path portion of a call is involved.[5]

---

[5] *See e.g.* JA-CP 102 at 19:13-15 ("receiving . . . a first call . . . , wherein the first call includes signaling information"), 19:64-65 ("placing a second call . . . , the second call including signaling information"); JA-CP 105 26:16-17 ("causing duplex communication to be provided so that the called party can converse with the calling party"); JA-CP 103 at 21:36-37 ("muting a return talk path to the caller"); JA-CP 102 at 19:24 ("recording speech from the caller").

CallWave and its expert assert that the plain and ordinary meaning of a "call" is a "connection or request for connection." [6]  But even a cursory review of these patents makes clear that a "call" specifically involves voice communication.  CallWave's construction, however, is devoid of any reference to a voice communication and therefore is overly broad.  A "connection" could encompass, for example, web browsing or online chatting involving an Internet connection or SMS text messaging.  Contrary to CallWave's contention that the patents use "call" and "connection" interchangeably, the patents use the term "connection" in different contexts—for example, to differentiate an Internet connection from a voice call.  *See e.g.* JA-CP 93 at 2:22-25 ("[A]n Internet Answering Machine (IAM) system allows a called party to monitor a message being left by a caller even when the called party is connected to the Internet over a dial-up connection."); *see also* JA-CP 93 at 1:49-52; JA-CP 96 at 7:3-10.  These passages from the specification reinforce that the claims of the asserted patents are directed to voice communications, not generic "connections."  Accordingly, "call" must be interpreted to involve *voice* communications and associated signaling information.

### 3.    Plaintiff's Reply Position

Defendants acknowledge that "call" is used in a readily understood manner in the asserted claims:  "The asserted patents . . . consistently use the term 'call' in the sense of a phone call."  Because "call" is readily understood, and the patentee did not specially define the term or disclaim its scope, no construction is necessary.

Defendants' attempt to limit the term "call" to require "a voice path" *and* "associated signaling information" is incongruous with the asserted patents, which teach that a call may

---

[6] CallWave's expert subscribes to CallWave's proposed construction but offers no justifications (from documentary evidence or from his own knowledge) that support CallWave's construction. *See* Lucantoni Dec. ¶ 11.

include "voice, data, **and/or** signaling information."  (JA-CP 0165 at 39:64-40:2.)    Defendants fail to address this explicit teaching that refutes their overly restrictive construction.

Defendants are wrong in contending that the claim language and the specification limit "call" to exchanging voice communications and a voice path.  For example, the specification teaches explicitly that the called party may select the "BLOCK CALL" option and thus choose not to answer a "call."  (JA-CP 0043 (Fig. 18)).  In other words, a "call" exists (else it could not be blocked or answered) and yet no voice communication occurs and no voice path is established.  While the specification teaches that a voice path or a talk path is established for some calls, that is consistent with its teaching that a call may include "voice, data **and/or** signaling information."  Defendants cannot show any teaching **requiring** voice information or a voice path.

Further, Defendants do not address the incompatibility of their construction with the claims.  For example, Claim 1 of the '901 Patent requires "receiving . . . a first call," but it makes no sense for a called party to receive a "voice path."  (Lucantoni Dec. ¶ 12.)  Similarly, Claim 40 of the '188 Patent discloses the situation where a first outcall is not answered.  (JA-CP 0183 at 32-55.)  If the call is not answered, then no voice path exists.  (*See* Lucantoni Dec. ¶ 12.)  In yet another example, claim 52 of the '188 patent requires:

> at least partly **in response to** receiving an indication that the mobile communication device **answered the call**, causing a half-duplex talk path to be established between the mobile communication device ….

(JA-CP 0183 at 76:49-54.)  The claim requires a "call" to be answered **before** a talk path is established.  Hence, the "call" exists before the talk path.

An additional problem with Defendants' "voice path" requirement is the term "path." Defendants do not refute Dr. Lucantoni's testimony that a VoIP call uses packets that may be sent over multiple paths.  (Lucantoni De. ¶¶ 14-15.)    Thus, construing the term to require a

"voice path" serves only to confuse the jury, which is the antithesis of claim construction.

Defendants "signaling information" requirement is also unsupported.  As Defendants admit in their answering brief, certain claims explicitly require signaling information, while others do not.  Defendants' construction would improperly import that requirement to all of the claims.  Further, the specification explicitly teaches that a call may include "voice, data, **and/or** signaling information."  (JA-CP 0165 at 39:64-40:2.)

### 4.      Defendants' Sur-Reply Position

A telephone "call" can function only if it includes voice and signaling.  To refute this, CallWave cites a portion of the specification, regarding "voice *and/or* signaling information," wholly out of context even though the entirety of the citation makes clear that "the call processing system optionally ***can monitor the call*** (including voice, data, and/or signaling information)."  Nowhere does it state that these components can individually comprise a call.

CallWave also relies on Fig. 18 and argues that a call does not require a voice path and may comprise only signaling information ("signaling"), because the CP Patents teach a "blocked call" feature.  CallWave is incorrect.  The call between the CPS and the called party necessarily includes a voice path so that the called party can hear the voicemail in real time and thus screen the call.  *See* JA-CP 155 at 20:6-11.  Screening calls necessarily requires that voice paths have been established to enable the called party to hear the voicemail.  Furthermore, the called party is provided the option to block an incoming phone call upon receiving the calling party's identity.  But, if the caller has been identified, signaling has been received (see phone number for "incoming call" at JA-CP 0043).  Under CallWave's construction, the called party could not actually "block" the call in Fig. 18, because the "call," consisting of signaling alone, would have already come through.  The only logical understanding of the embodiment depicted in Fig. 18 is

13

that the called party is given an opportunity to block a "call" by blocking the establishment of a voice path with the calling party.

CallWave also argues that Defendants' use of the term "voice path," somehow excludes "VoIP."  "Voice path" is simply a term used to distinguish voice from signaling.  The intrinsic record likewise uses the term "voice path," and synonymous terms (e.g., "audio path," "talk path") on numerous occasions to reference the voice component of a call, without ever distinguishing between traditional and VoIP calls.  JA-CP 0166 at 42:21-22.

CallWave next contends that Defendants' construction is inconsistent with the CP Patent claims that recite "receiving a call," because a called party does not "receive . . . a voice path." This argument has no merit.  Receiving a call, like "placing a call," has a particular meaning related to call setup that depends on context; Defendants' construction is consistent with that understanding.  CallWave also argues that the requirement of "signaling" in Defendants' construction is unsupported.  But, CallWave has not—and cannot—point to any call being established without signaling information because it, like a "voice path," is a fundamental component of a call.

### B.     Outcall

#### 1.     Plaintiff's Opening Position

Outcall does not have a specialized meaning.  (Lucantoni Dec. at ¶ 16.)  "Outcall" is easily understood, and construction of the term is not needed.  If construed, "outcall" should be construed to mean "outgoing call."

The intrinsic evidence supports CallWave's proposed construction because the claims and specifications use "outcall" to refer to an outgoing call and the patentee did not disclaim that scope.  For example, claim 1 of the '428 Patent recites "placing an outcall <u>from</u> the call processing system."  (JA-CP 0102 at 19:11-34.)  The language of that claim indicates that the

outcall is leaving (*i.e.*, outgoing from) the call processing system.  Similarly, the '188 Patent specification describes an example call transfer process in which a call intended for a called party is received by the call processing system, which subsequently requests an outcall to a telephone associated with the called party.  (JA-CP 0157-158 at 24:53-25:3.)  Thus, this passage discloses an "outcall" to mean an "outgoing call," supporting CallWave's proposed construction.

In contrast, the intrinsic evidence does not support Defendants' proposed construction limiting "outcall" to "a call originated from the call processing system."  As discussed above, claim 1 of the '428 Patent requires placing an outcall "from the call processing system." Defendants' construction would make that claim language a nullity, which is improper.  In contrast, other claims do not include the requirement that an "outcall" must be "from the call processing system."  For example, claim 14 of the '188 Patent simply requires "placing a third outcall to the transfer destination."  (JA-CP 0182 at 73:13-21.)  Similarly, claim 37 of the '188 Patent states "placing an outcall to the connect destination."  (JA-CP 0183 at 75:10-19.)  And claim 40 of the '188 Patent recites "placing a first outcall to a first communication device."  (JA-CP 0183 at 75:32-55.)  Thus, adopting Defendants' proposed construction would improperly import new limitations to these claims.

Defendants also insert a requirement that the outcall must be "originated" from the call processing system.  It is unclear what limitations Defendants imply by inserting the word "originated" here.  While in some cases (such as claim 1 of the '428 Patent) the outcall may come from the call processing system, but nothing in the intrinsic evidence requires the outcall to be "originated" from the call processing system, as Defendants would require.  If "originated" adds no additional limitation, then no construction is required.  If "originated" implies additional restrictions about the outcall, Defendants should clarify those restrictions.

Accordingly, there is no intrinsic support for Defendants' proposed construction, and it should be rejected.

### 2.    Defendants' Answering Position

While CallWave proposes to leave open the possibility that an outcall could originate from anywhere, Defendants' construction specifies that the outcall, consistent with the use of the term in the patents, is from the call processing system.  The patents' alleged invention relates to call processing functions performed by a call processing system.[7]  *See e.g.* JA-CP 146 at 2:11-36; JA-CP 93 at 2:22-44.  As such, the claims are written from the call processing system's perspective, not from a user's perspective.  For example, the claims recite "receiving at the call processing system a . . . call from a calling party" (JA-CP 181 at 72:64-65) and "placing a . . . call from the call processing system . . . to . . . the called party" (JA-CP 102 at 20:64-66).  Furthermore, the usage of "outcall" in each of the claims makes clear that the outcall is originated from the call processing system.  *See e.g.* JA-CP 181 at 72:22-23 ("placing a[n] . . . outcall *from a call processing system* to the . . . called party").  This is consistent with the entire premise of the invention—a call processing system that receives a call attempt while a subscriber is occupying their telephone line by accessing the Internet, and places outcalls to reach the subscriber.[8]  CallWave argues that claims 14, 37, and 40 of the '188 Patent omit the explicit identity of the outcall's originator.  But in each instance, the context of the claims makes clear that the recited steps are call processing steps performed by the call processing system.[9]

---

[7] The call processing system is also referred to in the patents as the call processor system, processing system, IAM system, first system, softswitch, etc.

[8] *See e.g.* JA-CP 157 at 24:54-56; JA-CP 159 at 27:41-42, 28:37-40, JA-CP 160 at 29:12-14; JA-CP 165 at 39:58-60; JA-CP 168 at 46:12-14; JA-CP 169 at 48:16-23.

[9] For example, in claim 40, the call processing system receives a message regarding a first call from a caller intended for a subscriber.  After this, the claimed system accesses a subscriber instruction and, based on the subscriber instruction, places an outcall to a communication device

CallWave also complains about the word "originated" in Defendant's construction. Specifically, CallWave argues that "nothing in the intrinsic evidence requires the outcall to be 'originated' from the call processing system," "there is no intrinsic support for Defendants' proposed construction," and "[i]t is unclear what limitations Defendants imply by inserting the word 'originated' here." To the contrary, the word "originated" and variants of this word are used throughout the specification (e.g., 74 instances in the '188 Patent alone). *See e.g.* JA-CP 165 at 40:13-14 ("[T]he call processing system can originate a call."). The word "originated" in Defendants' construction of "outcall" is amply supported by the intrinsic record. For example, according to the specification, placing an outcall involves *originating* a call. *See* JA-CP 134 at Fig. 24 (the call processing system receiving a re-originating instruction in step 1906 and, in turn, placing an outbound call in step 1910); JA-CP 169 at 47:30-35. Defendants' construction includes "originated" because that is the language used by the CP Patents.

CallWave's proposed construction of "outcall" as an "outgoing call" does nothing to further explain the meaning of this term and does not clarify that the outcall comes from the call processing system. Even the intrinsic evidence CallWave cites (i.e., '188 Patent at 24:53-25:3) clearly state that the "*call processing system* can place an outcall." JA-CP 157 at 24:54-55. The Court should adopt Defendant's proposed construction and reject CallWave's attempt to expand the scope of the claims.

---

associated with the subscriber. The outcall to the subscriber could not have been placed by the subscriber himself  because the caller does not have access to the subscriber instruction. In fact, if the caller could place an outcall to the subscriber directly, there would be no need for the call processing system of the invention. The call processing system is the only logical, and indeed the only possible, originator of the outcall. Similarly, in claims 14 and 37 of the '188 Patent, the call processing system receives a call transfer request from the subscriber who specified a transfer destination, and, in turn, the claims recite placing an outcall to the transfer destination. Again, only the call processing system could have placed the outcall, because only the call processing system received the transfer request.

### 3.     Plaintiff's Reply Position

The dispute is whether an "outcall" must originate from the call processing system (as Defendants contend) or not (as CallWave contends.)  Defendants can point to no disclaimer by the patentee of the scope of "outcall."  Instead, Defendants cite to the claim language of certain claims that recites "placing a[n] … outcall *from a call processing system* to the … called party." However, this language highlights the problem with Defendants' construction, which would render the language "from a call processing system" superfluous in those claims in which it is included, and imports that limitation into those other claims in which it is not included (*e.g.*, claims 14, 37, and 40.)  *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.")

The other problem with Defendants' construction is the use of the term "originated" because it creates ambiguity.  Defendants quote the '188 Patent specification's teaching about how to handle a call that has "been placed by the caller . . . that has poor quality."  (JA-CP 0165 at 40:5-6.)  It teaches in that instance to "re-originate a new call to the caller."  In one sense, the "new call" is originated by the call processing system because the new connection was requested by the call processing system.  In another sense, the "new call" was not originated from the call processing system because it was originally "placed by the caller." (JA-CP 0165 at 40:7-14.) Defendants acknowledge this ambiguity, which leaves the jury to guess what limitations "originated" implies.

### 4.     Defendants' Sur-Reply Position

Contrary to CallWave's contention, even absent a disclaimer, claim terms are to be read in light of the intrinsic record.  *See Phillips*, 415 F.3d at 1315. As discussed above, CallWave's assertion that an outcall can come from any equipment at any point in time is contrary to the

intrinsic record.[10] CallWave also argues that Defendants' construction is superfluous, because certain CP claims are explicit in stating that the outcall comes from the call processing system ("CPS"). This misses the point. The **fundamental objective** of the CP Patents was to provide a CPS to receive calls when a subscriber's phone line was occupied, and to place outcalls to notify the subscriber or otherwise complete the call. Allowing an outcall to originate from any point other than the CPS would ignore the essential feature of the invention. In omitting this concept, CallWave's proposal eliminates any distinction between a "call" and an "outcall."

Further the term "originated" in Defendants' proposal does not create ambiguity as CallWave suggests. Even the embodiment that CallWave relies upon describes an outcall first placed (i.e., originated) by the CPS. CallWave's proposal, however, would allow an outcall to be placed by the calling party, the called party, or any other party or equipment.

### C. Placing / place a[n] [first/new/second/third] [out]call / outcall is placed

#### 1. Plaintiff's Opening Position

Whether or not the Court decides to construe the term "outcall," the phrases "placing a[n] [first/second/third] outcall," "outcall is placed," and "outcall is to be placed" need not be independently construed. The additional language is easily understood.

