1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

4    CALLWAVE COMMUNICATION LLC,  :   CA NO. 12-1701-RGA

5                                 :   12-1702, 12-1703

6              Plaintiff,         :

7                                 :

8         v.                      :   February 25, 2015

9                                 :

10   AT&T MOBILITY LLC, et al.,   :

11                                :

12             Defendants.    :   1:50 o'clock p.m.

13   ...........................:

14

15

16             TRANSCRIPT OF DISCOVERY DISPUTE

17        BEFORE THE HONORABLE RICHARD G. ANDREWS

18             UNITED STATES DISTRICT JUDGE

19

20

21   APPEARANCES:

22

23   For Plaintiff:    PEPPER HAMILTON LLP

24                     BY:  EDMOND D. JOHNSON, ESQ

25                     BY:  GREGORY S. BISHOP, ESQ

```
 1                          BY:  NOAH V. MALGERI, ESQ

 2

 3     For Defendants:      MORRIS, NICHOLS, ARSHT & TUNNELL

 4                          BY:  KAREN JACOBS, ESQ

 5                          BY:  STEPHEN J. KRAFTSCHIK, ESQ

 6                                   -and-

 7                          DENTONS LLP

 8                          BY:  KIRK R. RUTHENBERG, ESQ

 9                          For Defendant Sprint

10

11                          SEITZ ROSS ARONSTAM & MORITZ

12                          BY:  BENJAMIN J. SCHLADWEILER, ESQ

13                                   -and-

14                          DENTONS LLP

15                          BY:  MARK C. NELSON, ESQ

16                          For Defendant AT&T

17

18                          CONNOLLY GALLAGHER LLP

19                          BY:  RYAN P. NEWELL, ESQ

20                                   -and-

21                          DENTONS LLP

22                          BY:  KIRK R. RUTHENBERG, ESQ

23                          For Defendant T-Mobile

24

25
```

1        MORGAN, LEWIS & BOCKIUS

2        BY:  JODY BARILLARE, ESQ

3        For Defendant Blackberry

4

5

6

7  Court Reporter:   LEONARD A. DIBBS

8         Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2

 3              THE COURT:  Good afternoon.  Please be seated.

 4              This is a discovery matter in CallWave Communication

 5    LLC v. various defendants, including No. 12-1701.

 6              Mr. Johnson?

 7              MR. JOHNSON:  Good afternoon, your Honor.

 8              Edmond D. Johnson representing CallWave.

 9              I have with me Greg Bishop from our Silicon Valley

10    office, and Noah Malgeri from our Boston office.