The parties agree that "placing[ed]" means "requesting[ed]." Thus, the only dispute is over Defendants' requirement that placing a first/second/third outcall means "originating a request for a first/new/second/third outcall." For similar reasons discussed with respect to "outcall," that additional limitation is ambiguous. The patentee specifically chose not to restrict the scope of these phrases with the term "originate," and there is no reason to do so now.

---

[10] CallWave is incorrect in its assertion that Defendants' citation to claims that explicitly disclose an outcall "from a call processing system," read this limitation into other claims. Defendants merely reference these claims as further evidence that the only place from which an outcall is generated – anywhere in the CP Patents – is the call processing system.

Nowhere in the specification are the phrases "placing a[n] [first/second/third] outcall," "outcall is placed," and "outcall is to be placed" limited by "originating."

Furthermore, combining Defendants' proposed definition of these phrases with Defendants' proposed definition of "outcall" yields a redundant and nonsensical claim. For instance, claim 1 of the '188 Patent reads in part "placing a first outcall from a call processing system," and inputting Defendants' proposed constructions would read "originating a request for a first call originated from the call processing system from a call processing system." Such a confusing result would suffice only to confuse the jury, which is the antithesis of proper claim construction.

### 2.      Defendants' Answering Position

Calls are enabled through complex networks of interconnected equipment; this equipment coordinates communications through the exchange of signaling information. Thus, one call originated from a calling party could arguably involve multiple requests from multiple devices others than the calling party's device. Accordingly, Defendants propose a construction that distinguishes the actor who placed a new call, i.e., the entity that actually *originated* the request for the new call, from some intermediary device that simply passed along the call request originated by someone else. It also clarifies, in accordance with the plain meaning of "placing," that a new call is originated.

The patents identify some of the networks and devices necessary to enable a call, including, for example, a local exchange switch, local gateway, central gateway, servers, Internet, PSTN, POTS network, LEC, IXC, ISP, MSC/VLR, HLR, BS, SIP proxy, firewall, and PBX/AA.[11]  While these pass-through, intermediary devices may *request* calls by processing and

---

[11] *See e.g.* JA-CP 110 at Fig. 1; JA-CP 112 at Fig. 3; JA-CP 124 at Fig. 16; JA-CP 142 at Fig. 31.

passing along call requests originated by someone else, these devices themselves do not *originate* new calls.[12]   As described in the patents, only the calling party and the call processing system can originate the new call.[13]   Therefore, the intrinsic record supports Defendants' construction that specifies that the claimed step of "placing" a call is performed by the one "originating a request for" the call, and not by an intermediary.

CallWave agrees that "placing" a call involves "requesting" a call.   But using the word "requesting" alone—as CallWave suggests—is overly broad, because as described above, one call originated from a calling party could arguably involve multiple requests from multiple devices other than the calling party's device.   Indeed, the arguments CallWave advances do not support its construction.   First, CallWave again criticizes Defendants' use of the term "originating," but as described above, that is the exact term used by the patents themselves. Second, CallWave asserts that the intrinsic record does not limit the term "placing" to mean "originating."   But the specification equates "placing" with "originating" by teaching that a call is *placed* in response to an instruction to *originate* a call, i.e., a new call is originated.   *See e.g.* JA-CP 134 at Fig. 24; JA-CP 169 at 47:30-35.   Third, CallWave mechanically substitutes the claim terms "outcall" and "placing" with Defendants' respective constructions for those terms, and argues that the resulting phrase includes "redundan[cy]."   However, [t]he purpose of claim construction is to "determin[e] the meaning and scope of patent claims," *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citation omitted), not to find exact synonyms that could replace the claim terms in every conceivable scenario without

---

[12] *See e.g.* JA-CP 175 at 59:4 ("SIP is a request-response protocol."); JA-CP 175 at 60:4-6 ("[T]he request may be redirected or may trigger a chain of new SIP requests by proxies."); JA-CP 179 at 67:51 ("[T]he call request passes through the corporate firewall.").

[13] *See e.g.* JA-CP 128 at Fig. 19B ("Calling Party 1102 originates call to Called Party Phone Line 1114."); JA-CP 166 at 41:4-5 ("[T]he call processing system originates a new call.").

redundancy.  *See 01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1296 (Fed. Cir. 2012) (rejecting an argument that two proposed constructions would be redundant when inserted into a claim, because there is no "authority for the proposition that construction of a particular claim term may not incorporate claim language circumscribing the meaning of the term").

### 3.    Plaintiff's Reply Position

If the Court decides this readily understood phrase needs construction, then the dispute is whether this phrase should be construed to mean "requesting a call" (as CallWave argues) or "originating a request for a call" (as argued by Defendants.)  There are at least three problems with Defendants' construction.

First, the claims do not support Defendants' additional limitation.  As discussed with respect to "outcall," claims 14, 37, and 40 of the '188 Patent merely require a call to be placed, but other claims, such as claim 17, identify the entity placing the call.  Attaching Defendants' limitation would improperly import new limitations to claims 14, 37, and 40.

Second, Defendants' contention that the specifications equate "placing" with "originating" is wrong.  Defendants point to Figure 24 of the '188 Patent which discloses in step 1906 a "re-originating instruction" and in step 1910 that an outbound call is "place[d]."  (JA-CP 0134 at Fig. 24.)  But, the use of two *different* words implies a different meaning.  Under Defendants logic, one would also conclude that the specification also equates "placing" with "conferencing," by teaching that a call is *placed* in response to a *conference* instruction.  (JA-CP 0134 at steps 1914 and 1916.)  Similarly, the specification teaches *placing* a call in response to an inbound call, but that does not equate "placing" with "inbound call."  The patentee clearly used "placing" more broadly than "originating."

Finally, the insertion of the term "originate" merely adds confusion and invites further construction as discussed with "outcall."

### 4. Defendants' Sur-Reply Position

CallWave rehashes its "outcall" arguments for the "placing" claim term, and seeks to artificially broaden the scope of the claims to cover anything "requesting" a call. Defendants seek to construe this term by using a more precise term – "originate" – which the CP Patents themselves use to describe the act of placing a call. *See, e.g.,* JA-CP 168 at 45:33-39.

### D. Switched network

### 1. Plaintiff's Opening Position

The parties dispute the scope of the claim term "switched network." This term is readily understood in the context of the claims and the specification and does not require a specialized construction. If the Court determines construction is necessary, "switched network" should be construed as "communication network with switches, for example a packet switched network and/or a circuit switched network."

Defendants propose to further limit "switched network" to only a "circuit switch network." The claim language itself precludes such a limitation. For example, claim 10 of the '428 Patent describes a method of processing calls, including the step of "placing a third call . . . over the switched network to the second terminal." (JA-CP 0102 at 20:46-47.) Claim 12, which depends from claim 10, states "the called party communicates with the caller using Voice over Internet Protocol (VoIP)." (*Id.* at 20:51-53.) As explained by the specification, VoIP communications use packet switching technology and thus use packet switched networks, another type of switched network. (Lucantoni Dec. at ¶¶ 18-21.) Because the switched network of claim 12 specifically requires VoIP communications, the "switched network" of claims 10 and 12 cannot be limited to only circuit switched networks.

The '428 specification further describes the networks over which calls can be received and placed, including "coupling of the call manager subsystem into the PSTN through voice

trunk circuits 118 directly interfacing with the Inter Exchange Carrier's (IXC) circuit switched *or*

*packet switched telephony network*." (JA-CP 0095 at 6:12-15.) Thus, a person of ordinary skill

in the art, reading the claims in the context of the specification, would understand the term

"switched network" to include packet switched networks.  (Lucantoni Dec. at ¶ 17.)

Thus, Defendants' proposed construction contradicts the intrinsic evidence by excluding

packet switched networks, a type of switched network explicitly disclosed in both the claims and

the specification.

## 2.      Defendants' Answering Position

Defendants' construction of "switched network" is consistent with its ordinary and

customary meaning at the time of the filing of the '428 Patent.  In fact, the dictionary definition

of "switched network" is the public switched telephone network ("PSTN").  *Newton's Telecom*

*Dictionary* 816 (16th ed. 2000) ("Switched Network:  See PSTN").  As CallWave's own expert

explains, "[t]he PSTN is a circuit switched network."  Lucantoni Dec., ¶18.  The intrinsic record

also supports Defendants' construction.

"Switched network" in claims 10 and 16 of the '428 Patent also can only mean "circuit

switched network," because the applicant disclaimed any broader interpretation to overcome

prior art.   During prosecution, the examiner rejected the application for U.S. Patent No.

7,103,167 (the "'167 Patent"),[14] as obvious over combinations of U.S. Patent No. 5,805,587

_____

[14] The '428 Patent is not only a continuation of the '167 Patent, but it contains a terminal
disclaimer to the '167 Patent to overcome a double patenting rejection of all claims.  '428 File
History, March 2, 2009 Office Action, at 2.  "When the application of prosecution disclaimer
involves statements from prosecution of a familial patent relating to the same subject matter as
the claim language at issue in the patent being construed, those statements in the familial
application are relevant in construing the claims at issue." *Ormco Corp. v. Align Tech., Inc.*, 498
F.3d 1307, 1314 (Fed. Cir. 2007).  Thus, the prosecution history of the '167 Patent, including the
disavowals made to obtain allowance, apply with equal force to the '428 Patent.

("Norris") with several other references.[15]  To overcome this rejection, the applicants argued that "Norris does not disclose call screening over a POTS [plain old telephone service] or wireless device via a switched network.  Rather, Norris uses the packet switched network."  JA-CP 343.[16] Thus, the applicants unambiguously disavowed call screening over a packet switched network in the '428 Patent and confirmed that the "switched network" refers to a circuit switched network, specifically POTS or wireless networks.  *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003).

Claims 10 and 16 of the '428 Patent require that the "switched network" over which the third call is placed be the same as "the network" over which call screening occurs. This is because "a network," at which the first call is received, is the only antecedent basis for "the network," over which the screening occurs and "the switched network."  Because call screening has to be "over a POTS or wireless device via a switched network" (JA-CP 343, 356, 359), "the switched network" also must be a circuit switched network.[17]  Having disclaimed a "packet switched" network for the call screening function, CallWave cannot now attempt to recapture this claim scope for the "switched network," as they must be the same network.

In contrast, CallWave offers a construction that is altogether unsupported.  For example, CallWave's citation to 6:12-15 of the '428 Patent confirms that the call management subsystem is attached to the circuit-switched PSTN.  *See also id.* at 5:30–32 ("a Call Management (CM)

---

[15] Norris discloses sending information to the called party via the Internet, i.e., a packet-switched network, about an incoming call.

[16] The applicants confirmed the examiner's understanding in their own summary of the interview.  JA-CP 356–59 ("Agreement was reached that [Norris] does not disclose and is not directed to call screening via a switched network, using a POT[S] device, or using a wireless device.")

[17] This is the only way in which call screening is discussed in the applicant's provisional application 60/719,635, which consists of CallWave product brochures.  *See* Ex. 2, U.S. Prov. App. 60/719,635 at 9, 11 – 15.

subsystem 108, which serves as the interface to the PSTN 104 to manage inbound and outbound telephone calls").  That passage goes on to explain that the system is either "configured as, or to appear as, a telephone end office" or is "locally attached to a LEC switch."  *Id.* at 6:21–26.  CallWave's argument that the IXC (used for long distance calls) may be either circuit switched or packet switched is irrelevant—the method of transmission between the two endpoints of the IXC does not alter that the CM system receives inbound calls from the circuit-switched PSTN, just as a telephone end office receiving a long distance call remains part of the PSTN.

CallWave argues that the "switched network" in independent claim 10 must include packet switched networks because dependent claim 12 requires that "the called party communicate[] with the caller using . . . VoIP."  However, the method of claim 10 ends with "a third call . . . over the switched network" but does not disclose actual communications between the parties.  In short, nothing in claim 12 indicates that the VoIP communication is conducted using the "switched network" of claim 10.[18]

### 3.    Plaintiff's Reply Position

The '428 Patent specification describes both circuit switched networks and packet switched networks.  (*E.g., see* JA-CP 0095 at 5: 25-27, 6:12-15; JA-CP 0096 at 7:11-24; and JA-CP 0104 at 23:47-48, 23: 49-50.)  A person of ordinary skill in the art, reading the claims in light of the specification, would understand the claim term "switched network" to encompass, at the very least, these two types of "switched" networks explicitly disclosed by the specification.  Moreover, the extrinsic evidence cited by Defendants only demonstrates that a "circuit switched network" is a type of switched network, and in no way excludes other types of switched

---

[18]  In addition, as discussed below, a VoIP call could take place across a circuit-switched connection.  For example, a VoIP call could take place over a dial-up Internet connection.  *See infra* § L ("[a]/[the] network").

networks, *e.g.*, a packet switched network.

Defendants argument regarding alleged disclaimer during prosecution of U.S. Patent Application No. 10/439, 601 ("the '601 Application")[19] is incorrect.   The patentee did not disclaim any scope of the claimed "switched network" during prosecution.  Defendants' careless analysis simply misapplies the doctrine of disclaimer.   Claim 1 of the '601 application recites two calls.  (JA-CP 0348.)   A *first call* is "received over a switched network at a call manager system.   (*Id.*)   A *second call* originates "from the call manager system."   (*Id.*)   Claim 1 was amended to require that the **second call** be directed to "at least one of a POTs telephone or a wireless phone."   (*Id*.)   Claim 1 does not associate the POTs telephone or wireless phone to which the **second call** is directed, with the "switched network" over which the **first call** is received.  (*Id.*)   The patentee argued that "Norris does not even discuss providing a caller phone number" to a wireless phone or a POTS phone, as is required in claim 1 for the **second call**.  (JA-CP 0359.)   The patentee, however, said nothing about the first call or the switched network. Thus, the patentee did not disclaim any scope of the claimed switched network.

Claim 7 of the '601 application is also instructive.   It originally recited receiving a *first call* at a call processing system over a switched network and a placing a *new call* from the call processing system over the switched network.  (JA-CP 0350.)   To overcome Norris, the patentee amended the claim to require that the *new call* be directed to at least one of a POTs or wireless telephone.   (*Id.*)   The patentee did **not** argue that the term "switched network" was limited to only circuit switched networks.   Instead, the patentee further limited the claim by **adding** a limitation that the new call was direct to POTs and wireless phones – an amendment that would be superfluous if Defendants construction were correct.   Accordingly, packet switched networks

---

[19] The '601 Application granted as U.S. Patent No. 7,103,167 ("the '167 Patent").  The '428 Patent is a continuation of the '167 Patent.

were not unambiguously disclaimed by the patentee.

Claim 12 further confirms that the patentee did not disclaim packet-switched networks. It makes clear that the called party communicates using VoIP (*i.e.,* a packet switched technology). (JA-CP 0102 at 20:51-53.)  Claim 12 would be nonsensical if independent claim 10 were limited to circuit switched networks.