11              MR. BISHOP:  Good afternoon, your Honor.

12              THE COURT:  And for the defendants, who's here?

13              Mr. Schladweiler.

14              MR. SCHLADWEILER:  Good afternoon, your Honor.

15              Ben Schladweiler of Seitz Ross on behalf of AT&T

16    Mobility, along with Mark Nelson of the Dentons firm.

17              MR. NELSON:  Good afternoon, your Honor.

18              THE COURT:  All right.

19              Good afternoon, Mr. Nelson.

20              Ms. Jacobs?

21              MS. JACOBS:  Good afternoon, your Honor.

22              Karen Jacobs along with Steve Kraftschik.

23              We have here with us Kirk Ruthenberg from Dentons for

24    Sprint in the 1702 case.

25              Your Honor, I would just point out that the dispute is
```

1    not against all defendants, but just a subset here, so I believe

2    it's just the 1701 and 1702 cases --

3              MR. RUTHENBERG:  And 1703.

4              MS. JACOBS:  And 1703, excuse me.

5              THE COURT:  Thank you.  I appreciate that Ms. Jacobs.

6              I did see that on the sign-in sheet.  I wasn't really

7    thinking about that when I was speaking, but that is helpful.

8              And Mr. Newell?

9              MR. NEWELL:  Good afternoon, your Honor.

10             Ryan Newell of Connolly Gallagher for T-Mobile, along

11   with Kirk Ruthenberg of the Dentons firm in the 1703 case.

12             THE COURT:  All right.  Thank you.

13             Mr. Barillare, I guess you're just visiting?

14             MR. BARILLARE:  Yes, your Honor.  I'm here for

15   Blackberry Limited and Blackberry Corp.

16             THE COURT:  It's nice to see you.

17             All right.

18             Sorry for the delay in coming out here.  I had various

19   stacks of CallWave related briefs.  I had trouble finding the

20   right stack.

21             Okay.  We've got this AT&T issue, which I guess is you,

22   Mr. Nelson and CallWave, and it seems like the ball has been

23   advanced in the Northern District of California until the last

24   day or two.

25             Do you have anything to say about that Mr. Bishop?

1          MR. BISHOP:  Yes, your Honor.

2          I think the Northern District of California does not

3     have as much information as this Court has, and I think that

4     there are some issues that we can talk about.

5          You know, what we're talking about here is just a

6     follow-on to the conversation we had back in September with the

7     Court, when we asked for all the documents having to do with the

8     indemnification.

9          And, at that time, Mr. Ruthenberg made the

10    representation that --

11         THE COURT:  Right, right, I read the letters.

12         MR. BISHOP:  -- that they would give us everything up

13    to the point where indemnification was agreed to, but there were

14    no other documents.

15         And, so, what we have here is after that, we found out

16    that there were -- there were some further communications about

17    indemnification.

18         And it seems to me that those would fall into the same

19    category as the ones that we've already -- that they agreed to

20    give us, in that, they were still talking about indemnification,

21    and what the scope of that indemnification would be, and how it

22    worked out with the parties.

23         So, really, the final agreement to indemnify is

24    probably included in those other documents that we don't have

25    yet.  And it seems to me that they're discoverable.  The leading

1    case in Delaware says that, you know, there are situations where

2    their interest is to diverge, and when they seek indemnification

3    communications, they're actually --

4         THE COURT:  Well, I thought at the last hearing that

5    they had actually agreed to indemnification.  Maybe they haven't

6    worked out all the details.  They actually agreed to

7    indemnification before these six letters.

8         MR. BISHOP:  You know, I can't address that, because I

9    don't know what's in these six letters, but my guess is that

10   they're still -- in the letters we've seen, they were

11   discussing, you know, the meets and bounds of that

12   indemnification.

13        And from the dispute between them about that, and then

14   Location Labs said they would step up and do the

15   indemnification, but there was further discussions about that,

16   and my guess is that --

17        THE COURT:  All right.

18        Mr. Nelson, do you happen to have these six letters

19   with you?

20        MR. NELSON:  I believe I do, your Honor.

21        THE COURT:  Is this something where it strikes me that

22   it might be the best thing to do would be for me to just quickly

23   look at these six letters, and see what I think about this?

24        MR. NELSON:  I mean your Honor is certainly more than

25   welcome to look at them in-camera.  We would be happy to provide

1     them.  I'll double check to see if I have them, but I do believe

2     that I have them.

3             THE COURT:  It took me a while, but when I finally --

4     which is nobody's fault but my own -- but when I saw what a thin

5     volume of documents that we're actually dealing with, it just

6     struck me that it might be easiest for me to look at them,

7     because I tend to think that if the indemnification was agreed

8     to in the documents that have already been produced, you know,

9     I'm pretty -- I'm doubtful that these are documents that should

10    be produced, but it strikes me that it would be easier for me to

11    actually figure that out for a fact then to, you know,

12    essentially just do it based on the record as it exists.

13            MR. NELSON:  Yes, but if your Honor wants to receive

14    them in-camera, I'll try to separate them out now, and probably

15    provide them --

16            THE COURT:  All right.

17            Why don't you see if somebody can separate them out

18    now?

19            MR. NELSON:  May I address one thing that Mr. Bishop

20    said, though?

21            THE COURT:  Yes.