Defendants also contend that claims 10 and 16 of the '428 Patent "require that the 'switched network' is limited because the third call is placed over the same as 'the network' over which call screening occurs."  Defendants' argument fails because packet switched networks were not unambiguously disclaimed and "switched network" is not limited to only circuit switched networks.  Therefore, the various networks in claims 10 and 16 of the '428 Patent can include both circuit switched networks and packet switched networks.

CallWave's construction for "switched network" is well-supported by the intrinsic record.  (*See e.g.*, JA-CP 0095 at 6:12-15; JA-CP 0086 at FIG. 1; JA-CP 0087 at FIG. 2.)  FIG. 1 discloses that the Call Processing System (124) can receive a call "through voice trunk circuits 118 directly interfacing with the Inter Exchange Carrier's (IXC) circuit switched or packet switched telephony network.  (JA-CP 0086 at FIG. 1; 6:12-15)  Thus, the specification clearly envisions the IXC network using both circuit switched and packet switched networks.  (JA-CP 0086 at FIG. 1; JA-CP 0095 at 6:12-15)  For example, a call may originate from the Calling Party phone (102) over the telephone line (134) to the local exchange switches ("LEC") (126) and then be directed to the IXC "circuit switched *or* packet switched telephony network," before exiting through voice trunk circuits (118) to the Call Processing System 124.  (JA-CP 0086 at FIG. 1.)  Moreover, computer terminal 110 may also be connected directly to the Internet 106 via broadband connection and communicate via VoIP over the Internet using packet switching.  (JA-

CP 0096 at 7:7-27.)  Thus, the '428 Specification provides ample support for "receiving over a network at a call processing system a first call," using both circuit switched and packet switched networks.

### 4.    Defendants' Sur-Reply Position

CallWave apparently concedes that there is only a single network in Claims 10 and 16 of the '428 Patent, as it offers no response to Defendants' argument.  Nor does CallWave appear to dispute that the patentee was required to disclaim call screening over a packet-switched network to overcome the Norris prior art during prosecution of the parent of the '428 Patent.[20]  Instead, CallWave asserts that the disclaimer was directed only to the network for the "second" or "new" call, and not for other calls.  Because all three instances of "network" in these claims refer to a single network, a disclaimer as to the "new" or "second" network extends to each of the other references to "network" – each must refer to a circuit-switched network.[21]

Most of the rest of CallWave's reply repeats the flawed arguments of its opening brief, which Defendants have already addressed above.  CallWave also cites to 5:25–27 of the '428 Patent, which is the only usage of "switched network" in the specification (other than a summary recitation of the claims).  This passage, however, explains that the various devices are linked "to a Public Switched Network (PSTN) 104 and to a common data network, such as the Internet 106."  JA-CP 95 5:26–27.  That is, the only use of "switched network" in the specification defines it as the PSTN, which as the parties agree, is a circuit-switched network.  Lucantoni

---

[20] CallWave states that "[t]o overcome Norris, the patentee amended the claim to require that the *new call* be directed to at least one of a POTs or wireless telephone" and "[t]he patentee argued that 'Norris does not even discuss providing a caller phone number' to a wireless phone or a POTS phone, as is required in claim 1 for the ***second call***."  *Supra*.

[21] As discussed above, this is consistent with the technical dictionary definition of "switched network" as "PSTN."  Contrary to CallWave's assertion, "PSTN" is not merely an example, but is the entire definition of the term."  NEWTON'S TELECOM DICTIONARY 816 (16th ed. 2000).

Dec., ¶ 18.   This passage also demonstrates that the specification describes packet-switched networks, such as the Internet, as "data networks," not as "switched networks."

### E.      Bridging the … [out]call and the … [out]call / causing … to be bridged

#### 1.      Plaintiff's Opening Position

Whether or not the Court decides to construe the terms "call" and "outcall," the phrases "bridging the first/second call and the first/second outcall" and "causing the first/second call and first/second outcall to be bridged" need not be independently construed. The parties agree that "bridging[ed]" means "joining[ed]" - the dispute is over Defendants' proposed construction of "call" and "outcall."    If construed, these phrases should be construed to mean "joining the first/second call and the first/second outcall" and "causing the first/second call and first/second outcall to be joined."

#### 2.      Defendants' Answering Position

Defendants' construction is correct because it clarifies, consistent with the intrinsic record, that "bridging" facilitates communication by joining two previously independent circuits that pass voice and signaling information.  CallWave does not dispute that "bridging the first call and the outcall" (and its variations) refers to the joining of two independent connections (the call and the outcall).

A call connection process using bridging begins with a caller making a first call to a called party.  JA-CP 96 at 8:39-41.  Rather than being routed directly to the called party, this first call is received by a CPS (e.g., the IAM system).  JA-CP 98 at 12:50-52.  The CPS "answers" the first call, by establishing a full duplex, two-way talk path with the calling party.  *Id.* at 12:57-59. The CPS then forms a separate call leg—the outcall—from the CPS to the called party's phone. "At state 517, the IAM system 124 **initiates a new call to the called party phone** 112."  JA-CP 99 at 13:21-22.  Once these two independent calls each consisting of signaling and voice paths—

have been established, the CP system then performs the step of "bridging" the two call segments (the first call and the outcall). It acts as a bridge between the two. *Id.* at 13:25-27. "[T]he IAM system 124 then bridges, in full duplex mode, the inbound call between the calling party and IAM system 124 with the outbound call between the IAM system 124 and called party's line 114." JA-CP 98 at 11:55-60.

The following annotated figure (figure 5A from the '428 Patent), provides a graphical representation of the "bridging" function:



At "state 520" (i.e. row 20), the IAM system (i.e., the CPS) "bridges" by spanning the gap between two independent calls: a first call (blue arrow) between calling party 102 and IAM System (*see* state 506, "2-way talk path between IAM system 124 and Calling Party 102") and a second call (green arrow) between IAM System and called party telephone 112 (*see* state 519, "IAM system 124 announces call to Called Party 112"). *See also supra* § A ("Background"). This same description of bridging, in which the CPS "bridges the two ends of [a] call together"

after a call has been answered (both signaling and voice path are present) is clearly detailed in the prosecution history as well.  *See* Ex. 2, U.S. Prov. App. 60/719,635 at 15.

The CP Patents are clear that a bridged telephone call provides users the same basic functionality as any other telephone call.  For this to be true, both signaling information and a voice path must be connected.  For example, a called party can hang up the phone "thereby terminating the bridged call."  JA-CP 100 at 16:66-17:10.  Hanging up the phone provides an "on hook" signal—signaling that the call should be concluded.  This functionality would be unavailable if the connection of the calls was limited and did not include signaling information.

In addition, since the entire point of any call (including a bridged call) is to allow the parties to speak, a bridged call must connect the voice paths of the call and outcall.  This is further evidenced by the ability in certain embodiments for the user to be able to screen a call by listening to an audio message from the calling party in substantially real-time.  Streaming this voice requires joining the voice paths of the call and outcall.[22]

### 3.     Plaintiff's Reply Position

The dispute with this phrase results from Defendants' improper restrictions on the term "call" in requiring a "voice path" and "signaling information."   As discussed above, the specification teaches that a call may have "data, voice *and/or* signaling information," but does not require *every* call to have both voice and signaling information.

First, Defendants cannot cite a single reference in which the patents state that bridging involves joining voice paths and signaling information.  Nor do Defendants provide any evidence that a person of ordinary skill in the art would understand bridging to include those requirements

---

[22] Regardless of what the call processing system or called party monitors, the basic components of signaling information and voice path must be included for any phone call, including a bridged phone call.

in light of the specification. Defendants provide only attorney argument, but fail to explain how their construction is compatible with the disclosed embodiments that use a packet-switching network in which there is no defined "voice path," but merely connections opened long enough to send discrete packets. (Lucantoni Dec. at ¶¶ 14-15.)

Second, Defendants' construction is technically incorrect with regard to circuit switched networks. Defendants state that the allegedly independent circuits "pass voice and signaling information." The patent specifications teach otherwise, however, teaching that signaling information is not contained in the same circuit as the voice traffic. (JA-CP 0148 at 5:42-47.) Thus, the intrinsic record does not support Defendants' argument that "bridging" joins "two previously independent circuits that pass voice and signaling information."

Third, Defendants contend that bridging occurs only after a voice path and signaling path has been established. The patent teaches otherwise. For example, Fig. 26 of the '188 Patent describes that two calls ([1]inbound call from caller and [2] outbound call to subscriber) are bridged (step 1104A) *before* a talk path is opened to subscriber (step 1108A). Similarly, in the Provisional Application cited by Defendants, the "CallWave Softswitch bridges the two ends of the call together in step 4, then later in step 5, the Callee answers the phone and the Callee and the subscriber begin conversing. (Ex. 2 at 15.) Thus, at the time the bridging occurs, the Callee has not yet answered the phone so there is no voice path.

Defendants' construction is based on a false premise that "the entire point of any call . . . is to allow the parties to speak." To the contrary, the entire purpose of CallerID functionality is to allow the called party to *avoid speaking* by not establishing a voice path if the called party determines that the call is unwanted. This is further evidenced by the provision in some embodiments with only CallerID functionality, and no voice message.

### 4.   Defendants' Sur-Reply Position

CallWave again premises its argument on the faulty position that a call need not comprise both voice and signaling.  As discussed above, CallWave's only support for this proposition is a truncated quote from the specification.  CallWave also does not address Defendants' argument that the CP Patents' disclosure regarding bridging requires bridging two "calls" (i.e., comprising signaling and voice path).

CallWave's citation to a passage on the separation of signaling and voice is also off-point.  This passage does not address bridging, and does not address that both of these components are present at the time of bridging.  The entire point of bridging two calls is to take two independent voice paths – one to the calling party and one to the called party – and join them at a central point to allow the calling and called party to converse.  Eliminating the connection of two voice paths from the definition of bridging would contradict the purpose of the invention.

Finally, CallWave argues that a passage from the prosecution history of a patent to which '428 Patent does not claim priority supports its proposed construction.  CallWave's reference to this file history is of limited value because the '428 Patent claims priority back to a 2002 application that does not contain this disclosure.  Substantively, CallWave argues that the passage teaches bridging before two voice paths are available.  It says no such thing and does not support CallWave's construction.

### F.   Forward[ed]

#### 1.   Plaintiff's Opening Position

"Forward[ed]" is a common English word that any judge or jury will readily understand, and the intrinsic evidence does not specially define it or disclaim any of its scope.  If construed, the term should be construed according to its plain and ordinary meaning to mean "redirect[ed]." (Lucantoni Dec. at ¶ 22.)

While Defendants appear to agree that "forward" means "redirect," Defendants tack on several additional limitations that are neither suggested by the claims nor supported by the intrinsic record and instead create ambiguities.  For example, Defendants attempt to improperly limit what and why something can be forwarded by construing the term to mean "redirecting *a call directed for a first destination to a second destination based on a predefined rule*."

First, the claims themselves specify what is forwarded, thereby rendering the language "a call directed for a first destination to a second destination" redundant in some claims and, in other claims, results in a change in claim scope.  For example, claim 3 of the '188 Patent, claim 21 of the '901 Patent, and claim 55 of the '428 Patent already expressly recite a specific call that is forwarded (*i.e.*, "the first call is forwarded to the call processing system," "the inbound call is a forwarded call," "the first call is forwarded to the processing system," respectively), while claims 10 and 16 of the '428 Patent recite that a "caller" – not a "call" – is forwarded (*i.e.*, "forward the caller to a second terminal.")  (JA-CP 0102 at 20:44-45.)

Second, nowhere in the intrinsic record is there any requirement that forwarding must be "based on a predefined rule."  (Lucantoni Dec. at ¶¶ 23-25.)  To the contrary, the specification teaches that "the called party can, via a phone key press, voice commands, or otherwise, instruct the call processing system to … ***forward*** … the caller's call to another target/second phone, such as a POTs phone, a wireless phone, a VoIP phone, a networked computer, or other communication device."  (JA-CP 0157 at 24:32-37; JA-CP 0249 at 24:21-26; *see also*, JA-CP 0099-0100 at 14:59-15:3.)  Such forwarding is not based on a predefined rule, but on commands (*e.g.*, key press, voice commands, or otherwise) that a user may execute spontaneously to forward a call.  Thus, Defendants' construction excludes disclosed embodiments, which is rarely, if ever, correct.  *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008).  Nonetheless,

some of the asserted claims expressly recite that forwarding is based on an "instruction" (*e.g.*, claims 10 and 16 of the '428 Patent) or on "at least one of a call forward on ring-no-answer condition, a call-forward-all calls condition, or of a forward-on-busy condition" (*e.g.*, claim 3 of the '188 Patent).   In these instances, Defendants' construction creates further ambiguity and confusion as to what is a "predefined rule" and whether the each of the aforementioned "instruction" and "conditions" is such a "predefined rule."

## 2.      Defendants' Answering Position

The term "forward" is consistently used in the specification of the CP Patents to refer to calls that are "forwarded . . . to the [call processing] system" using predefined rules implemented by the called party's local phone company including "call forwarding on busy, call forwarding on ring-no-answer, and call-forward-all calls."   *See* JA-CP 93 at 2:25-30; JA-CP 95-98 at 5:52-56; 8:30-45; 10:27-30; 12:50-52.   In numerous claims of the CP Patents, the term "forward" is used in a manner consistent with this disclosure – to refer to an initial forwarding of a call to the call processing system by the telephone company pursuant to a pre-defined rule (i.e., a rule that was defined *before* the incoming call was received).   *See e.g.* JA-CP 20-21 at claims 13, 19, 29; JA-CP 104 at claim 55; JA-CP 181 at claims 3, 4; JA-CP 262-63 at claims 1, 21.

While claims 10 and 16 of the '428 Patent do not claim automatic forwarding within the telephone system, the term "forward" as used in those claims can (and should) be construed consistently with its usage throughout the remainder of the intrinsic record.   *Omega*, 334 F.3d at 1334 (stating that "unless otherwise compelled. . . the same claim term in the same patent or related patents carries the same construed meaning").   Both claims 10 and 16 recite "receiving an instruction from the called party to forward the caller to a second terminal" and subsequently "placing a third call from the [call processing] system . . . to the second terminal."   Consistent with the other usage of "forward" throughout the intrinsic record, the specification is clear that a

called party can "manually specify further call treatment" by providing an instruction through a menu of predefined options, such as "take the call on home phone," or "take the call on office phone." JA-CP 98 at 12:29-40.

CallWave's argument that the specification details "forwarding" through a non-predefined rule is mistaken. First, CallWave cites portions of the '188 and '901 specifications, neither of which contain claims that use "forwarding" with respect to a user input. *See* JA-CP 181 at claim 3 and JA-CP 20-21 at claims 13, 19, 29, and 39-41 (all using "forward" in relation to forwarding to the call processing system.) In addition, CallWave cites to disclosure that did not appear in the '428 Patent, and *was added after the filing of the application for the '428 Patent*. It is black letter law that new matter introduced in follow-on applications cannot be used to expand the scope of claim in earlier applications. *Joao Bock Transaction Sys., LLC v. Jack Henry & Assocs., Inc.*, Case No. 12-1138-SLR at 3 (D. Del. Jun. 30, 2014) (finding that new matter must be disregarded in construing the scope and meaning of the claims) (citing *Dresser Indus. Inc. v. United States*, 432 F.2d 787, 793 (Ct. Cl. 1970)); *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1353 (Fed. Cir. 2000) (interpreting "the claim at issue to cover no more than what the specification supported at the time of filing").