22            MR. NELSON:  You know, one of the things that was my

23    understanding is that when the production was made of the

24    indemnity documents up until the point where it's our view that

25    indemnity was accepted, that there was certainly -- part of the

1      premise of that production was that there was no waiver of

2      privilege with respect to these other documents, because that

3      was one of the big things that we were worried about.

4              THE COURT:  I don't remember that one way or the other.

5      I mean it does strike me that -- and part of the premise as I

6      remember it is, when the letters that occurred before the

7      indemnification obligation is accepted, are, you know, like two

8      businesses negotiating something.

9              And, so, the claims of privilege and the like, you

10     know, it's hard to tell.  I mean I do tend to think that once

11     the indemnification is accepted, I think the judges in the

12     Northern District of California, it was pretty persuasive that,

13     you know, there's not a commonality of interest, so that

14     anything going back and forth, probably was work product, and

15     probably was not waived by the fact that this was exchanged,

16     because the two parties now did have a common interest.

17             It doesn't mean they were a hundred percent aligned,

18     but they were -- so I thought that sounded pretty reasonable to

19     me.

20             All right.

21             Well, so, why don't you -- I'm sorry -- did I cut you

22     off before you were done?

23             MR. NELSON:  No, that's fine.  I was just going to go

24     back and get the other documents.

25             THE COURT:  Okay.  That's fine.

1          So, let's talk about this other thing, the scheduling

2     of depositions.

3          Has any progress been made on that?

4          MR. BISHOP:  Your Honor, there has been some progress

5     made.  After we filed our discovery letter, they were unable to

6     meet-and-confer about some disputed topics, but we still, up

7     until noon today, 11:00 o'clock today, we still haven't had any

8     deposition dates.

9          THE COURT:  Are you saying within the last three hours,

10    you've gotten some?

11         MR. BISHOP:  I did get some dates for two of the

12    parties, but as we feared, defendants are still granting

13    themselves this --

14         THE COURT:  Right.

15         MR. BISHOP:  Well, the depositions dates they gave us

16    are into April, and we're -- one of the complaints that they

17    said they needed additional time for discovery was so that it

18    wouldn't all be jam packed into the last couple of weeks, and

19    that's exactly what we're doing now.

20         THE COURT:  All right.

21         So, what is it would you like me to do today to help

22    you?

23         MR. BISHOP:  It would help us if you could order

24    defendants to give us dates in March, so that we can take

25    discovery.  And if we have follow-on discovery to do, that we

1    can do it in April, rather than having to later ask for

2    additional time.

3            THE COURT:  All right.

4            That seems rather modest.

5            Mr. Ruthenberg?

6            MR. RUTHENBERG:  Your Honor, as Mr. Bishop has said, we

7    have met-and-conferred and, tried to that narrow in on the

8    disagreements with the various topics.  We needed to understand

9    what those topics were to figure out what witnesses were to

10   appear.

11           I have now been able to determine from T-Mobile and

12   Sprint, certain of the witnesses, and check on their schedules.

13           And the dates that were offered, specifically for

14   Sprint, were based on the availability of those individuals who

15   are going to testify, who are available on specific dates in

16   that first whole week of April.

17           And with regard to T-Mobile, I have been advised that

18   because of various other commitments, including commitments in

19   other cases, that the particular people that we need are not

20   available until April.

21           And, so, I have pressed on that issue, and we have

22   offered dates, and we're prepared to offer witnesses.

23           MR. BISHOP:  Your Honor, this is exactly the problem we

24   foresaw in the January hearing that we had about the Motion to

25   Stay.

1         And, you know, we said that what they're doing is, they

2    are going to push all this out until April, and we're going to

3    be in the exact same position as we are now.

4         THE COURT:  Mr. Bishop, you've gotten a couple of

5    dates, it was unclear to me completely whether you've gotten

6    them, or what the dates were.

7         MR. BISHOP:  There was the two that Mr. Ruthenberg just

8    referred to.

9         THE COURT:  And, I'm sorry, I thought you said you had

10   gotten some in March, but what you're saying is you got some in

11   April?

12        MR. BISHOP:  That's correct.  I got the e-mails here.

13        THE COURT:  So, are we talking about Sprint, or

14   T-Mobile, or one from each?

15        MR. BISHOP:  I got -- it's a -- Sprint 30(b)(6)

16   deposition witnesses will be available April 8th and April 10th,

17   and T-Mobile's -- they're looking at scheduling during the week

18   of April 13th, with the possibility of some witnesses on April

19   2nd and 3rd.

20        And my concern is that they're all going to be at these

21   late dates in April and there will be no time for follow-up, or

22   no time for further information.

23        THE COURT:  So, in terms of the no time for follow-up,

24   that's a concern, because of when the expert reports are due and

25   things like that?

1          Mr. BISHOP:  And the end of discovery is in April, on

2     April 12th, and these are subpoenas or --

3          THE COURT:  Okay.

4          MR. BISHOP:  -- deposition notices that were sent in

5     January.

6          THE COURT:  So, the easiest thing for me to do, which

7     may or may not meet your needs, is to say that rather than

8     saying, you know, defendants stop your games here and produce