Plaintiff's construction eviscerates the common understanding of the term "forward" held by those skilled in that art. A leading technical dictionary defines "forward" consistently with that term's use in the CP Patents – as a feature that redirects incoming calls based upon a previously defined instruction: "[a] switch feature that temporarily redirects incoming calls. The incoming calls are redirected from the forwarding telephone to another destination by the person associated with the telephone or by the computing domain. The other destination has ***previously been defined*** to the switch by the device associated with the telephone." *Newton's Telecom*

37

*Dictionary* 333 (15th ed. 1999) (emphasis added).   That common understanding is likewise repeated throughout the asserted patents and cannot be contradicted here.[23]

### 3.     Plaintiff's Reply Position

Defendants' argument is based on its demonstrably mistaken assertion that "forward" is limited to calls that are "forwarded" using predefined rules.   Yet, the patent specifications are replete with examples to the contrary.   Moreover, the asserted claims themselves specify what is forwarded and to where.   (JA-CP 0181 at 72:41-42; JA-CP 0263 at 51:14-15, 51:32-33; JA-CP 0104 at 23:50-51; JA-CP 0102 at 20:44-45.)

Claims 10 and 16 of the '428 patent explicitly require "receiving an instruction from the **called party** to forward the caller to a second terminal."   Thus, the plain language of the claim requires the forwarding to result from an instruction from the called party, not based on a "predefined rule."   (JA-CP 0102-3 at 20:46; 21:4-7.)   The claim also makes clear that the claimed invention allows the called party to "screen the caller," thereby allowing the caller to make a spontaneous decision to instruct that the call be forwarded.   (JA-CP 0103 at 21:1-3.)

Defendants admit that the patents include embodiments that are not based on a predefined rule, and thus seek to construe their own construction by arguing that the "predefined rule" includes the called party "manually specify[ing] further call treatment" by providing an instruction.   In other words, under Defendants new construction, a predefined rule is not a *rule* that must be followed, but an *option* available to the user.   Citing call forwarding examples disclosed in the '428 patent (JA-CP 0098 at 12:29-40), Defendants admit that their definition of

---

[23] To the extent that Plaintiff is attempting to suggest that any call can be forwarded at any time, that suggestion is inaccurate.   As the definition above (and all the examples in the specification) demonstrates, a call can be "forwarded" before the call is answered—when it is "incoming." When somebody "redirects" an on-going call to a different line, that movement of the call is not referred to as a "forward", rather it is a transfer.

"predefined rule" is met by selection of "predefined options" such as menus of visual or voice options and the like which may be "manually specified" by the called party. (*Id.* at 12:20-40.) But the specification makes clear that use of an explicit menu is optional and that other selection methods are contemplated. (*Id.,* "[T]he options *can be* provided via a visual menu, a voice menu, or the like.") Those skilled in the art would understand that the called party may make the selection by "a phone key press, voice commands, or otherwise, instruct the call processing system to … *forward* … the caller's call to another target/second phone, such as a POTs phone, a wireless phone, a VoIP phone, a networked computer, or other communication device." (JA-CP 0157 at 24:32-37; JA-CP 0249 at 24:21-26; *see also,* JA-CP 0099-0100 at 14:59-15:3[24].)

Defendants further contend that a call may only be forwarded before a call is answered and not while the call is ongoing. But the intrinsic record makes clear that a call may be forwarded during the call. For example, each of claims 10 and 16 of the '428 Patent recite "receiving an instruction from the called party to forward the caller to a second terminal," which puts no limitations on when a call may be forwarded. (JA-CP 0102 at 20:44-45; JA-CP 0103 at 21:4-5.) Moreover, the inventors stated explicitly, "The called party can optionally *forward* the call back to their cell phone or to another phone/phone line *during the call with the called party* by pressing an appropriate phone key, such as the "2" key. (JA-CP 0069 at 29:8-11. *See also* JA-CP 0069 at 25:22-28; 25:33-38, 25:55-64, 26:10-36.) Ignoring actual usage of the term by the inventors, Defendants rely only on attorney interpretations of dictionary definitions which do not overcome the overwhelming evidence from the intrinsic record.

---

[24]  Defendants falsely allege that CallWave seeks to expand the scope of "forwarding" in the '428 Patent. To the contrary, CallWave insists that the claims be given the claimed scope. Defendants' argument about new matter is unavailing because the claimed subject matter was in the original application from which the '428 patent derived. (*See* Ex. 5 at 32 (claim 14.).

### 4.    Defendants' Sur-Reply Position

CallWave acknowledges that the CP Patents disclose predefined call forwarding options, but argues that, because the patents disclose *other* call handling options that are not predefined, this somehow means that forwarding also need not be predefined.  CallWave cites no intrinsic evidence to support this argument.

Similarly, CallWave states that the CP Patents contemplate forwarding during a call.  In support, CallWave cites the '110 Patent ("[t]he called party can optionally forward the call back to their cell phone . . . during the call").  This same disclosure does not appear in the '428 Patent, whose claims CallWave cites as exemplary regarding the forward feature, and in fact, this disclosure was added only to later specifications.  CallWave cannot rely on new matter to artificially expand the scope of this claim term.  *See Joao*, No. 12-1138-SLR at 3.

### G.    Transfer[ring]

### 1.    Plaintiff's Opening Position

"Transfer[ring]" is a common English word that any judge or jury will readily understand, and the intrinsic evidence does not specially define it or disclaim any of its scope.  If construed, the term should be construed according to its plain and ordinary meaning to mean "redirect[ing]."  (Lucantoni Dec. at ¶ 26.)

When viewed in light of the intrinsic record, it is clear that the patent uses the terms "forward" and "transfer" interchangeably to mean "redirect."  (Lucantoni Dec. at ¶¶ 27-29.)  Defendants use "move" instead of "redirect," but there is no apparent difference between them.  Defendants, however, go further and tack on several limitations that are neither suggested by the claims nor supported by the intrinsic record and instead create ambiguities.

For example, Defendants attempt to improperly limit what and where something can be transferred by construing the term to mean "moving *a call from a first device to a second device*

*identified by the user of the first device*."  But, a subset of the claims themselves specify what is transferred and to where, thereby rendering the language "a call from a first device to a second device" redundant.  For example, each of claims 19, 23, and 41 of the '110 Patent, claim 23 of the '901 Patent, and claim 11 of the '188 Patent already expressly recites what is transferred and to where (*i.e.*, "transfer[ring] the call to a/the first/second alternate destination," "transfer the call to another phone address," "transferring the third call to a destination associated with the subscriber," respectively).  Moreover, the remaining claims (claim 26 of the '428 Patent and claim 14 of the '188 Patent) instead recite a "call transfer instruction" and a "transfer destination."  Replacing "transfer" with Defendants' proposed definition in those claims renders them nonsensical and further highlights the deficiencies in Defendants' construction.

Furthermore, the intrinsic record does not require that the transfer destination must be "identified by the user of the first device."  Whereas claim 26 of the '428 Patent explicitly recites "enabling the called party to provide a call transfer instruction via the wireless phone . . .", the claim does not specify by whom the destination must be chosen.  (JA-CP 0103 at 21:58-59.)  Moreover, claim 19 of the '110 Patent only requires a single destination (*i.e.*, a first alternate destination).  (JA-CP 0080 at 51:28.)  As there is only one required alternate destination, there may be no need to explicitly "identify" the second device.  Nothing in the specification disclaims the scope of the claims as written.

Defendant's proposed construction also limits the transfer to occur from one "device" to a second "device."  The term "device" is ambiguous.  For example, the specification describes a "software telephone," which is certainly within the scope of the claim.  (JA-CP 0200 at 9:21-23.)  Also, if the callee instructs the call to be transferred to voicemail, that voicemail might be stored at some server, server farm, etc., in the cloud, and it is unclear whether defendants' construction

would preclude such as transfer.  (Lucantoni Dec. at ¶ 30.)

Other intrinsic evidence shows that transferring is not necessarily directed to a "device", depending on how that term is interpreted.  For example, claim 14 of the '188 Patent recites, "while the first outcall is in process, receiving at the call processing system a call transfer request from the subscriber, wherein the call transfer request is associated with a transfer destination." (JA-CP 0182 at 73:15-18; Lucantoni Dec. at ¶ 31.)  The claim should not be construed to preclude such embodiments, and it is unclear whether defendants are attempting to do so.

### 2.    Defendants' Answering Position

The term "transfer" as used in the CP Patents refers to moving a call from a first destination to another specified destination.  For example, Claim 19 of the '110 Patent requires giving a called party the call handling option of "transfer[ring] the call to a first alternate destination," after screening an incoming call.  JA-CP 80 at 51:28.  Claim 14 of the '188 Patent requires "placing a third outcall to the transfer destination."  JA-CP 182 at 73:19-21.  As used in the claim language, the term simply describes the act of moving a call from a first device to a specified second device.

The patents' use of "transfer" is consistent with the meaning to one of ordinary skill in the art.  For example, a leading technical dictionary provides the following definition of "transfer":  A telephone system feature which provides the ability *to move a call from one extension to another*."  *Newton's Telecom Dictionary* 811 (15th ed. 1999) (emphasis added). Transfers thus move a call from one phone extension to a second specified phone extension.  The specification repeatedly confirms this fundamental and widely understood function, noting that a called party can take a call on a landline home phone and "manually transfer the call to the called party's wireless, mobile cellphone in order to continue the conversation with the caller."  *Id.*  The called party simply enters a command that includes a new telephone number (or some other

shortened code) to select which destination will receive the transfer.  JA-CP 159-160 at 28:62-29:1.  The asserted patents all contain extensive descriptions of the well-known process whereby a party receiving a call can select a new destination to receive a transferred call:

> based on the called party selecting option (4) [call transfer], the Client application sends a corresponding instruction to the IAM system 1124 along with a specification of the desired destination station phone number. The destination number specification can be an index into the subscriber's electronic phone book or may literally be the desired destination phone number.)

JA-CP 63 at 18:12-19; *see also* JA-CP 158 at 25:14-34; *see also* JA-CP 67 at 26:33-36;

JA-CP 53 at Fig. 25B (element 1012).

Despite this evidence, Plaintiff contends that "the patent uses the terms 'forward' and 'transfer' interchangeably to broadly mean 'redirect'" a construction that obliterates the fundamental differences between these functions.[25]  But, these are technical terms with distinct meanings in the art, and those same meanings are reflected in the intrinsic record.  There simply is no indication that the patentee intended to redefine the terms "forward" and "transfer" in the manner proposed by Plaintiff.  To blur the lines between these terms now, and construe these terms "in a manner different from the[ir] plain import" would be "unjust to the public" and allow the patentee to avoid his obligation to "define [his invention] precisely."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citations omitted).[26]

### 3.    Plaintiff's Reply Position

The asserted claims themselves either specify what is transferred and to where, or instead

---

[25] CallWave accuses a single function in each of Defendants' products as being both a "transfer" and a "forward." A single accused function cannot be both – much less additionally be the "handling" and "redirection" functions, as CallWave asserts.

[26] Nor can CallWave discredit Defendants' proposed construction by claiming that the word "device" is unduly limiting.  Defendants' used the generic term device to avoid any argument that it was crafting language (e.g., "phone") that would not include the full complement of telephone devices.

recite a "call transfer instruction [request]" or "transfer destination."   (JA-CP 0080 at 51:28, 51:43-44, 52:29-30; JA-CP 0263 at 52:5-6; JA-CP 0182 at 73:2-3; JA-CP 0103 at 21:57; JA-CP 0182 at 73:15-19.)   Defendants do not dispute that the intrinsic record does not require that the transfer destination be "identified by the user of the first device."   Though Defendants point to a dictionary in support of its proposed construction, notably even this dictionary definition does not limit by whom the transfer destination may be identified or even whether such an identification must be made.   Thus, this additional limitation is not warranted.

What does appear to be in dispute is Defendants' use of the term "device" in its proposed construction.   While Defendants now clarify that "device" is intended to include "the full complement of *telephone* devices," it remains unclear if this "construction of the construction" impermissibly precludes the transfer of calls to such locations as "software telephones" (residing, *e.g.*, on a personal computer), voicemail (stored, *e.g.*, on a server, in the cloud, or elsewhere), or broadly to a "transfer destination" as each of these examples are expressly contemplated by the patent (JA-CP 0200 at 9:21-23; JA-CP 0249 at 24:42-59; JA-CP 0182 at 73:15-18; Lucantoni Dec. at ¶ 30.)

Finally, Defendants incorrectly contend that the patentee never intended to use the terms "forward" and "transfer" interchangeably to mean "redirect," and present a preview of their non-infringement position by arguing that no single functionality in Defendants' products can be both a "transfer" and a "forward."   First, there are numerous examples where the patentee uses "forward" and "transfer" synonymously.   For example, each of the '428, '188, and '901 Patents describes that an "option 5" is selected to continue screening a call after *transferring* it to an alternate destination.   (JA-CP 0099 at 14:16-37; JA-CP 0155 at 19:7-28; JA-CP 0246-247 at 18:62-19:16.   *See also* JA-CP 0097 at 9:29-30; JA-CP 0152 at 14:11-12; JA-CP 0244 at 13:62-

64.)  The specification goes on to interchangeably use "forwarded" and "transferred" to describe the transferred call:

> The call setup signaling information for this outbound call is modified by the IAM system 124 to deliver the calling party number from the inbound call in the outbound call's ANI field.  This allows **the forwarded destination** station to display the "original Caller-ID" to use as a first level filter for remotely screening the call. Should the remote called party decide to ignore this call, they simply do not answer it and the IAM system 124 will abort **the transferred call attempt** after a programmable time interval or a programmable number of ring cycles.  (JA-CP 0099 at 14:38-49 (emphasis added); JA-CP 0155 at 19:29-40; JA-CP 0247 at 19:17-28.)

That is, although it is clear that a transferred call attempt is being discussed, the destination of said transferred call is referred to as "the forwarded destination."

Similarly, in each of the '188 and '901 Patents, a call transfer process is described wherein *after the outcall is successfully connected* to the transfer destination, *e.g.*, a wireless cell phone, "the called party can *press a key* to generate a tone, *such as DTMF 2*, to **transfer** the call to their home."  (JA-CP 0159 at 28:62-65; JA-CP 0251 at 28:51-54.  *See also* JA-CP 0159-160 at 28:9-29:31; JA-CP 0251-252 at 27:65-29:20.)  The specification further describes that "[t]he called party can optionally **forward** the call back to their cell phone ... during the call ... by *pressing* an appropriate phone key, such as *the '2' key*."  (JA-CP 0160 at 29:28-31; JA-CP 0252 at 29:17-20.)  Here again, it is clear that "transfer" and "forward" are used synonymously to describe redirecting a call, in this case after the call has been answered.