9     people in March, which I don't know what that's -- you know,

10    it's kind of hard for me -- it forces them, they're going to,

11    you know, say various dates here and there.  They may not be

12    convenient for you.

13          The dates they're suggesting in April, leaving aside

14    your concerns of what happens afterwards, are they good for you?

15          MR. BISHOP:  Well, I have to stop there, because I have

16    not had time to determine that, but I imagine we can make it

17    work.

18          THE COURT:  So my suggestions this.

19          Let's make it work with the dates that they have come

20    up with, because they're submitting that they have actually have

21    witnesses available who will be ready, and I'm perfectly happy

22    to either push back now the discovery deadline by two weeks, or

23    three weeks, or something like that.

24          MR. BISHOP:  Well, that's exactly what they would like

25    you to do.

1           We would --

2           THE COURT:  But --

3           Mr. BISHOP:  We have a very tight schedule.

4           THE COURT:  Well, but you say you have a very tight

5    schedule, we don't even have a trial scheduled in this case,

6    right?

7           Mr. BISHOP:  And their hope is that we can drag out

8    discovery and not have a trial.

9           THE COURT:  In other words, you know, telling them

10   produce a witness on March 22nd, strikes me like a telling the

11   ocean stop coming in.

12          You know, it's kind of hard to see exactly how that's

13   likely to lead to anything good.  That's a bad analogy.

14          But, in any event, so while I'm not, you know, I'm

15   sympathetic to what you're saying, because as far as I can see,

16   they are dodging, and dragging, and otherwise making life as

17   difficult as they can for you, but I think given that we don't

18   actually have firm dates into the future for -- and can't be

19   adjusted in regard to a couple of weeks -- that we should take

20   the dates that we've got and make them work.

21          MR. BISHOP:  Your Honor, I'm happy to take the dates

22   we've got.

23          Mr. Malgeri informs me that they set it for the same

24   dates that they want to take our inventor deposition in the CP

25   track case, but we'll work that out.  We'll take the dates that

1     we're offered.  If we need more time, we'll ask for it, but I --

2              THE COURT:  Okay.  Well, I mean, partly, because, you

3     know, if you want more time right now, I'm in a generous mood,

4     but if you'd rather, you know, because you did start out saying

5     how these dates will jam you up on follow-up, I'm also perfectly

6     happy to let you just have the dates that you have.

7              And like everything else, it's being written down, and,

8     you know, if can come back right afterwards and say, I need more

9     time, I will give you more time.

10             MR. BISHOP:  Just to put this all in context, we've got

11    no dates from AT&T.  We've got no --

12             THE COURT:  AT&T, are they part of this dispute on this

13    point, or is it just T-Mobile and Sprint?

14             MR. NELSON:  I think we are.

15             If I may for a second?

16             THE COURT:  Okay.

17             MR. NELSON:  We objected to their deposition notice on

18    January 26th, I think.  And, in the context of that, indicated

19    that we were available to meet-and-confer on several different

20    topics that are technical-related topics and financial-related

21    topics.  That the scope of those topics, you know, in our view

22    was objectionable.

23             And depending on what the ultimate agreed scope would

24    become, would lead us to identify maybe one, maybe two, maybe

25    several witnesses.

1              We met and conferred on late on last Thursday, is that

2    correct?

3              MR. BISHOP:  I don't remember the exact date, but it

4    was in that range.

5              MR. NELSON:  And he sent a letter to me Friday

6    confirming the narrow scope of some topics.  Some topics that we

7    still had a little bit of a disagreement on.

8              But, you know, from AT&T's perspective, the dispute

9    about dates here, now that we have the topics sort of worked out

10   pretty close to what they are going to look like is only a

11   couple of days old.

12             And we'll be prepared to offer you dates by early next

13   week as to dates when AT&T witnesses will be available.

14             THE COURT:  And when do you think those dates are going

15   to be?

16             MR. NELSON:  I need to check with the witnesses, but

17   that process is underway now.  I suspect those dates will be

18   probably be late March or early April.

19             THE COURT:  All right.

20             Well, I'm going to --

21             MR. NELSON:  Giving time for the preparation of

22   witnesses?

23             THE COURT:  No, no, based on what you're saying, you

24   know, late March sounds pretty reasonable.

25             Do you have anything more to say.  Mr. Bishop?

1          MR. BISHOP:  Since we are settling on dates, if they

2     could identify who those witnesses are, so that we could also

3     prepare.  So far we don't have any identification of who the

4     witnesses are, but based on their dates, they should be able to

5     give those to us.

6          THE COURT:  Well, so that sounds like something for the

7     two of you to talk about.  I'm sure there's a history as to how

8     you all do these things.

9          It seems reasonable to me, but that's, you know, you

10    can talk to each other.

11         MR. BISHOP:  Thank you, your Honor.

12         THE COURT:  All right.

13         So we got Mr. Nelson's representations about AT&T.

14         MR. BISHOP:  And there's also the other defendants we

15    don't have any dates for.

16         THE COURT:  Well, as Ms. Jacobs pointed out, they're

17    not here, or with all due respect to Mr. Barillare.

18         MR. BARILLARE:  Your Honor.

19         THE COURT:  Oh, there you are.  I thought you left.