Finally, while "transfer" and "forward" are indeed used interchangeably throughout the patents and asserted claims, the two terms are never used simultaneously within the same claim or in any manner implying that either term should be given any different scope or meaning from the other beyond the context of the claim in which they appear.[27]  Thus, Defendants objections to

---

[27]  In particular, both terms are used in each of the '901, '428, and '188 Patents with "forward" appearing only in claim 21 of the '901 Patent, claims 10, 16, and 55 of the '428 Patent, and claim 3 of the '188 Patent; and "transfer" appearing only in claim 23 of the '901 Patent, claim 26 of the '428 Patent, and claims 11 and 14 of the '188 Patent.

"transfer" and "forward" being construed identically are unfounded.

### 4.      Defendants' Sur-Reply Position

As reflected in Defendants' construction, the term "transfer" is used consistently in the CP Patents to refer to a choice to move a call from a first device (e.g., telephone) to a *specific* second device (e.g., telephone).  Even the embodiments CallWave relies on to claim ambiguity (e.g., software phone) consistently have a "device" (e.g., personal computer hosting the software phone) to which the call is transferred.

CallWave again argues that the patentee acted as his own lexicographer in defining "forward" and "transfer" commonly.  But, to act as his own lexicographer, the patentee "must clearly express that intent in the written description."  *Merck*, 395 F.3d at 1370.  CallWave has not cited, and the CP Patents do not contain, any such explicit disclosure.  CallWave relies on a passage related to a single call handling option described as "Option 5," but this passage uses the term "forwarded" to clarify that the CPS, not the end device, forwards the call to the end device. *See* JA-CP 0099 at 14:40-45.  Even if CallWave were correct, a single instance of careless language cannot outweigh the bulk of the disclosure, or serve as proof that the patentee intended that **two distinct terms** – "transfer" and "forward" – should have a common meaning.  *See CAE Screenplates v. Heinrich Fiedler GmbH*, 224 F. 3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.").

### H.      Call handling

### 1.      Plaintiff's Opening Position

No specialized construction of "call handling" is required.  If construed, "call handling" should be construed to mean "call management."  CallWave's proposed construction is supported by the specification.  Figure 18 of the '110 Patent discloses a "call handling options

dialog box" depicting, for example, seven different call handling options. (JA-CP 0061 at 13:44-14:5.) The specification later refers to these seven "call handling options" as "call management options." (JA-CP 0065 at 21:1-2.) Thus, CallWave's construction is consistent with the specifications.

Unlike CallWave's construction, Defendants' construction is inconsistent with the claims and specifications. Specifically, Defendants require the handling of an incoming call "before establishment of a two-way voice communication." The claims do not require such a limitation, but the specification gives numerous examples in which the call handling process takes place after the establishment of a two-way voice communication. For example, the '110 Patent teaches that the called party can provide the call handling instruction "during the conversation with the caller…." (JA-CP 0067 at 25:33-38.) In another example, the specification discloses that "the called party can elect to manually transfer the call to the called party's wireless, mobile cell phone in order to continue the conversation with the caller after leaving home." (JA-CP 0068 at 27:11-18.) The specification provides teachings about how to handle the call "if the user instruction to transfer the call occurred during the call…." (JA-CP 0068 at 27:24-29.) In each of these examples, the specification expressly describes call handling taking place after the establishment of two-way voice communication.

### 2.    Defendants' Answering Position

Defendants' construction gives meaning to the term "call handling" that is consistent with the intrinsic record. "Call handling" is a corollary function to "call screening." While screening an incoming call, the called party is given "call handling options." JA-CP 80 at claim 19; JA-CP 263 at claim 25. This clear relationship is reflected in both the claims and specification. Read in context, it is indisputable that the "call handling" options are made available to the called party during the call screening process. Figure 4 of the '110 and '901 Patents, provided below, details

47

the "call handling decision" being made directly after the call screening process (element 37 refers to collection of call screening information, which is provided to the called party).  JA-CP 57 at 6:27-34.



**FIG. 4**

Indeed, both claim 19 of the '110 Patent and claim 25 of the '901 Patent start by stating that the purpose of the claimed method is to give the called party the "ability to screen calls."

The specifications of the '110/'901 Patents are consistent with Defendants' construction. For example, the specification of the '110 Patent teaches that *while a called party is screening an incoming call*, the system may provide a number of call handling options, including: answering the call on a computer, a home phone, or an alternate phone; transferring the call; or terminating the call.  JA-CP 98 at 11:61-63 ("the user can specify call handling rules that determine, at least in part, *the call treatment for an incoming call* based on one or more conditions") (emphasis added); *see also* JA-CP 61-62 at 13:44-64,  13:44-14:5, Fig. 18; JA-CP 98 at 9:14-41, Fig. 18.  In each of the descriptions of call handling provided in the specification, actions are taken by the system (1) in response to an incoming call and (2) prior to the opening of a two-way call path (i.e., commencement of voice communications between the caller and the called party).

In contrast to Defendants' construction, which is rooted in the intrinsic record, CallWave proposes a construction, "call management," that is unbounded in the time or manner of performance.   Under CallWave's construction, hanging up the telephone at the end of a telephone conversation would satisfy this claim term, because it is a form of call "management. None of the evidence cited by CallWave supports this premise or even uses the terms "call handling."   Rather, CallWave points to a transfer function that can take place after two-way communications are setup.   While this function may be described in the disclosure, CallWave has not identified any evidence that ties this function to "call handling."

Plaintiff's proposed construction also has limited value because it merely replaces the word "handling" with "management."   Claim construction is not simply a matter of finding synonymous language.   Rather, the purpose is to provide a definition that is "at least somewhat more precise than an intuitive understanding" of the claim term.   *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1351 (Fed. Cir. 2004).   CallWave's construction does not achieve this most basic goal.

### 3.      Plaintiff's Reply Position

Defendants improperly construe "call handling" to require a call handling action take place before a two-way voice communication.   Both the claims and specification refute this overly narrow construction.   For example, claim 25 of the '901 Patent includes the steps of "answering the inbound call" and "receiving a call handling instruction."   (JA-CP 0263 at 52:10-24.)   Claim 25 allows for the call to be answered (i.e., establishment of a two-way voice communication) **before** the call handling instruction is received.   This is opposite of Defendants' proposed construction which requires the call to be answered **after** the call handling instruction is received.

Further, figures 19A and 19B in the '901 Patent disclose a call processing workflow in

which a two-way voice communication is established before the handling of an incoming call attempt. (JA-CP 0227-228.) "At state 1406, the PSTN 1104 establishes a full duplex, 2-way talk path with the calling party." (JA-CP 0245 at 15:6-8.) "At state 1413, the called party notifies the IAM system 1124 that the called party wants to take the call." (*Id*. at 15:28-29.) Thus, the call handling occurs **after** the establishment of a two-way voice communication.

Defendants rely only on attorney argument. For example, Fig. 4 of the '110 Patent shows that the "Call Handling Decision" occurs after the call screening process, yet nothing supports Defendants conclusion that the call handling must occur *before* the two-way communication begins. Fig. 4 just as readily supports the conclusion that the call handling occurs *after* the call screening is complete and the two-way communication has begun. The specification supports both scenarios, stating:

> Optionally, the called party can provide the instruction to connect the call to another phone *before initiating the conversation* with the caller, such as while screening the call, *or during the conversation* with the caller, such as after accepting the initial call bridged to the called party by the call processing system.

(JA-CP 0067 at 25:33-38.) Similarly, Fig. 23 of the '110 Patent shows that the patentee used the word "handle" to describe the transfer function, whether it occurs during call screening (Handle Transfer 2308) or after the call is connected (Handle Transfer 2316.) (JA-CP 0050.)

### 4. Defendants' Sur-Reply Position

CallWave relies upon claim 25 of the '901 Patent to support its argument that the CP Patents contemplate call handling instructions after a call has been answered, and two-way communications have been established. CallWave's citation fails to support its position because claim 25 states that prior to the call handling instruction, the call is answered *by the call processing system*, not the called party. This claim, like the rest of the intrinsic record, is consistent with Defendant's construction in which a call handling instruction occurs *before* two-

way voice communications with the called party.[28]   CallWave's argument regarding claims 19A and 19B of the '901 Patent are similarly flawed, as they do not show a two-way communication established with the ***called party*** prior to the call handling instruction.

CallWave's commentary regarding Fig. 4 of the '901 and '110 Patents is similarly misguided.   The figure and associated disclosure are clear that the call handling decision comes directly after "an incoming call" and the "system identifies the [calling party]" for screening purposes.   JA-CP 0057 at 6:6-34.   CallWave also relies on an unrelated disclosure, describing "[a]n example ***call transfer process***," not a "call handling" process.   JA-CP 0066 at 35.   This disclosure has no relevance to call handling or the call screening process.

## I.     Call redirection instruction

### 1.     Plaintiff's Opening Position

Defendants ask the Court to construe "call redirection instruction."   This phrase is easily understood in the context of the claims and the specification and does not require specialized or limiting construction.   If the Court determines construction is necessary, "call redirection instruction" should be construed as an "instruction to redirect a call."

The specification provides several examples of call redirection instructions.   For example, FIG. 3 of the '588 Patent shows an example menu of call screening/handling options available to the called party when receiving an inbound call.   (JA-CP 0191; JA-CP 0197 at 4:40-42.)   The corresponding text in the specification describes several "options" available to the called party.   (JA-CP 0200 at 9:20-33.)   Certain of those options include an instruction to redirect

---

[28] Defendants believe their construction is clear that a call handling instruction must occur "before establishment of a two-way voice communication" with the called party.   If clarification is needed, Defendants would consent to the following modified construction: "handling of an incoming call attempt before establishment of a two-way voice communication ***with the called party***."

the call. For example, a call redirection instruction (Option 3) can indicate that the called party wishes to "pickup (answer) the call to talk to the caller using the 'home phone' on the phone line used to connect to the Internet (the user telephone station 112)." (*Id.* at 9:24-26.)   A call redirection instruction (Option 4) can also indicate that the called party wishes to "pickup (answer) the call to talk to the caller after transferring the call to an alternate phone or to an alternate PC." (*Id.* at 9:27-28.)   Another call redirection instruction (Option 5) can indicate the called party wishes to "continue screening the call after transferring it to an alternate phone or to an alternate PC." (*Id.* at 9:29-30.)   Call redirection instructions, however, are not limited to the exemplary "call screening/handling" options described in FIG. 3.   The specification describes an embodiment of the invention where the "IAM system 124 will stay bridged between the calling party and the called party for the duration of the call and may respond to internal events or called party actions." (*Id.* at 10:4-6; JA-CP 0203 at 15:4-7.)   A person of ordinary skill in the art would understand these internal events or called party actions to include various methods to indicate call redirection options such as transferring or redirecting the call. (Lucantoni Dec. at ¶ 32.)   CallWave's proposed construction, an "instruction to redirect a call," is consistent with and supported by these disclosed embodiments.

Defendants' proposed construction is ambiguous and unclear.   Defendants propose to define call redirection instruction as "an instruction to move a call from a first device to a second device identified by the user of the first device during the call screening process."   It is not clear what constitutes a "device" under Defendants' construction.   For example, the specification describes a "software telephone," which is certainly within the scope of the claim.   (JA-CP 0200 9:21-23.)   Because the terms "device," "first device," and "second device" are not found in the claim, substitution of Defendants' proposed construction would lead to confusing and

nonsensical claim language.

Defendants' proposed construction also imports an ambiguous (and unsupported) temporal limitation: "during the call screening process." But which element of Defendants' proposed construction must occur during the call screening process: the ***instruction*** to move a call, the ***movement*** of the call from a first device to a second device, or the ***identification*** of the second device by the user of the first device? Moreover, what events or steps define the boundaries of the "call screening process?" Defendants' proposed construction thus combines undefined elements with ambiguous limitations, neither of which are supported by the intrinsic evidence.

## 2.    Defendants' Answering Position

First, proper construction of this claim term requires "re*direction*." To "direct" a call requires that it be sent to a specific destination (e.g., a specific device). Just as an initial call is "directed" to a specific number, a "redirection" is also specifically targeted to arrive at a specified destination. This is consistent with the only usage of "redirect[ion]" in the specification, which relates to redirection of the call from network equipment to the call processing system upon a ring no-answer/busy condition. JA-CP 196 at 1:21-26. This is also consistent with the functionality in the specification that tracks with the claim language, in which an incoming call is sent "to an alternate phone or to an alternate PC." JA-CP 200 at 9:24-30; JA-CP 202 at 14:29-33.

Second, the language of the claims is clear regarding the timing of the call redirection instruction. The claims require that the called party receive a new call having the calling party's signaling information "so that the called party can determine the identity of the caller" (i.e., screen the call) and in response, provide a call redirection instruction. JA-CP 205 at 19:29-30. In the context of the claims, the call redirection instruction must take place during the call

screening process.

In contrast, Plaintiff's construction does nothing more than rearrange the order of the words "call – redirection – instruction" to "instruction – redirect – call."  This cannot be a proper claim construction, as it fails to provide any contextual insight into the meaning of the term as understood by one of skill in the art.  *Funai Elec. Co. v. Daewoo Elec. Corp.*, 616 F.3d 1357, 1372 (Fed. Cir. 2010) ("words of a patent claim are capable of many meanings; we must translate them into the underlying purpose of their user.").

### 3.      Plaintiff's Reply Position

The phrase "call redirection instruction" is easily understood and does not require specialized construction.  The phrase is clearly intended to capture any instruction that redirects a call.  Defendants apparently agree that "call redirection instruction" includes "transfer" instructions as their "call redirection instruction" construction mirrors their overly restrictive construction for "transfer."  Yet, Defendants seek to further ***narrow*** the phrase to only the subset of transfer instructions that occur "during the call screening process."

Defendants provide no clarification as to when call screening process begins and ends, so their proposed limitation is ambiguous.   But, the '588 Patent specification explicitly discloses exemplary embodiments where the call redirection instruction can occur throughout the "duration of the call."  (JA-CP 0200 at 10:4-6; JA-CP 0203 at 15:8-11.)  Moreover, as discussed above with respect to "call handling," the specification clearly teaches that instructions to transfer may occur ***before or after*** the call is answered by the caller.  Depending on how the jury might resolve the question of when the "call screening process ends," Defendants' proposed construction may exclude this embodiment and, thus, cannot be correct.

Defendants' proposed construction also requires moving the call to a second device "identified by the user of the first device."  The '588 Patent specification discloses several

exemplary embodiments of call redirection instructions, including a call redirection instruction to "multiparty conference," *i.e.*, "broadcast to multiple phones and IP Clients substantially at the same time."  (JA-CP 00204 at 18:40-42.)  It is not clear whether or not this embodiment is captured by Defendants' proposed construction - Defendants' proposed construction necessitates further construction of terms and phrases not found within the '588 Patent claims or specification.

### 4.     Defendants' Sur-Reply Position

CallWave relies on "exemplary embodiments," which generically reference "external events or called party actions" and not a "call redirection instruction." JA-CP 0202 at 15:8-11.  CallWave also argues that Defendants' construction is ambiguous because the term "call screening process" does not have a clear beginning or end.   But the purpose of "call screening," – the process of deciding whether (or how) to take an incoming call – marks the boundaries of the call screen process.   This process logically begins when the called party receives the identity of the caller (e.g., caller-ID), and must be completed before the establishment of two-way communications between the calling and called party.   Further, moving an incoming call "from a first device to a second device" does not "read out" "multiparty conference[s]" – the CP Patents *never reference* a multiparty conference as call redirection.   In fact, the embodiment that CallWave cites does not involve any "redirection," and would not even be encompassed by CallWave's own construction.