20         I'm not going to hold you to anything.  Sit down.

21         Yes?

22         MR. BISHOP:  And your Honor had come out with an Order

23    about the third issue that we had to discuss.

24         THE COURT:  Yes, I resolved that.

25         MR. BISHOP:  Is there any --

1          THE COURT:  No.

2          Mr. BISHOP:  Okay.  There was also a letter that we

3   received from Ms. Jacobs.

4          THE COURT:  Right, I read that.

5          Mr. BISHOP:  We would like a chance to respond to that.

6   We think it deserves a response.

7          I was thinking if we could have until Monday to do

8   that?

9          THE COURT:  Sure.  I mean, I thought Ms. Jacobs --

10   although I don't necessarily imagine she wrote this herself --

11   but I thought she followed my request not to be terribly

12   argumentative.  That's why I appreciated that.

13          So I would make the same request of you and your letter

14   by Monday.

15          MR. BISHOP:  We just want to give the other side the

16   facts.

17          THE COURT:  All right.

18          That doesn't sound very argumentative.

19          Is there anything else, Mr. Bishop?

20          MR. BISHOP:  Not from our side, your Honor.

21          THE COURT:  Ms. Jacobs?

22          MS. JACOBS:  Thank you, your Honor.

23          On a different topic, your Honor, you may recall that

24   when we were here the last time we talked about the '933 track,

25   and the fact that --

1           THE COURT:  This is the one where my claim construction

2    has done damage to the plaintiff'S case?

3           MS. JACOBS:  Yes.  So I think where we are on that is

4    we -- we don't have an agreement that CallWave -- that there is

5    no infringement under your Honor's claim construction.

6           Unfortunately, we've been working on that stipulation

7    before the New Year's, and we've reached agreement on all terms

8    for a stipulated judgment except for one, which is there is a

9    dispute between the parties that CallWave wants to --

10          THE COURT:  I'm sorry, Ms. Jacobs.

11          Did you tell CallWave that you were going to bringing

12   this up?

13          MR. NELSON:  Yes, your Honor.

14          THE COURT:  Okay.

15          MR. BISHOP:  I got a phone call yesterday.

16          THE COURT:  Okay.  Yes, yes, yes, that's reasonable.

17          MS. JACOBS:  I think where we are, your Honor is, we

18   largely agreed on all issues.  The only outstanding issue that

19   we're aware of is, there is a dispute in the sense that CallWave

20   would like to have a 54(b)certification for an immediate appeal,

21   and some of the defendants disagree with that.

22          Today, otherwise, would be the last day of fact

23   discovery, and the first day of expert reports.  Obviously,

24   we're not exchanging.  No discovery has come forward.  Expert

25   reports won't be exchanged today in light of CallWave's

1    agreement in our discussion at the last hearing that the case

2    would not be moving forward, but we are continuing to be

3    uncomfortable that the case is sort of unresolved in the sense

4    that we don't have a judgment yet.  And these dates are going

5    by.

6            And I guess we would like to ask that there be a sort

7    of a formal recognition on the record that these dates are

8    stayed.  They would certainly be agreed upon portions of the

9    judgment -- are that they would be a judgment of

10   non-infringement, and that the parties would defer all other

11   issues pending appeal of the non-infringement issue.

12           And the only remaining issue would be a 54(b)

13   certification, or whether it would be decided on the final

14   appeal of all issues.

15           So, in terms of relief, I guess what we, defendants,

16   would be looking forward to on the record is certainly a stay of

17   all dates.

18           But we would like to bring some closure to this, and if

19   there is a disagreement about 54(b) certification, then we ought

20   to just present our judgments, and we can, to the extent that

21   CallWave wants to move for a 54(b) certification, certain

22   defendants will oppose it, and that can be decided.

23           THE COURT:  All right.

24           Mr. Bishop?

25           MR. BISHOP:  There's really -- the problem we're having

1    here is, we can't get a definitive answer from the defendants

2    about who is opposing the motion, and if so, on what grounds.

3            We've asked multiple times whether they'll agree to a

4    54(b) stipulation, or if they're going to oppose it, and if

5    they're going to oppose it, what are the grounds for such

6    opposition.

7            So far we haven't been able to learn what that is, so

8    it's hard for us to move forward with any kind of stipulation,

9    because, in our view, the stipulation would need to include a

10   54(b) certification.

11           And, so, we're -- it looks like we're going to have to

12   move, but we're going to have move not knowing who opposes it,

13   and who doesn't, and what their grounds are for opposing it.

14           That has been our frustration here.

15           THE COURT:  The '933 patent, which I know I did claim

16   construction on, but that was yesterday, so I don't remember it,

17   does it have any actual relationship to either of the other

18   tracks?

19           MR. BISHOP:  No, it doesn't.  In fact, it was

20   defendants that argued that they should be separated out in

21   different tracks, and the reason that they said it should be on

22   its own separate track was because it had no relation to the

23   other patents, so we updated the information that would be

24   relevant.  I mean they're --

25           THE COURT:  Okay.  Ms. Jacobs, do you, or somebody

1    here, because I'm assuming -- I don't know whether you represent

2    somebody, what's your client's position on the 54(b)

3    certification?

4         MS. JACOBS:  Yes, your Honor.  And we continue to be

5    frustrated.  We've had repeated and extensive discussions about

6    this.  It's simply -- for Sprint it does oppose a 54(b)