### J.     Causing the first entity call to be selectively connected to one of a plurality of potential second entity terminal destinations

### 1.     Plaintiff's Opening Position

First, this term is straightforward and no specialized construction is necessary. Rather, it should be understood according to its plain and ordinary meaning.   If however, the Court

determines that construction is necessary, the term should be construed as: "causing the first entity call to be connected to a selected one of a plurality of terminal destinations associated with the second entity." This proposed construction observes the fact that "selectively" is clearly taught to refer to the selection of "one" of the terminal destinations to which to connect an incoming call. It further makes clear that the "second entity terminal destinations" are those destinations that are "associated with the second entity." In contrast, Defendants' proposed construction, "causing a connection to the one of a plurality of potential terminals selected by the second entity," impermissibly associates the "selectively" term with the "plurality of potential destinations" rather than the selection of "one" *particular terminal destination* to which to connect the instant call. This construction is starkly at odds with the intrinsic record.

First, claim 1 of the '910 Patent read as a whole, makes clear that "selectively" refers to selecting "one" particular destination to which to connect a particular call, based on information received about the incoming call or caller. Indeed, the term "selectively" is used in in the preamble in this very sense: "A method of providing a called entity the ability to *selectively* accept phone calls, the method comprising…." (JA-CP 0020 at 7:29-30.) After reciting how the patented technology enables a called entity (referred to as the "second entity") to consider some recorded speech from an incoming caller (the "first entity"), the claim makes clear that the second entity is enabled to provide an instruction to the patented system ("receiving an instruction, over the Internet communication channel from the second entity via the networked computer, and at least partly in response to the received instruction") by which the second entity *selects* the terminal destination to which to connect the call: "causing the first entity call to be *selectively* connected to one of a plurality of potential second entity terminal destinations." Thus, sound principles of claim construction demonstrate that "selectively" refers to the selection

of the "terminal destination," not the "plurality of potential" destinations as proposed by Defendants. *See, e.g., In re Gulack*, 703 F.2d 1381, 1385 (Fed. Cir. 1983) ("The claim must be read as a whole.").

The plain and uncontroverted teaching of the specification further reinforces this proper understanding of the role of the word "selectively" in the claims.  The Abstract introduces the invention by noting: "the content of the spoken message [from the calling entity] permits the called party to ***decide how to handle*** the call." The specification further explicitly teaches how the called party, or subscriber, can handle calls on the fly by making a decision how to direct the call upon hearing some information about the incoming call:

> The client or subscriber has many ways to deal with an incoming call.  He can elect not to answer and to take a message, or he can have the call played through the personal desktop computer 25 and talk to the caller via the Internet 26, or he can have the call transferred to a different instrument such as a second telephone 24 (FIG. 1) or a cell phone 45 (FIG. 5).  There is another way for the subscriber to handle a call.  While the central server 29 is holding the call, the client can pick up a cell phone or a regular POTS phone and call in to the central server 29 and have a call cross-connect right there.

(JA-CP 0019 at 6:1-11.)

Thus, the specification makes clear the called party is selecting the "terminal destination" to which to connect an incoming call, and not, as Defendants' construction would require, selecting a group of "potential second entity terminal destinations" to which an incoming call may be connected.

## 2.      Defendants' Answering Position

Defendants' construction is supported by the language of the claims.  For example, Claim 1 of the '910 Patent involves "a call from a first entity directed to a second entity's virtual telephone number" (JA-CP 20 at 7:31-33), wherein the second entity can listen to recorded speech from the first entity "played by the network computer to the second entity" ('910 Patent

7:38-39).  The second entity then has the ability, in the words of the claim, to send an instruction

to the call processing system "causing the first entity call to be selectively connected to one of a

plurality of potential second entity terminal destinations," or in other words, send the call to one

of the second entity's plurality of devices so the call can be answered.  Thus, in the context of the

claim, this phrase should be understood to mean "causing a connection to the one of a plurality

of potential terminals selected by the second entity."

The specification is consistent with this proposed construction, describing how after

screening a call, a called party "can have the call played through the personal desktop computer

25 and talk to the caller via the Internet 26, or he can have the call transferred to a different

instrument such as a second telephone 24 (FIG. 1) or a cell phone 45 (FIG. 5)."  In short, once

the called party has screened the call, he can select the location where he wishes to be connected

to the caller.

Plaintiff offers a construction that is redundant of other portions of the same claim and

contradicts the key language of the limitation.  By inserting the language "at least partly in

response," which directly precedes this term within claim 1, Plaintiff's construction is

redundant.[29]  In addition, Plaintiff's proposal that an incoming call can be connected to any

terminal "associated" with the second entity eliminates the term "**selectively** connected," which

focuses on how the connection is made, and replaces it with a results-oriented limitation that is

satisfied as long as any connection is made.

Plaintiff's criticism of Defendants' proposed construction has no merit.  Plaintiff does not

appear to dispute that the called party can select the destination of the call.  Further, Plaintiff's

---

[29]  The relevant portion of claim 1 reads: "***and at least partly in response to the received instruction***, causing the first entity call to be selectively connected to one of a plurality of potential second entity terminal destinations."

mischaracterization that Defendants' proposed construction involves "selecting a group" is controverted by the literal words of the definition.  Contrary to Plaintiff's argument, Defendants' proposed definition reflects that there exists a plurality of potential destination terminals and one of them is selected.

### 3.    Plaintiff's Reply Position

Again, this term is straightforward and no specialized construction is necessary. To the extent any construction is necessary, Plaintiff's construction observes the fact that "selectively" is clearly taught to refer to the selection of the "one" of the terminal destinations to which to connect an incoming call.  In contrast, Defendants' proposed construction, "causing a connection to the one of a plurality of potential terminals selected by the second entity," impermissibly associates "selectively" with the "plurality of potential destinations" rather than the selection of "one" particular terminal destination to which to connect the instant call.  As addressed in Plaintiff's opening brief, such a construction is starkly at odds with the intrinsic record.

Conspicuously, in their answering brief, Defendants appear to concede the relevant association of "selectively" with the "one" rather than the "plurality.":

> Plaintiff does not appear to dispute that the called party *can select the destination of the call.* Further, Plaintiff's mischaracterization that Defendants' proposed construction involves "selecting a group" is controverted by the literal words of the definition. Contrary to Plaintiff's argument, Defendants' proposed definition reflects that there exists a plurality of potential destination terminals *and one of them is selected.*

Thus, Defendants agree with the portion of Plaintiff's construction that makes clear that "selectively" refers to the "one" rather than the "plurality" and do not contend that "selectively" refers to "selecting a group." Importantly, however, Defendants' proposed construction at best *profoundly confuses* this distinction (which all parties agree is correct), and at worst cannot be reconciled with this understanding at all. Based on Defendants' argument, it is clear the parties are in agreement on the proper role of "selectively" – thus, to the extent the Court elects to

construe this term, it should adopt Plaintiff's construction with regard to "selectively," which observes the relationship of "selectively" to which the parties agree.

The remaining issues argued by Defendants in support of their proposed construction are secondary in importance and result either from an error in reading Plaintiff's proposed construction or a concern over a profoundly unlikely reading of it. Specifically, Defendants object that Plaintiff's definition attempts to insert the redundancy of "at least partly in response…." Plainly, Plaintiff's construction does not include such language; thus, this objection should be disregarded. Next, Defendants argue that Plaintiff's construction, which renders the claim language "second entity terminal destinations" as "terminal destinations associated with the second entity," somehow reads out the word "selectively." *Id*. Although Plaintiff does not appreciate how this is the case, Plaintiff is nonetheless willing to default back to the actual language of the claim for this portion of the term, obviating this objection and resulting in a construction adjusted to accommodate Defendants' objection: "***causing the first entity call to be connected to a selected one of a plurality of potential second entity terminal destinations***."

### 4.    Defendants' Sur-Reply Position

CallWave argues that Defendants' construction misapplies the term "selectively connected to one" to the term "plurality of potential . . . destinations."  The disclosure is clear that the called party can switch an incoming call to one of several other potential devices.  JA-CP 0018 at 4:19-24.  Defendants' proposal reflects this concept, and is fully consistent with the claim language.  In contrast, CallWave's proposal merely parrots the claim language, provides no clarification, and leaves the term "selectively connected" open for interpretation.[30]

---

[30] CallWave's odd assertion that its proposed construction "does not include such language," is contradicted by Plaintiff's proposal of this very construction in the Joint Claim Construction Statement.  (*See* JA at Ex. 4.)

### K.      Subscriber specified rule; subscriber instruction

#### 1.      Plaintiff's Opening Position

This term involves commonly understood words that a judge or jury can easily understand.  If construed, it should be construed as it would be understood by a person of ordinary skill in the art to be "a rule or instruction specified by a subscriber." (Lucantoni Dec. at ¶ 34.)

Defendants' construction, on the other hand, tries to limit the scope of the term by importing several limitations that are neither suggested by the claims nor supported by the intrinsic record.  For example, independent claim 40 makes clear that the recited "subscriber" is "a subscriber of services offered by the call processing system."  (JA-CP 0183 at 75:37-38.) Meanwhile, claim 1, from which claim 11 depends, makes clear that the recited "subscriber" is a subscriber of "a call processing system." (JA-CP 0181 at 72:11-13.)  Yet Defendants improperly attempt to limit the term "subscriber" to a subscriber of a "phone service," thereby creating confusion as to what is a "phone service[31]," and how, if at all, a "phone service" differs from the "services offered by the call processing system" in claim 40 or  the "call processing system" in claim 11.

Defendants further try to limit the scope of the term by requiring the "rule" or "instruction" to be "stored in the call processing system's database," which is neither suggested by the claims nor supported by the intrinsic record.  Rather, claim 11 recites that the "subscriber specified rule" is read "from computer readable memory," but it does not require that memory to be in a database of the call processing system.  (*Id*. at 72:66-67.)  Similarly, claim 40 merely

---

[31]  Indeed, Defendants' construction for "call processing system" does not even include the words "phone service," thereby further highlighting the inconsistencies of Defendants' construction here with the express claim language.

requires that the "subscriber instruction" be included in "an account record associated with the subscriber," but does not require a so-called "database of the call processing system." (JA-CP 0183 at 75:41-43; Lucantoni Dec. at ¶ 35.) Furthermore, those skilled in the art would understand that the call processing system could access databases other than its own to gather rules or instructions. (Lucantoni Dec. at ¶ 36.)

Moreover, Defendants attempt to classify the "rule" or instruction" to be a "*call handling rule*," when again, no such limitation can be found either within the claims or in the intrinsic record. Rather, claim 40 simply requires that the first outcall is placed "based at least in part on the subscriber instruction," while claim 11 requires that the third call is transferred "based at least in part on one subscriber specified rule," each of which begs the question: is placing an outcall or transferring a call based on the subscriber instruction/specified rule sufficient to make said instruction or rule a "call handling rule," or must one construe the construction to determine what a "call handling rule" entails? (JA-CP 0183 at 75:44-46; JA-CP 0182 at 73:1-2.)

### 2.    Defendants' Answering Position

Defendants' proposed construction is consistent with, and supported by, the intrinsic record. The asserted patents are directed toward telephone services provided to subscribers. *See e.g.* JA-CP 84 at Abstract; JA-CP 107 at Abstract. The claims and the specification are clear that the claimed "subscriber" is a phone service subscriber.[32] The claims and the specification also explain that the claimed "rule" and "instruction" are call handling rules.[33] Furthermore, these

---

[32] *See e.g.* JA-CP 183 at 75:37-38 ("a subscriber of services offered by the call processing system"); JA-CP 175 at 60:27 ("The call processing system can provide telephone services."); JA-CP 152 at 13:9-10 ("[T]he called party is subscribed to an Internet call answering service.").

[33] *See e.g.* JA-CP 153 at 16:47-49 ("[T]he user can specify call handling rules that determine . . . the call treatment for an incoming call."); JA-CP 149 at 7:12-13 ("instructions for call handling"); JA-CP 183 at 75:1-2; JA-CP 177 at 64:45-45.

rules are stored in the call processing system's database.[34]

CallWave also argues that it does not know how, if at all, "phone service" in Defendants' proposed construction differs from "services offered by the call processing system" recited in the claims. These two terms are used synonymously in the patents. That is, the phrase "phone service" is a concise and accurate description of the services offered by the call processing system. *See e.g.* JA-CP 175 at 60:27 ("The call processing system can provide telephone services."). Therefore, the phrase "phone service" helps to better understand the meaning of "subscriber" in the claim term "subscriber specified rule."

CallWave complains that Defendants' proposed construction requires the "instruction" to be "stored in the call processing system's database." Although, as discussed above, the instruction typically is stored in the call processing system's database, CallWave identifies claims where the instruction is stored in a "memory" or in an "account record." CallWave argues based on these claims that, because the memory or the account record need not be stored in the call processing system's database, the instruction need not be stored in the call processing system's database. If CallWave's complaint is directed to Defendants' use of the word "database," there is no substantive difference between "database," "memory," and "account record" in this context. The patents refer to "account record" as "account *database* record" and the record is stored in "memory."[35] If CallWave's complaint is directed to Defendants' use of the possessive form "the call processing *system's* database" (in other words, CallWave is arguing that the database need not be inside the call processing system), regardless of whether the

---

[34] *See e.g.* JA-CP 156 at 21:2-4 ("Configuration rules governing the automatic call handling treatment can be stored in the IAM DB subsystem 1136."); JA-CP 172 at 54:63-67.

[35] *See* JA-CP 157 at 24:10-12 ("a prior instruction from the called party stored in computer readable memory, such as in an account database record"); JA-CP 158 at 25:30-33 ("the user account database record . . . stored in computer readable memory").

instruction is stored inside or outside the call processing system, the instruction must be accessible by the call processing system.[36] The phrase "the call processing system's database" in Defendants' proposed construction merely signifies that the database is accessible by the call processing system, not necessarily that the database is inside the call processing system.[37] Accordingly, Defendants' proposed construction is consistent with the claims and the specification.

CallWave's proposed construction of "subscriber specified rule" and "subscriber instruction" as "a rule or instruction specified by a subscriber" merely shuffles the words in the disputed claim terms. This type of construction does nothing to assist in understanding these claim terms. *See e.g. Wi-LAN, Inc. v. Acer, Inc.*, 712 F. Supp. 2d 549, 570 (E.D. Tex. 2010) (Regarding construing "clock recovery" as "recovery of the clock," "[t]he Court finds . . . that Defendants merely rephrase and rearrange the terms to be construed, and such a construction is not helpful in this instance."). Moreover, CallWave's proposed construction leaves the term susceptible to overly broad interpretations. For example, under CallWave's proposed construction, these terms could encompass a magazine subscriber specifying an instruction for recurring payments. Such an interpretation goes far beyond the teachings of the CP Patents and the proper meaning of "subscriber" and "instruction." Accordingly, the Court should reject CallWave's overly-broad construction.