7    judgment.

8         And the reason is -- the simple reason is, there should

9    be there be ultimately two appeals in this case or one?

10        THE COURT:  Well, as you probably know, I'm generally

11   sympathetic to that kind of argument, but it's generally come up

12   where the issues are related.

13        And I guess I'm wondering, Mr. Bishop says -- and it's

14   not inconsistent with the fact of the CP tracks here -- and

15   notwithstanding the way the cases are captioned -- the '933

16   patent has nothing to do with the other patents?

17        MS. JACOBS:  Right, and I don't disagree with that,

18   your Honor.  Notwithstanding that the Federal Circuit often does

19   wait for disputes on all patents to be resolved, even when

20   they're unrelated.

21        And I believe it was Google that provided that

22   authority to CallWave's counsel, so --

23        THE COURT:  When you say, "waited," you mean, in other

24   words, as I recall, if I did a 54(b) certification -- and I'm

25   pretty sure that I've done one so far, so only once -- but, in

1    fact, I know it's something that even if I think it should be so

2    certified, the Court of Appeals still has the discretion to take

3    it or not, right?

4              MS. JACOBS:  That's my understanding, your Honor.

5              THE COURT:  And, so, you think there's a --

6              MS. JACOBS:  Even for unrelated patents, your Honor,

7    that a 54(b) judgment is still a matter of discretion.

8              THE COURT:  Well, I believe it's a matter of

9    discretion, and, as I said, in cases where I thought there was

10   -- you know, I guess I can see -- I think part of the thing that

11   I sometimes have is, even if piecemeal appeals are logically

12   piecemealed, if you let them go up one at a time, you're much

13   more likely to get appeals than if you hold them all off until

14   the end.  And maybe the Court of Appeals thought something like

15   that or recognized something like that, so it seems to be a

16   reasonable -- something they could do.

17             But I have to say that from my point of view -- let me

18   ask -- I think you said Sprint opposes this.

19             I take it the basis for Sprint's opposition is

20   essentially -- and I'm not saying there is no force to this --

21   but you brought all these things together, and, therefore, wait

22   until they're all done then you go and have your one appeal?

23             MS. JACOBS:  Exactly, your Honor.  We shouldn't have

24   the expense and the burden of potentially two Federal Circuit

25   appeals.

1           I don't want to speak to the other defendants who are

2       not here, but there are other -- Google, for example, is one who

3       indicated they would oppose the 54(b) certification.

4           THE COURT:  Okay.  In any event, I take it if there is

5       nothing else, to some extent, Ms. Jacobs, that you just orally

6       requested a stay of the '933 case.

7           Mr. Bishop, do you oppose that?

8           MR. BISHOP:  Well, we don't disagree that we're not

9       going to go forward with expert reports, and that the proper way

10      to move forward is simply for us to go ahead and file a 54(b)

11      motion, and --

12          THE COURT:  Don't you have to first file a stipulated

13      judgment?

14          MR. BISHOP:  I don't know that it has to be stipulated.

15      I think we have to put in the facts that would support our 54(b)

16      motion to go forward.

17          THE COURT:  But, I mean, where it's come up before is,

18      people have filed stipulated judgments, and then they have moved

19      to certify them, right, because it's kind of hard to certify

20      something that doesn't actually exist, if it's in your own mind?

21          MR. BISHOP:  I think my companion that knows more about

22      this is back home in California.

23          We would follow whatever procedure is necessary, but I

24      think that is the proper step forward.

25          THE COURT:  All right.

1                Well, my suggestion would be this:

2                I will grant a stay of discovery and other deadlines in

3        the '933 case.

4                My suggestion for trying to break the logjam here is

5        that you get a stipulated judgment on file that says you agree

6        to disagree on the Rule 54(b) and that, you know, CallWave can

7        promptly file a motion.

8                It doesn't need to have a brief.  I mean it can just be

9        a speaking motion requesting the 54(b) certification, and

10       enclosing a Form of Order that would do that.

11               And I'm not promising you that I will grant it, but I

12       think notwithstanding my general resistance to Rule 54(b)

13       certifications.  I think you have a pretty good case here.  And

14       I really do think that you have a separate case.

15               And, you know, I remember early on, and not without

16       some reason, you complained you sued them in every case, or at

17       least I think they did, that my memory anyhow, I think the

18       divisions of -- the litigation divisions here are all sort of

19       arbitrary.

20               So, based on my current factual understanding that the

21       '933 patent raises different issues, I would imagine entirely

22       different issues.

23               Are the accused products in the '933 case the same?

24               MR. BISHOP:  No, your Honor.  It has to do with carrier

25       building, which is very different than the other patents.

1          THE COURT:  Okay.  Well, I mean, I think you've got a

2     good case for a Rule 54(b) certification.  You have a very good

3     case for one.

4          And, certainly, if the defendants stipulated to it, I

5     would just sign it under these circumstances.

6          But I can't promise, given that I haven't necessarily

7     heard the arguments against the people who aren't even here

8     today would make, I can't promise you that I would sign it.

9          So, that would be my suggestion to get the stipulated