---

[36] *See e.g.* JA-CP 177 at 63:21-25 ("[T]he softswitch . . . accesses the subscriber's account configuration (e.g., . . . screening instructions . . . )."); JA-CP 156 at 21:9-15 ("[T]he CM subsystem queries the SM subsystem 1122 and/or the IAM DB subsystem 1136 . . . to retrieve that subscriber's call handling preference rules."); JA-CP 149 at 7:13-17 ("One of the first things done by the central server 29 is to check to see if there are special instructions for handling of a given incoming call.").

[37] If the Court agrees with CallWave's argument on this issue, then Defendants are willing to amend its proposed construction as follows:  "a phone service subscriber's specified call handling rule, stored in <u>memory accessible by</u> the call processing system~~'s database~~."

64

### 3. Plaintiff's Reply Position

The asserted claims themselves already make clear that the recited "subscriber" is either "a subscriber of services offered by the call processing system" (JA-CP 0183 at 75:37-38) or a subscriber of "a call processing system" (JA-CP 0181 at 72:11-13).  Defendants agree, as they admit that "phone service", which defendants seek to add, is synonymous with "services offered by the call processing system"[38] and is therefore redundant and confusing.  Likewise, the asserted claims expressly recite that either the "subscriber specified rule" is read "from computer readable memory" (*Id.* at 72:66-67), or that the "subscriber instruction" must be included in "an account record associated with the subscriber" (JA-CP 0183 at 75:41-43), both of which the Defendants now admit is synonymous with the rule or instruction being "stored in memory accessible by the call processing system."  As such, there is no material dispute that the express language of the claims already makes clear what is the scope of "subscriber" and where the "subscriber specified rule" or "subscriber instruction" is stored, and thus no construction as to these aspects is needed.

Therefore, the only remaining dispute – which Defendants have failed to address – is why the "subscriber specified rule" or "subscriber instruction" must be a "*call handling* rule." There is no support anywhere in the intrinsic record for the importation of such a limitation. Defendants skirt the issue by alleging that CallWave's construction is overly broad, apparently seeking to import the same restrictive limitations here that they import into "call handling."  Yet the asserted claim language very clearly specifies the term's metes and bounds by expressly requiring that a call (*i.e.*, an "outcall" or "call") be placed or transferred based at least in part on

---

[38] Whether or not the Court decides to construe the term "call processing system," that term need not be independently construed here within the context of "subscriber specified rule" or "subscriber instruction."

the subscriber instruction/specified rule.  Accordingly, no construction is needed.

### 4. Defendants' Sur-Reply Position

A "subscriber specified rule" must refer to a call handling rule because this functionality of the CPS – receipt of a forwarded call and application of a subscriber specified rule – is the core of the invention of the '188 Patent.  Each of the claims that recite these terms, have the CPS apply this rule to a forwarded call.  *See, e.g.*, JA-CP 183 at 75:36-47 ("determining if the first call is directed to a telephone address of a subscriber of . . . the call processing system.").

### L. [a / the] network

### 1. Plaintiff's Opening Position

Defendants propose to construe "network" to mean "switched circuit network."  The term "network" is readily understood and requires no specialized or limiting construction.  However, if construction is necessary, "network" should be construed as "communication network."

The '428 Patent specification discloses numerous examples of networks: Public Switched Telephone Network (PSTN) (JA-CP 0095 at 5:26); Local Area and Wide Area Networks (*Id.* at 5:46-47); Circuit Switched and Packet Switched Telephony Networks (*Id.* at 6:15); IP Networks (*Id.* at 11:23); and the Internet or other computer networks (*Id.* at 12:47-48).  The shared commonality between these networks is that they are all communication networks, consistent with CallWave's proposed construction.

Moreover, the claim language itself allows "network" to at least include a packet switched network such as a computer network or the Internet.  Claim 10 of the '428 Patent describes a method of processing calls, including the step of "placing a second call . . . over the **network** to a first terminal."  (JA-CP 0102 at 20:38-39.)  Claim 15, which depends from claim 10, states "wherein the first terminal is a computer."  The specification explains a computer "can be equipped with a Voice over Internet Protocol (VoIP) software module . . . allowing voice

66

communications to be conducted over a computer network, such as the Internet." (JA-CP 0096 at 7:11-15.) Thus, "the network" of claim 10 can include a packet switched network (such as the Internet), which would be excluded by Defendants' proposed construction. In fact, Defendants' proposed construction excludes numerous types of networks explicitly disclosed by the specification.

### 2.     Defendants' Answering Position

"A network" and "the network" are terms used in the asserted claims of the '428 and '588 Patents to denote the network over which calls are received, placed and screened. Defendants' construction of "[a / the] network" to mean "circuit-switched network" is a necessary result of the patentees' disclaimer of "packet-switched network" during prosecution of the '428 Patent's parent, U.S. Patent No. 7,103,167 ("the '167 Patent"). *See supra* § D ("switched network").

In each instance where "a network" appears in the claims of the '428 and '588 Patents, an initial call intended for a called party is received over "a network." *See e.g.* JA-CP 102 at claim 10 ("receiving over a network at a first system a first call from a caller intended for a called party"). The patentee did not employ ordinal descriptors, such as "a first network" in these claims. Instead, in each claim where "a network" appears, any subsequent use of the term is referenced as "the network," thereby referring back to the network over which the initial call was received. *See Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008); *Imperium (IP) Holdings, Inc. v. Apple Inc.*, No. 4:11-163, 2012 WL 6949611, at *11 (E.D. Tex. July 2, 2012) ("As a general rule, claim terms preceded by the definite article, 'the,' refer back to a prior recitation of the same limitation . . ."), *report and recommendation adopted as modified*, No. 4:11-163, 2013 WL 322053 (E.D. Tex. Jan. 28, 2013). Therefore, if the initial call intended for the called party is received over a circuit-switched network, then all other call processing and/or screening actions occurring over "the

network" also must occur over the circuit-switched network.  The reverse is also true: if the call-screening step occurs over the circuit-switched network, then the initial call must have been received over a circuit-switched network.

CallWave argues that Defendants' construction cannot be correct, because claim 15 recites "wherein the first terminal is a computer," and that this computer could be equipped with VoIP software.  CallWave argues, without explanation, that this requires "the network" to extend to packet-switched networks.  There is no question that VoIP software could be used to send IP data—including voice— over a circuit-switched network.  Ex. 3, U.S. Robotics Offers 56k VoIP Modem (2001).  In fact, using a circuit switched connection to send IP data was the entire purpose of the dial-up connections that are central to CallWave's patents.  JA-CP 96 at 7:3-7 ("The telephone line 114, can be used to establish a dial-up connection for computer terminals, *such as terminal 110 via the computer modem, to an Internet Service Provider (ISP) offering dial-in remote access service connections from the PSTN 104* via trunk interface circuits 120.") (emphasis added); Ex. 4, U.S. Prov. App. No. 60/127,434 at 11.

CallWave's proposed construction is incorrect because it would include call screening over a packet-switched network, a limitation specifically disavowed in the '167 Patent application.  *See Uship Intellectual Props., LLC v. United States*, 714 F.3d 1311, 1316 (Fed. Cir. 2013) ("Even if the specification had disclosed an embodiment where a human performed the entirety of the validation step, prosecution disclaimer could result in that embodiment not being covered by the claims."); *see also supra* § D.  Because "network" is used consistently within each asserted claim, and call screening over a packet-switched network was disclaimed in the parent application, the Court should adopt Defendants' construction of "[a / the] network" as "circuit-switched network."

3.      **Plaintiff's Reply Position**

As discussed above, packet-switched networks were not disclaimed during prosecution of the '167 Patent.  Accordingly, neither "switched network" nor "network" are limited to circuit switched networks.  Defendants use circular logic and generic statements in an attempt to improperly restrict calls to being received, placed, and screened over a circuit switched network.  For example, Defendants state: "'A network' and 'the network' are terms used in the asserted claims of the '428 and '588 Patents to denote the network over which calls are received, placed and screened."  However, to the contrary, neither claim 1 nor claim 6 of the '428 Patent contain the term "A network" or "the network."  Instead, these claims describe "networked computers." (JA-CP 0102 at 19:18; JA-CP 0102 at 20:5-6.)  Likewise, claim 42 of the '428 Patent discusses receiving a call over "a communications network," wherein the communications network is explicitly described as either a circuit switched network or a packet switched network.  (JA-CP 0104 at 23:46-49.)

Finally, Defendants argue that "if the initial call intended for the called party is received over a circuit switched network, then all other call processing and/or screening actions occurring over 'the network' also must occur over the circuit-switched network."  This statement is misleading, as none of the asserted claims in the '428 or '588 Patents recite receiving a call over "a circuit switched network."   Instead, Defendants reach this conclusion by *presuming* "network" to be defined as "circuit switched network."  Defendants' arguments are circular in nature, and rely on generic statements in an attempt to improperly apply their reasoning to all asserted claims of the '428 and '588 Patents.

In contrast, the asserted claims and specification of the '428 Patent clearly contemplate the use of packet switched networks in receiving, placing, and screening calls.  Claims 1 and 6 of the '428 Patent both describe "placing an outcall from the call processing system to at least one

69

destination, wherein the at least one destination is a phone."   (JA-CP 0102 at 19:31-33, 20:14-16.)   Claims 2 and 7, which depend from Claims 1 and 6 respectively, state "the called party communicates with the caller using Voice over Internet Protocol (VoIP)," thus requiring use of a packet switched network.   (JA-CP 0102 at 19:37-39 and 20:20-23.)   Additionally, claims 10 and 16 of the '428 Patent both recite "placing a third call from the first system over the switched network to the second terminal."   Claims 12 and 18, which depend from claims 10 and 16 respectively, state "the called party communicates with the caller using Voice over Internet Protocol (VoIP)," thus requiring use of a packet switched network.

### 4.    Defendants' Sur-Reply Position

CallWave attempts to use ***different terms*** – "networked computer" and "communications network" – to argue that "[a / the] network" does not denote the network over which call processing and screening occurs.   This makes little sense, since a "networked computer" is unrelated to "[a / the] network."   Further, "communications network" is a different term (for which construction is not sought) that appears in a claim not at issue here.   CallWave also restates its argument that, because several dependent claims recite the use of VoIP, a packet-switched network is required.   But, as Defendants already explained above, VoIP can operate over a circuit-switched network – a point not disputed by CallWave.

Despite its hand-waving arguments, CallWave does not contest that the claims of the '428 and '588 Patent describe only a single network.   That is because the term "a network" is always followed by use of "the network" in the claims.   The necessary conclusion is that the network over which the initial call is received ("a network") is the same network over which all subsequent calls in that claim are placed and screened ("the network").   As discussed above, CallWave disclaimed call screening over packet-switched networks, *see supra* § D, and nothing CallWave cites works to undo that disclaimer.   To allow CallWave to recapture this claim scope

now contradicts the most basic principles of claim construction.  *See Hakim v. Cannon Avent Group, PLC*, 479 F.3d 1313, 1317–18 (Fed. Cir. 2007) ("The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.") (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003)).  Moreover, none of CallWave's citations show **anything other than** the use of a circuit-switched network for the initial call (the call received over "a network").

### M.    Call processing system

### 1.    Plaintiff's Opening Position

This term comprises commonly understood words that a judge or jury can easily understand, and the intrinsic evidence does not specially define the term or disclaim any of its scope.  If construed, the term should be construed as it would be understood by a person of ordinary skill in the art to mean "a system for processing a call or information relating to a call." (Lucantoni Dec. at ¶ 37.)

The intrinsic record supports CallWave's construction.  For example, the specification teaches that a "call processor system can receive an inbound call … and place an outbound call," and thus process a **call**.  (JA-CP 0107 at Abstract.)  In another example, the specification describes that, in placing a first outcall, "the call processing system inserts the first phone address in a callerID field associated with signaling information associated with the first outcall," thereby demonstrating that the call processing system may process **information relating to a call**.  (JA-CP 0146 at 2:20-24.)

On the other hand, Defendants' proposed limitation that the call processing system "serves as the interface between the PSTN and the Internet" is incorrect because it excludes disclosed embodiments.  *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008).  For

example, the specification discloses numerous examples of a call processing system bridging calls between VoIP users, and between wireless users, none of which necessarily comprise "an interface between the PSTN and the Internet."  (JA-CP 0157 at 23:61-24:12, 24:21-42; JA-CP 0168 at 45:18-38; Lucantoni Dec. at ¶¶ 42-43.)  Likewise, nothing in the intrinsic record requires the central processing system to have a "central server that answers an incoming call."  Indeed, the specification expressly describes that an exemplary central processing system may comprise several subsystems, wherein "[o]ne or more of the foregoing subsystems can be hosted on the same computer system (e.g., a server), or *subsystems can be hosted on separate corresponding computer systems*," thereby making clear that the central processing system may comprise multiple servers that answer incoming calls.  (JA-CP 0172-73 at 54:43-55:7; Lucantoni Dec. at ¶¶ 38-41.)

## 2.    Defendants' Answering Position

Defendants' construction is correct because it is consistent with and supported by the intrinsic record.  The specification describes a central server implementing the services provided by the call processing system.  *See e.g.* JA-CP 149 at 8:10 ("[T]he central server 29 is holding the call."), 8:22-24 ("The central server 29 is able to capture and store the dynamic profile of the subscriber's rules for treatment of incoming calls.").  In addition, the provisional application lists components of the call processing system, including a central server.  *See* Ex. 4, U.S. Prov. App. No. 60/127,434 at 11 ("The Central Server provides message storage, user authentication, and call control.").  These descriptions are consistent with the centralized nature of the call processing system, which provides services, as distinguished from end-user client systems which receive services.  Furthermore, both the claims and the specification describe the call processing

system as answering incoming calls.[39]  The specification[40] and figures[41] (e.g., Fig. 16 of the '188 Patent reproduced in part below) also describe the call processing system as serving as the interface between the PSTN and the Internet.



CallWave has two complaints about Defendants' proposed construction.  First, CallWave argues that it is "clear that the central processing system may comprise multiple servers." Defendants agree.[42]  But Defendants' proposed construction is accurate because it merely requires "having a central server"; it does not preclude having multiple servers.  Second, CallWave argues that the patents disclose calls between two VoIP phones and calls between two wireless phones, which CallWave alleges would not require an interface between the PSTN and Internet.  But, even if true, the specification is clear that the call processing system serves as the

---

[39] *See e.g.* JA-CP 103 at 21:24-25 ("answering the first call . . . at the call processing system"); JA-CP 159 at 28:61 ("The call processing system answers the incall."); JA-CP 173 at 55:20-21 ("[A]fter answering a call, the call processing system plays a greeting to the caller."); JA-CP 128 at Fig. 19B ("IAM system 1124 answers incoming call from Calling Party 1102.").

[40] *See e.g.* JA-CP 150 at 10:1-7 ("FIG. 17 further decomposes the IAM system 1124 into its functional components:  a Call Management (CM) subsystem 1108, which serves as the interface to the PSTN 1104 . . . a Router subsystem 1140, which serves as the interface to the Internet 1106.