10    judgment on file, file a motion, and I will promptly resolve it.

11         And, in fact, I would also say, just in terms of filing

12    papers without it, you know, I can easily have a speaking motion

13    with a proposed order, and a response, and that would be it.

14    There is no need to reply or anything else.

15         MR. BISHOP:  Thank you, your Honor.

16         THE COURT:  Okay?

17         But that's a suggestion.

18         Not an order, okay?

19         All right.

20         MR. BISHOP:  Thank you, your Honor.

21         THE COURT:  Anything else?

22         MR. BISHOP:  No, your Honor.

23         MR. NELSON:  Just quickly, your Honor.

24         So I do have these documents with me.  The copies that

25    I have are highlighted and kind of marked up a little bit.

1          THE COURT:  Okay.  Would you like to do this?

2          Can you arrange to have the non-highlighted and marked-

3     up copies in my chambers in the next couple of days?

4          And I will promptly review them, and issue some kind of

5     order after I do that?

6          MR. NELSON:  Yes, I can, your Honor.

7          THE COURT:  And, when you send them, copy Mr. Bishop

8     and the docket, since you are submitting documents in-camera, so

9     they know they're being submitted.

10          But don't file them as in-camera documents, just send

11     them to my chambers, all right?

12          MR. NELSON:  Yes, understood.

13          The other thing, your Honor, that I would like to

14     submit with that, looking at the record, it does look like the

15     AT&T privilege log was submitted by either party.  I think Mr.

16     Bishop submitted a log of Location Labs in the California case.

17          THE COURT:  Is that Exhibit E?

18          MR. NELSON:  Your Honor, that's not the AT'T log.

19     That's the Location Labs log.

20          THE COURT:  Okay.  All right.

21          MR. BISHOP:  We didn't have the AT&T log at that time.

22          THE COURT:  No, no, no, that's fine.  I was hoping to

23     compare your log against it.  I would expect it would be pretty

24     similar.

25          MR. NELSON:  I think they would be pretty similar.

1           AT&T's log has some other documents on it that aren't

2      relevant to this, but for the record, I think the documents in

3      question here are Document Nos. 8 through 13 on the AT&T log

4      that we will submit.

5           THE COURT:  All right.

6           Just to make sure that I have this right, could you

7      also, while you're submitting that, also just submit what I

8      believe you've already produced, the indemnification letter, or

9      whatever it is, that preceded these six things where you think

10     that an indemnification agreement was reached?

11          Because I think I probably saw that before, but it

12     would be a lot easier for me, if you would just take the

13     documents that Mr. Bishop has, right?

14          MR. NELSON:  And there's a series of four letters, two

15     going back and forth between AT&T indemnity's counsel, and

16     Location Labs' counsel, that Mr. Bishop has.

17          THE COURT:  All right.

18          Well, can you with this also submit that, and not

19     in-camera, just so I have the context of these things?

20          MR. NELSON:  Yes, your Honor.

21          THE COURT:  So we can say you will do that by Monday?

22          MR. NELSON:  We'll do it by Friday.

23          THE COURT:  Okay.  All right.

24          Anything else from you, Mr. Nelson?

25          MR. NELSON:  No.

1           THE COURT:  Mr. Ruthenberg?

2           MR. RUTHENBERG:  Yes, your Honor.

3           We're not the subject of this AT&T dispute, but Mr.

4    Bishop started with the statement about a representation that I

5    made --

6           THE COURT:  I read the letters.  I got it.  There is no

7    need to address that.

8           MR. RUTHENBERG:  Oh, okay, your Honor.

9           I just didn't want my silence to be viewed as

10   acquiescence, because I don't think he stated my representation

11   accurately.

12          Thank you, your Honor.

13          THE COURT:  Okay.  Anything else, Mr. Bishop?

14          Mr. BISHOP:  Other than to say that I think I stated it

15   very accurately, and I have nothing else, Your Honor.

16          THE COURT:  Okay.  Well, you know, it's like this will

17   never finish.

18          All right.

19          Okay.  So -- oh, I know one other thing.

20          So I was just curious, the last time when we had this

21   Motion to Stay, then afterwards I got some letters with some

22   statistics, and the letters seemed to read -- seemed to have

23   different takes on what was essentially the same information.

24          I just wanted to tell you what my take on the

25   information is.

1          Actually, I have one page here, so I'm not even sure

2    whose letter it was, but there was somebody who submitted

3    something that was called inter parties review petitions

4    terminated to date (as of 1/15/2015.)

5          And then it says underneath it, 20,206 claims and 617

6    petitions.

7          Then it says -- well, there's a category, which I'm not

8    entirely sure what it was -- but then it says 9,048 claims

9    challenged, and again it has the reference to 617 petitions.

10         Then it says 6,114 claims instituted.

11         So, presumably, these are now 6,114 claims that have

12   been resolved.

13         And other than those 6,114, 2,176 were found to be

14   unpatentable, and 643 were found patentable by the PTAB.

15         Then there's two other categories of claims.

16         There are 893 claims that were canceled, or -- and my

17   copy kind of fades out -- but I think it was discarded, or dis

18   something or other.  Presumably it was done by the patent

19   holder.

20         And then it says 2,402 claims remain patentable.

21         And I think, from reading the letter, I got that what

22   that was was settlements, or for some reason or other, why the

23   challenge was dropped.

24         So, to me, which I think is the defendants' take on