[41] *See e.g.* JA-CP 124 at Fig. 16 (call processing system 1124 serving as an interface between PSTN 1104 and Internet 1106); JA-CP 127 at Fig. 19A (IAM system 1124 serving as an interface between PSTN 1104 and Internet 1106); JA-CP 138 at Fig. 27 (softswitch 107A serving as an interface between PSTN and Internet); JA-CP 110 at Fig. 1; JA-CP 112 at Fig. 3; JA-CP 123 at Fig. 15.

[42] *See e.g.* JA-CP 148 at 5:8-9 ("the Server (or array of Servers) 29"); JA-CP 110 at Fig. 1 ("server(s) 29"); Ex. 4, U.S. Prov. App. No. 60/127,434 at 11 ("The Central Server provides message storage, user authentication, and call control.  This application runs on redundant servers at CallWave's central location.").

interface between the PSTN and the Internet during the numerous calls cited above between a telephone on the PSTN network and a PC or VoIP phone on the Internet. *See e.g.* JA-CP 147-48 at 4:58-5:19; *see also* JA-CP 110, 112, 123, 124, 127, 138 [Figs. 1, 3, 15, 16, 19A, 27]. For at least such calls, the call processing system serves an interface between the PSTN and the Internet, as explained above.

CallWave's proposal is unhelpful because it merely rearranges the words in the disputed claim term—"call processing system" to "a system for processing a call"—and then tacks on "or information relating to a call." *See Wi-LAN*, 712 F. Supp. 2d at 570. This proposal does not clarify the meaning of "call processing system" and leaves the term overly broad. If the term "call processing system" simply means any system that processes calls, as CallWave proposes, the term would encompass even end-user telephones; as used in the CP Patents, however, the "call processing system" *provides* telephone services *to end user telephones*. For example, numerous figures illustrate the call processing system as being separate and distinct from the end users and their devices. *See e.g.* JA-CP 110, 112, 124, 127, 129, 131, 135, 138-142 [Figs. 1, 3, 16, 19A, 20A, 21, 25A, 27-31].[43] Accordingly, a narrower construction is necessary at least in order to exclude user telephones from the scope of this term.

### 3.      Plaintiff's Reply Position

Defendants do not dispute that their proposed construction excludes numerous embodiments such as call processing systems that bridge calls between VoIP devices, between wireless devices, and/or between POTS devices – none of which necessarily comprise "an interface between the PSTN and the Internet." (JA-CP 0157 at 23:61-24:12, 24:21-42; JA-CP

---

[43] The call processing system in some of these figures and in the specification is referred to as or includes server(s), central server, IAM [Internet answering machine] system, call manager, softswitch, etc.

0168 at 45:18-38; Lucantoni Dec. at ¶¶ 42-43.)   Yet Defendants inexplicably point to other examples in the specification which do comprise such an interface and, without basis, argue to require that limitation wholesale.

In addition, Defendants admit that the central processing system may have multiple servers that answer incoming calls.  Yet their proposed construction requires a "***central*** server that answers an incoming call," leaving unclear which of the multiple servers would comprise a "central" one.  For example, central might refer to location; yet such a context requires a reference point from which to determine whether a particular server is centrally located, adding further subjectivity and uncertainty as to what Defendants' construction means.  Alternatively, central might refer to priority, *e.g.*, a main server, which again invites confusion.

Finally, Defendants argue that CallWave's proposed construction is overly broad and might encompass "end-user client systems which receive services," which Defendants further allege are distinguished from "the call processing system, which provides services."  These assertions have no factual basis and amount to nothing more than attorney argument.  As it is well known that that any number of end-user devices such as personal computers, smartphones, or other devices can operate as a server, and hence a call processing system, Defendants' objections as to breadth are not persuasive.  (Lucantoni Supp. Dec. at ¶ 44.)

### 4.      Defendants' Sur-Reply Position

CallWave presents no substantive response to the arguments in favor of Defendants' construction.  For example, characterizing a CPS as a system that serves as the interface between the PSTN and the Internet does not "exclude numerous embodiments" as CallWave alleges.  Likewise, as stated in Defendants' Response, reference to a "central" server in Defendants' proposed construction does not preclude having multiple servers.

Further, CallWave fails to explain how simply rearranging the order of the words in the claim phrase serves to "accord [this] claim the meaning it would have to a person of ordinary skill in the art at the time of the invention."   *Innova*, 381 F.3d at 1116.   As set forth in Defendants' Response, CallWave's construction would include any system that processes calls, including even end-user telephones.  *Supra* p. 74 Construing this phrase to include any system for processing "information relating to a call" is so broad as to literally encompass a telephone billing system, which is very far removed from "what the inventors actually invented and intended to envelop with the claim."  *Renishaw PLC*, 158 F.3d at 1250.

**N.     Substantially real time**

**1.     Plaintiff's Opening Position**

Defendants ask the Court to construe several different phrases containing numerous terms.  However, the only claim language shared among all of the phrases is "substantially real time."  Therefore, it appears Defendants intend to construe the phrase "substantially real time." This phrase is readily understood in the context of the claims and the specification and does not require a specialized or limiting construction.   If the Court determines this phrase requires construction, it should be construed as "almost real time."   This construction is expressly provided by the intrinsic evidence.

The '428 and '588 specifications recite: "playing the transmitted speech data in *substantially or almost real-time*, before an entire speech data file of a caller's message has been transmitted."  (JA-CP 0196 at 2:39-41.)  Thus, the specification explicitly states **substantially** real time is synonymous with ***almost*** real time.  Consistent with this definition, the '110 and '910 specifications recite: "the recording can be streamed in substantially real-time or sent to the subscriber over the Internet within seconds after the recording has completed.  Just like a home telephone answering machine, the subscriber can elect to interact with the caller while they are

still on the line or can call them back at a later time."  (JA-CP 0095 at 5:59-64.)

Defendants propose to construe "substantially real time" to mean "transmitting speech data almost simultaneously as that data is being recorded."  Defendants' proposed construction not only unnecessarily redefines "voice message" ('428 claims 22, 63), "voice communication" ('428 claim 42) and "speech" ('428 claims 1, 6) as "speech data," but, more critically, Defendants' improper construction adds the limitation of "recording" to claims which do not require a "recording" step.  For example, '428 claims 22, 42, and 63; '901 claims 1 and 18; and '110 claim 19 do not require a "recording" step.  Thus, Defendants' proposed construction, "transmitting . . . as that data is being recorded," would impermissibly add this additional limitation.

Defendants' proposed construction is incompatible with and incomprehensible in light of those claims without a "recording" step.  Accordingly, Defendants' proposed construction should not be adopted, as it is neither consistent with nor supported by the intrinsic evidence.

### 2.    Defendants' Answering Position

As with many of the terms that are disputed by the parties, the meaning can be discerned from the context in which it is used in the claim.  Each of the claims employing these claim terms transmits voice in "substantially real-time" "so that the called party can audibly listen to the voice communication in substantially real time and screen the calling party's call."  JA-CP 20 at 8:5-8.  To screen an incoming call, the called party must be able to listen to the calling party's message almost simultaneously with its recording so that the called party can pick up the phone, or issue another call handling instruction, before the caller hangs up.  Accordingly, this claim phrase should be construed to mean "transmitting speech data almost simultaneously as that data is being recorded."

This is consistent with the way these terms are used in the specifications.  For example, a

leading technical dictionary defines "real time" as:  A voice telephone conversation is conducted in real time.  That is, there is no perceived delay in the transmission of the voice message or in the response to it."   *Newton's Telecom Dictionary* 652 (15th ed. 1999).   Likewise, the specifications of the relevant patents note "a communication channel is opened with the called party over the public Internet and speech is 'streamed' to the called party."  JA-CP 93 at 2:33-35. "With streaming, a client application executing on the called party's computer can start playing the transmitted speech data in substantially or almost real-time, ***before an entire speech data file of a caller's message has been transmitted***."  *Id.* at 2:37-41 (emphasis added).

Plaintiff's proposal merely substitutes the term "substantially" with the term "almost." And while Plaintiff cites much of the same evidence as Defendants, they ignore that evidence in an effort to maintain ambiguity, and propose a construction that fails to place any limits on what constitutes "real-time."   Plaintiff also argues that the term "speech data" in Defendants' construction cannot be correct.  But, Defendants' proposal provides a common term for the three phrases "voice communication," "speech," and "voice message."  These quibbles cannot change the simple fact that Defendants' construction is wholly consistent with the intrinsic record.

### 3.    Plaintiff's Reply Position

Defendants admit that the meaning of this term can be discerned by its use in the claims. Thus, construction is not necessary; yet Defendants nonetheless seek to insert new limitations into the claims, by identically construing several different phrases found in four separate patents.

The several different phrases contain terms such as "speech," "voice message," "voice communication," and "at least a first portion of the voice communication."  Defendants propose to uniformly redefine these diverse terms to mean "speech data."  While Defendants argue that their construction "is wholly consistent with the intrinsic record," they fail to identify any intrinsic evidence.  Nor have Defendants put forth a single reason why construing these terms

78

and phrases is necessary.  To the contrary, these terms and phrases are easily understood and require no specialized construction.

Defendants also propose to construe "substantially real time" to mean "almost simultaneously as that data is being recorded."  As previously noted, a substantial number of claims affected by this proposed construction do not require "recording" any data.  Thus, construing "substantially real time" to include the temporal limitation of "as that data is being recorded" would be meaningless, or worse, import a "recording data" limitation into numerous claims that do not require a "recording" step.

### 4. Defendants' Sur-Reply Position

CallWave argues again that several of the claims reciting transmission of a voice message in "substantially real-time" do not require a recording, because they fail to recite an explicit recording step.[44]  But, throughout the intrinsic record the step of recording comes before transmitting in real-time.  *See, e.g.,* JA-CP 0059 at 10:8-13; JA-CP 0062 at 15:14-21.  This makes sense, because the feature proposed by the CP Patents allows voicemails to be recorded, and transmitted quickly enough so that a called party can screen the voicemail and make a call handling decision.  JA-CP 0057 at 6:19-23.

---

[44] CallWave is incorrect that recording could not be part of the claims at issue for this term. Each of the "substantially real-time" claims recites a "method comprising," and can therefore include additional unrecited steps.  *See Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1368 (Fed. Cir. 2003).

PEPPER HAMILTON LLP

/s/ James G. McMillan
Edmond D. Johnson (# 2257)
James G. McMillan, III (#3979)
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
(302) 777-6539
johnsone@pepperlaw.com
mcmillaj@pepperlaw.com

Attorneys for Plaintiff
CallWave Communications, LLC

OF COUNSEL:

William D. Belanger
Noah V. Malgeri
Leah R. McCoy
Christopher Boundy
Suparna Datta
(all admitted *pro hac vice*)
Pepper Hamilton LLP
125 High Street
19th Fl. High Street Tower
Boston, MA 02110
(617) 204-5100

Gregory S. Bishop
(admitted *pro hac vice*)
Pepper Hamilton LLP
333 Twin Dolphin Drive
Suite 400
Redwood City, CA 94065
(650) 802-3600

MORRIS, NICHOLS, ARSHT &TUNNELL LLP

/s/ Paul Saindon
Jack B. Blumenfeld (#1014)
Paul Saindon (#5110)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
psaindon@mnat.com

Attorneys for Defendant Google Inc.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Eleanor G. Tennyson
Karen Jacobs (#2881)
Stephen J. Kraftschik (#5623)
Megan E. Dellinger (#5739)
Eleanor G. Tennyson (#5812)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
kjacobs@mnat.com
skraftschik@mnat.com
mdellinger@mnat.com
etennyson@mnat.com

Attorneys for Sprint Spectrum L.P. and Sprint
Communications Company L.P.

SEITZ ROSS ARONSTAM & MORITZ LLP

/s/ Benjamin J. Schlaweiler
Collins J. Seitz, Jr. (#2237)
Benjamin J. Schladweiler (#4601)
100 S. West Street, Suite 400
Wilmington, DE  19801
(302) 576-1600
cseitz@seitzross.com
bschladweiler@seitzross.com

*Attorneys for Defendants Verizon*
*Communications, Inc. and Cellco Partnership*
*d/b/a Verizon Wireless*

December 10, 2014

8727293

ASHBY & GEDDES

/s/  Andrew C. Mayo
John G. Day (#2403)
Tiffany Geyer Lydon (#3950)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
jday@ashby-geddes.com
tlydon@ashby-geddes.com
amayo@ashby-geddes.com

*Attorneys for Broadsoft, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2014, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on December 10, 2014, upon the following in the manner indicated:

Edmond D. Johnson                                              *VIA ELECTRONIC MAIL*
James G. McMillan
PEPPER HAMILTON LLP
1313 North Market Street
P.O. Box 1709
Wilmington, DE  19809-1709
*Attorneys for Plaintiff*

William D. Belanger                                            *VIA ELECTRONIC MAIL*
Noah V. Malgeri
Benjamin M. Snitkoff
Lauren Reznick
Leah R. McCoy
PEPPER HAMILTON LLP
High Street Tower, 19th Floor
125 High Street
Boston, MA  02110
*Attorneys for Plaintiff*

Gregory S. Bishop, Esquire                                    *VIA ELECTRONIC MAIL*
Charles F. Koch, Esquire
PEPPER HAMILTON LLP
333 Twin Dolphin Drive, Suite 400
Redwood City, CA  94065-2133
*Attorneys for Plaintiff*

Karen Jacobs                                          *VIA ELECTRONIC MAIL*
Stephen J. Kraftschik
Eleanor G. Tennyson
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
*Attorneys for Sprint Spectrum L.P. and Sprint*
*Communications Company L.P.*

Kirk R. Ruthenberg                                   *VIA ELECTRONIC MAIL*
Mark L. Hogge
Shailendra K. Maheshwari
DENTONS US LLP
1301 K Street, N.W., Suite 600
Washington, DC  20005
*Attorneys for Defendants Sprint Spectrum L.P.*
*and Sprint Communications Company L.P.*

Collins J. Seitz, Jr.                                *VIA ELECTRONIC MAIL*
Benjamin J. Schladweiler
SEITZ ROSS ARONSTAM & MORITZ LLP
100 S. West Street, Suite 400
Wilmington, DE  19801
(302) 576-1600
*Counsel for Defendants Verizon*
*Communications, Inc. and Cellco Partnership*
*d/b/a Verizon Wireless*

Kevin P. Anderson                                    *VIA ELECTRONIC MAIL*
Robert Scheffel
Karin A. Hessler
Paul M. Kim
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C.  20006
(202) 719-7000
*Counsel for Defendants Verizon*
*Communications, Inc. and Cellco Partnership*
*d/b/a Verizon Wireless*

John G. Day                                          *VIA ELECTRONIC MAIL*
Tiffany Geyer Lydon
Andrew C. Mayo
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
*Attorneys for Broadsoft, Inc*


Stephen P. McBride                                   *VIA ELECTRONIC MAIL*
COOLEY LLP
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, VA 20190
(703) 456-8000
*Attorneys for Broadsoft, Inc*


                                        /s/ Paul Saindon
                                        Paul Saindon (#5110)