25   this, there were 2,819 claims that went to resolution, and 2,176

1    of them were found to be unpatentable, 643 were found to be

2    patentable.

3         Then I believe that's something on the order of 78

4    percent to be found unpatentable and 22 percent found to be

5    patentable.

6         I know you didn't come here to hear about statistics,

7    and I don't know that anybody who wrote the letter is actually

8    here, but, in any event, it seems to me like when these things

9    get PTAB, they're at least so far, the patentholders has not

10   been doing very well.

11        Mr. BISHOP:  Yes.  I would just add to that, your

12   Honor, that there's also procedural grounds that patents are

13   sometimes challenged on -- and, in this case, that's a very big

14   issue as the Court knows with the privity issue, in that it's

15   unlikely, given the facts of this case that the second IPR will

16   even be allowed, once the Patent Office is informed of the fact

17   that they don't currently have before them.

18        THE COURT:  So you think that if you won on privity,

19   for the second one that would fall into the category of 2,402

20   claims remaining patentable?

21        Mr. BISHOP:  I think that there was an other different

22   category of claims that were dismissed on procedural grounds.

23        THE COURT:  I think that was the 78 percent.

24        Mr. BISHOP:  I think that would take that 78 percent

25   down to 50 percent.  I don't have the letter in front of me, but

1    it does take that number down significantly, and I think that's

2    the category that we fall into in this case.

3         THE COURT:  You know, the thing is, I think that

4    somebody in one of their letters said that, you know, that was

5    kind of a grab bag category.  It might include the procedural

6    things, but also seemed include settlements.

7         Mr. BISHOP:  It's difficult to parse it down much

8    further than that.  That's correct, your Honor.

9         THE COURT:  Maybe what I should say is, that of the

10   2,800-odd claims that were resolved on the merits, the

11   patentholders are not doing very well?

12        Mr. BISHOP:  That is probably less well than the other

13   side, but I think that you can't really make that decision

14   without looking at the specific facts of this case, which have

15   to do with privity.

16        THE COURT:  Well, you know, and that is a problem with

17   statistics generally is, while I think they -- figure what one

18   might infer -- you know, it sounds like -- and I know you've

19   been around -- you know, my impression when I started was, all

20   you have to do was show up for the claim for ex-parte re-exam

21   and it would be granted.

22        MR. BISHOP:  Right.

23        THE COURT:  But for one reason or another, it seems

24   like these are much more -- that, in fact, the PTAB standard for

25   instituting these things is a robust standard.

1          MR. BISHOP:  And then I would add to that if we

2     submitted the letters, more statistics would come out, and it's

3     showing that the -- declining, and I think that's natural in a

4     situation where we have a new procedure, the chafe gets weeded

5     out first, and then, as you go on, it becomes less and less

6     effective.

7          So, you know, I can't argue with the statistics that

8     there are a lot of bad patents out there, but I think if you

9     look at the specifics of this case, especially the procedural

10    issues that we're concerned about that, that we brought up

11    multiple times in Court, and I don't need to do the again --

12         THE COURT:  Well, let me ask you.

13         The procedural issue, is that something -- when do you

14    expect the PTAB to actually resolve that?

15         Mr. BISHOP:  Yes.  I don't have the exact dates in my

16    head, but I have it generally.  The patent owner's response is

17    due early in March.  We just took the deposition of Mr. Hodes,

18    who is one of the witnesses for Location Labs.

19         And we're waiting for the PTAB decision on our being

20    able to get the discovery that we already have in the

21    litigation, but that we're unable to use, because of the

22    prosecution bar.  That was the subject of one of our motions.

23         THE COURT:  Right.

24         MR. BISHOP:  Part of the problem there is, is you have

25    to be able to identify with particularity what you're looking

1    for.  We know about the documents, but our IPR counsel doesn't.

2    That's why we asked the Court to allow us to use it.

3          So, that's the next step, is the patent owner will file

4    their response, and then I don't know how long, but it's several

5    months after that.

6          THE COURT:  I guess what I'm wondering is, my

7    impression is that on the merits, that the PTAB has something

8    that is a trial or a hearing?

9          Mr. BISHOP:  That's right.

10          THE COURT:  That privity thing, should that have to be

11    resolved before the trial or the hearing?

12          MR. BISHOP:  I think so.  There are -- again, I'm not

13    an expert on IPR procedures -- but I think the way it works is

14    that there will be -- we'll find out whether or not we get the

15    discovery, we'll file the patent owner's response, and that

16    response will argue the issue of privity.

17          And I think the PTAB would decide that before trial,

18    but I can't represent that for sure.

19          THE COURT:  All right.

20          All right.

21          Okay.  Anything else?

22          MR. NELSON:  No, your Honor.

23          THE COURT:  All right.  Thank you.

24          I look forward to the communications from Mr. Nelson.

25          Actually, am I supposed to see you like later this week

1    on some other thing?

2              MR. BISHOP:  You'll see us tomorrow, your Honor.  It

3    will be Mr. Malgeri.

4              THE COURT:  Okay.  Well, I can hardly wait.

5              (The proceedings adjourned at 2:35 o'clock p.m.)

6                          *  *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25