1                   UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF DELAWARE

3

4    CALLWAVE COMMUNICATION LLC,   :   CA NO. 12-1701-RGA,

5                                  :   12-1704-RGA,

6                 Plaintiff,       :   12-1788-RGA

7                                  :

8          v.                     :   March 16, 2016

9                                  :

10   AT&T MOBILITY LLC, et al.,    :

11                                 :

12              Defendants.    :   3:43 o'clock p.m.

13   .............................:

14

15                   TRANSCRIPT OF 101 MOTION

16          BEFORE THE HONORABLE RICHARD G. ANDREWS

17                UNITED STATES DISTRICT JUDGE

18

19

20   APPEARANCES:

21

22   For Plaintiff:    PEPPER HAMILTON LLP

23                     BY:  JAMES G. MCMILLAN, III, ESQ

24                     BY:  WILLIAM D. BELANGER, ESQ

25                     BY:  GREGORY S. BISHOP, ESQ

```
 1                              BY:  SUPARNA DATTA, ESQ

 2

 3

 4     For Defendants:       ROSS, ARONSTAM & MORITZ LLP

 5                           BY:  BENJAMIN J. SCHLADWEILER, ESQ

 6                                    -and-

 7                           SMITH GAMBRELL & RUSSELL

 8                           BY:  EDWARD A. PENNINGTON, ESQ

 9                           BY:  SID V. PANDIT, ESQ

10                           For Defendant Verizon

11

12                           MORRIS, NICHOLS, ARSHT & TUNNELL

13                           BY:  PAUL SAINDON, ESQ

14                                    -and-

15                           MILBANK, TWEED, HADLEY & MCCLOY

16                           BY:  MARK SCARSI, ESQ

17                           BY:  CHRISTOPHER J. GASPAR, ESQ

18                           BY:  NATHANIEL T. BROWAND, ESQ

19                           For Defendant Google

20

21

22

23     Court Reporter:       LEONARD A. DIBBS

24                           Official Court Reporter

25
```

1                    P R O C E E D I N G S

2

3              (The proceedings occurred at 3:43 o'clock p.m. as

4     follows:)

5              THE COURT:  All right.

6              Please be seated.  Hold on a minute.

7              All right.

8              So, this is the Section 101 Motion filed by somebody in

9     these three cases; 12- 1701, 12-1704 and 12-1788.

10             This is CallWave Communication v. various people.

11             So, Mr. McMillan, who do you have with you?

12             MR. MCMILLAN:  Good afternoon, your Honor.

13             In this case, I have with me William Belanger and

14    Suparna Datta from our Boston office, and Greg Bishop from

15    Pepper Hamilton's Silicon Valley office.

16             THE COURT:  All right.

17             Good afternoon to you all.

18             And Mr. Saindon, or Mr. Schladweiler, why don't you

19    tell me -- that's what that is.

20             You know, I did recognize Mr. Schladweiler, because of

21    the way you put the SCH.  I thought you were Bensch Landweiler.

22    Sorry about that.

23             I've got to be careful, you know.

24             In any event, Mr. Saindon, who do you have with you?

25             MR. SAINDON:  Good afternoon, your Honor.  Paul Saindon

1    from Morris Nichols.  I have with me Mark Scarsi, Chris Gaspar,

2    and Nathaniel Browand from Milbank Tweed.

3              THE COURT:  Thank you.

4              All right.

5              Mr. Schladweiler.

6              MR. SCHLADWEILER:  I apologize, your Honor, about my

7    handwriting.  I think my 12-year-old has better handwriting than

8    me.

9              In any event, I'm here on behalf of Verizon.

10             I'm joined by Ed Pennington and Sid Pandit from Smith

11   Gambrell.

12             THE COURT:  All right.

13             So, who is going to make the argument on behalf of the

14   defendants?

15             MR. SCARSI:  Good afternoon, your Honor, Mark Scarsi.

16   I'll be making the argument.

17             THE COURT:  All right.

18             Let's hear you.

19             MR. SCARSI:  Your Honor, we have some slides.

20             May I hand up a set?

21             THE COURT:  Sure.

22             MR. SCARSI:  Good afternoon, your Honor.

23             I'd like to briefly talk about the '970 patent, the

24   patent that this motion is based on.

25             I want to briefly go through the law behind the Alice

1    analysis, talk about how the claims preempt the idea is and --

2         THE COURT:  And, I'm sorry, just remind me, because

3    I've forgotten this.

4         Have I already construed any terms this patent?

5         MR. SCARSI:  You have, your Honor, yes.

6         THE COURT:  Okay.

7         MR. SCARSI:  Then next I was going to talk about the

8    fact that the motion is ripe, the claim construction has been

9    entered in the case, and it is based purely on the pleadings in

10   the patent, and then go through the case law that CallWave

11   cites.

12        So, briefly, on the '970 patent, here we've got --

13   we've five asserted claims; 14, 15, 16, 17, and 19.

14        Three independent claims; 14, 16, and 19, and two

15   dependent claims.

16        Now, just briefly, I'm going to talk about each of the

17   claims.

18        Claim 14 is a claim that we'll be spending most of our

19   time on.  It's the claim that we discussed in our briefing as

20   representative of the claims.  It's a method claim and it

21   determines location of a mobile platform.

22        According to the Court's construction and papers, a

23   mobile platform can be anything.  It can be a car, a person, a

24   phone.

25        It, essentially, accepts inputs from a subscriber

1    looking to find an item.  It determines a tracking system to use

2    to find the item, routes the identity of the item in the

3    tracking system, receives a result and routes that back to the

4    subscriber.

5            So, it's essentially a clearinghouse method that allows

6    a subscriber to access multiple tracking systems for the

7    location of a mobile platform.

8            Claim 17 depends from Claim 14 and it includes another

9    step of, when you found the item, correlating the location of

10   the item on to a map.

11           Claim 17 depends from Claim 16, and that includes the

12   same mapping item.

13           And then Claims 16 and 19, essentially, two limitations

14   of the claims.

15           Claim 16 requires a computer readable program code for

16   a performing method.

17           And Claim 19 requires a program storage device readable

18   by a machine in conjunction with the method.

19           Neither party are looking at these limitations as a way

20   to distinguish the claims for the purpose of the 101 framework,

21   and so, we'll be focusing mostly on Claims 14, 15, and 17.

22           As the Court obviously knows very well, the -- Alice

23   describes a two-step analysis; do we have a abstract idea, and

24   if we do, is there something inventive to pull it out of the

25   abstract and put it into patentable subject matter?

1          As identified in the papers, the patent claims do claim

2     an abstract idea.  Essentially, they claim the abstract idea of

3     requesting location information, and receiving the location

4     information back from the tracking system that was provided with

5     the request.

6          So, essentially, requesting information, receiving

7     information after the mobile has been tracked.

8          The claim -- back to Claim 14 -- it boils down to some

9     very basic steps.

10          The system receives a request.  It selects a remote

11     source established by the request, the remote tracking systems.

12     It sends the request to the remote source.  It receives the

13     results, and forwards those back to the subscriber.

14          That's really the whole claim and that's really the

15     method.

16          What you'll see in the papers, though, CallWave has

17     focused on this underlying phrase in the preamble where the

18     remote tracking systems are adapted to determine the location of

19     a respected mobile platform, according to a property that is

20     predetermined.

21          So, the remote tracking systems that are used by the

22     method, have been adapted to track items based on a property of

23     those items.

24          And we contend that this limitation, whether it's a

25     limitation or not, but this language added to the preamble, it's

1    very broad and really doesn't add anything to the invention.

2         Any system that can track something must be able to

3    track it, based on some property of the thing it's tracking.

4         So, for example, the property could be the item's name,

5    it could be the item's size, it could be a description of the

6    item.

7         There really -- it's almost a tautology, that if you're

8    looking for something, you need to know at least one thing, one

9    property about the thing that you're looking for.

10        And that's really all that this language added.  It

11   doesn't add any specifics on how, or why, or what the properties

12   have to be.  They can be any properties at all.

13        I think, at this point, if we can go to the claim

14   construction slide, just to briefly review the claim

15   constructions in this case, and make sure we're all working from

16   the same -- I believe that's Slide 50.

17        And you'll see these are the constructions that your

18   Honor entered in this case.

19        By background on claim construction, CallWave's

20   position on any claim construction was that nothing needed

21   construction.

22        Google and the other defendants argued for a number of

23   constructions.

24        These are the ones the Court entered leaving a number

25   of terms that have an ordinary meaning.

1          You'll see here that mobile platform in the claims can

2    mean anything.  It can be a vehicle, it can be a person, a

3    portable computer, a phone.

4          A remote tracking system merely is a system that's

5    separate from the thing that you're tracking, and it's capable

6    of tracking something.

7          Again, it's a very broad definition.  It just needs to

8    be separate from the item you're tracking.

9          And here a property that is predetermined for each

10   mobile platform, it's just a property of a platform that's

11   determined before you're tracking, so there really isn't much

12   there.

13         So, the claim construction that we're entering into in

14   this case, do nothing to really narrow the claims.  We're still

15   dealing with very much a claim that's broad and is drawn to a

16   very abstract idea.

17         In our briefs, we read the claim -- can we go to Slide

18   13?

19         We read the claim language sort of as a basic human

20   activity just to show sort of the breadth of the claim.  And the

21   analogy that was used was an analogy where a parent requires of

22   a principal in a school, the location of their student that is

23   attending the school.

24         THE COURT:  Yu know, I did the principal and the school

25   thing in that one case.  And, now, in each of these, everyone is

1    always is analogizing things to schools.

2         Let's try to come up with some different analogy in the

3    future, okay?

4         MR. SCARSI:  Yes, your Honor, we will.

5         This claim is broad enough that we could even -- I

6    mean, it could be, you know, as simple as finding anything, but,

7    yes, the next time.

8         THE COURT:  I'm just curious.

9         Do you think this would be covered by Claim 14?

10        The State of Delaware has a fleet of vehicles that they

11   give to state employees, not give, but let state employees use

12   for business purposes.

13        And there's somebody out there who's busy monitoring, I

14   assume for a fee, where all these vehicles are to make sure they

15   are where they are supposed to be, or at least not where they're

16   not supposed to be.

17        And if we -- and let's assume, because when I work for

18   the state, some of these cars are ten years old, that, you know,

19   some of them have GPS devices made by GPS device Manufacturer

20   No. 1.  Some of them have GPS devices manufactured by GPS device

21   Manufacturer No. 2.  It's a little more modern.  And whoever is

22   tracking all these things, can track either GPS device.

23        The State of Delaware is the subscriber, the vehicles

24   are the remote platforms, the mobile platforms, or whoever is

25   being paid to do all this, is the location determination

1        service.

2                Is that covered by this patent?

3                MR. SCARSI:  Certainly, your Honor, yes.

4                That sort of system would be -- would well fall within

5        this patent, especially if you have multiple ways of tracking

6        the cars.

7                So, let's say, for example, there was a GPS method.

8        There was a second GPS method.  Even if you could track a car by

9        the owner of the car, that could be your tracking system.

10               So, someone, for example, could say to the person in

11       charge, hey, I need to find that, you know, 2005 Pontiac car

12       with license plate X5253.

13               That person could either -- they could look it up and

14       figure out who's got that car assigned to him, call that person

15       and say, where is the car, that would fall within the purview of

16       this patent.

17               It's really as simple as that.  As long they had

18       multiple tracking systems available to them, they could access

19       one.  And if there were some problem about the car that enabled

20       the tracking system to work, that certainly would be covered.

21               THE COURT:  Well, you can tell me about the teachers.

22               MR. SCARSI:  Okay.  Sorry.  We'll definitely use a

23       different analogy the next time.

24               But in the teacher example, going to the preamble, you

25       have to have a predetermined property.

1    And we're looking for students.  And so, the
2  predetermined property is the appearance of a student.
3    It's really as simple as that.  It doesn't have to be
4  technological.  It doesn't have to have any other structure.
5    The first step of the claim, receiving a request.
6    The parent calls the school and says, I'm trying to
7  find out where my daughter is.
8    That's it.  Receiving a request.  The principal
9  receives the request.
10    The next step is, the principal determines what system
11  to use.
12    In our analogy, the principal determines what teacher
13  to ask.  And the principal can do that in any number of ways.
14  The patent doesn't specify any specific way that that needs to
15  happen.  The principal just needs to determine which system to
16  use.
17    Here the principal can determine what teacher to ask
18  based on what classroom the student is in, which really is as
19  simple as that.  There is no other technical requirements in the
20  claims.
21    Once the principal determines what teacher to ask, the
22  next two steps are very simple.
23    The principal asks the teacher to find a particular
24  student.  And then the principal receives the location back from
25  the teacher.  And then the principal gives that information back

1    follow the parent.  And that's really it.

2        And, in this patent, there's nothing more specific

3    that's required in the claim, as long as the teacher was, in the

4    preamble, adapted to identify the mobile platform of the

5    students by some property.

6        And, certainly, a teacher knows what their student

7    looks like, so that precondition has already been satisfied

8    there.

9        CallWave disputed this analogy in another way.  They

10   say in multiple platforms, you can have multiple teachers.  That

11   really doesn't -- it's not a stretch to think that a school has

12   multiple classrooms and multiple teachers.

13       They argue that we didn't explain how the teacher

14   determines which -- what teacher to the principal -- what

15   teacher to ask.

16       There is no requirement in the claim for a specific

17   determination method, and the teacher could easily just look up

18   on a file to see what, you know -- the principal could look up

19   in a file to see what teacher a student is in.

20       CallWave argues that we didn't -- that the parents

21   aren't subscribers.

22       But, again, in the broadest interpretation of the

23   claim, there is no teeth on subscriber.  That means it's got to

24   be somebody that is paying money for a service.  It could be

25   somebody who has access to that service.  And, certainly, a

1    teacher has access to the services of a school.

2         And, then, with respect to 15 and 17, identifying the

3    location on a map, certainly the principal could have a map of a

4    school, and just put an X there to show where the location --

5    where the cafeteria or a classroom is.

6         So there's really not much to this -- to this claim at

7    all.  This claim is actually very similar to the claim in the

8    Dealertrack case from the Federal Circuit.

9         And --

10         THE COURT:  Mr. Scarsi, there is one question I would

11   like to ask, and maybe Dealertrack is your answer.  But if there

12   was one case, and I don't care whether it's the Federal Circuit

13   or it's District Court -- that you're going to say, Judge, if

14   you read this case, and you follow it, we have to win.

15         What case would that be?

16         MR. SCARSI:  Your Honor, if you read Dealertrack, and

17   follow it, we have to win.  This is our case.

18         THE COURT:  Okay.  Good.

19         I can't believe how many people then try to give me

20   three cases in response to that, so I like your answer.

21         MR. SCARSI:  This is our case.  This is right on all

22   fours.

23         And I'll just briefly go through it.

24         Dealertrack was a system -- by way of background.  In

25   the old days when you go to buy a car, and you needed credit,

1   the car dealer would try to find a credit source, so he would go

2   through his different sources and try to match up, you know,

3   your credit report with what he could sort of do to make that

4   deal.

5          And it was somewhat of an cumbersome process.  He was

6   in the back room trying to match it up so they could come back

7   and tell you, hey, we have the credit for you, you can finance

8   the car.

9          What Dealertrack said is, you know, that's a cumbersome

10  process.  If we only had a system that was sort of a

11  clearinghouse where you could take the credit application, put

12  it into the system, you could match it up against an appropriate

13  credit source, get a decision, and then route it back.

14         It's very much the clearinghouse procedure that's in

15  '970 patent, and it really follows these same steps.

16         In Dealertrack, you receive -- you receive a request.

17  You receive a credit application.  You select a remote source.

18  You select which credit funding source you're going to send the

19  application to.

20         You send the application to the credit sources.  You

21  get a decision back.  And route that back to the person at the

22  -- at the site.

23         It's got the same steps to it that the '970 patent has.

24         Now, in that underlying credit application data it

25  says, there's that preamble where the systems are adapted to

1    actually identify locations based on a property of a mobile

2    device.

3            Here, the funding sources are adapted to make a credit

4    determination based on the credit application data.

5            So, for example, there might be a credit score that

6    they use to decide whether to give credit or not.  They might

7    use income, they might use three or four things together.

8            Those are all properties they use to decide whether to

9    give credit.  Those credit systems are clearly adapted to make

10   decisions based on that.

11           So, it really does have all of the elements of the

12   claims that were issued in the '970 patent.

13           And we matched them up on this slide.  Let me just go

14   through them in more detail one-by-one.

15           Starting off in the preamble, it's property that is

16   determined.  That's the credit application data.  That is the

17   information that the credit source is going to use to determine

18   whether to give credit.  So that property is there and it's

19   predetermined in credit systems.

20           And then we go through these very simple steps.

21           We receive a request for credit.  We select a remote

22   source.

23           In the '970 patent it's a tracking source.  In this

24   patent, a funding source.

25           We send the information to the remote source.  In the

1    '970 patent we send the item to be tracked.  In the Dealertrack

2    patent, we sent the credit application to the remote source.

3         Outside of the claim, the remote source is going to do

4    whatever it does.

5         So, if the tracking system were tracking, the funding

6    system will determine the funding.  That's not within the claim.

7    The claim is just passing the information back and forth.

8         One step is that it's doing is that it receives

9    information back, either the location, or the yes, no, on the

10   credit, and then we transmit information back to the user.  It's

11   really the same process.  Clearinghouse back and forth.

12        THE COURT:  In the Dealertrack case, when the Federal

13   Circuit was talking about the abstract idea, how did they

14   describe it?

15        MR. SCARSI:  They said, that Dealertrack's claimed

16   process in its simplest form includes just three steps.

17        Receiving data from one source, selectively forwarding

18   the data, and forwarding reply data to the first source.

19        And they said this is just like the Bilski case, where

20   it's just a clearinghouse of information going back and forth.

21        THE COURT:  And yet, I'm correct, am I not, that your

22   proposal for the abstract idea portion of this analysis is not

23   processing information through a clearinghouse, is it?

24        MR. SCARSI:  No, our abstract idea was a little wordier

25   than that, because we included location information in it,

1    because this was -- this patent is restricted to location.

2           THE COURT:  So, processing location information through

3    a clearinghouse?

4           MR. SCARSI:  Our abstract idea, requesting and

5    receiving information about location of something via an

6    intermediary, so an intermediary that's sort of acting as a

7    clearinghouse.

8           THE COURT:  Well, so, does Dealertrack -- is there

9    something wrong with the processing location information through

10   a clearinghouse?

11          MR. SCARSI:  Not at all, no.  I think it's probably a

12   better articulation of the idea, because it gives you this

13   concept of you've got multiple sources that you're going to use,

14   potentially use to find the location.

15          You find the right one, get the location, and come

16   back, so the clearinghouse concept is very much like Dealertrack

17   system.

18          THE COURT:  All right.

19          Well, you know, it struck me as strange, when you say

20   that the Dealertrack is the case, Judge, that has the abstract

21   idea.  In that case, here's our case compared to their case.

22          And yet you have kind of a very different set of

23   formulations.

24          MR. SCARSI:  Yes, we could have done a better job of

25   doing that, your Honor, of presenting the abstract idea in line

1    with the Dealertrack case.  It really is sending data over to a

2    clearinghouse and getting the results back in the context of a

3    location finding system.

4              THE COURT:  Okay.  Go ahead.

5              MR. SCARSI:  Can we go to Slide 27?

6              And just by way of example, the two systems sort of

7    work the same way when you look at the preferred embodiments and

8    the figures of the patent.

9              You'll see on this slide, the request starts out in a

10   sort of a red box where we're receiving information.  That

11   information gets sent to a communication medium that sends it

12   out to the various sources in blue.  The sources return results

13   and that goes back to the red box.

14             So, it's, essentially, the -- the patent is receiving

15   the request, sending it out to a particular source of a

16   potential multiple source, and then sending those results back.

17             The cases -- also one case that I wanted to bring to

18   the Court's attention was Concaten case.  This case also

19   involved -- this involved a location --

20             THE COURT:  Concaten, I have not read that.

21             Is that a District Court case?

22             MR. SCARSI:  Yes, your Honor.  It's from the District

23   of Colorado.  It's from last September.

24             THE COURT:  All right.

25             MR. SCARSI:  And this case involves a system that gave

1      a location of tracking snow removal devices.

2             And, again, it accepted information.  It routed that

3      information to some processing.  It transmitted information

4      back.  And what this case did is, it displayed the information

5      on a map.

6             So, essentially, it included the step in the dependent

7      claims of displaying information on a map.  This was a pure

8      information transfer system, and the result was that it was

9      displaying information on the map.

10            What this doesn't have, though, is the step of picking

11     one of multiple sources to process the information that you're

12     sending.

13            So, it doesn't match up as well with the <u>Dealertrack</u>

14     case, but does have the extra step of finding information or

15     identifying information we found and putting it on a map.

16            THE COURT:  Is it your understanding that the asserted

17     claims of the '970 patent, whichever ones we're talking about of

18     the five, the only way to make this thing work is to write some

19     computer code to do these things, right?

20            MR. SCARSI:  Not necessarily, no.  The patent doesn't

21     require, at least Claim 14, doesn't require a computer code to

22     perform the clearinghouse operation.

23            The other claims require that a source code might, but

24     the system doesn't require a computer.  It doesn't require

25     structure.  It really could be as simple as the teacher example

1    we gave, or the example of somebody trying to find a car in the

2    State of Delaware.  There really doesn't need to be any

3    structure there at all.

4         THE COURT:  Okay.

5         MR. SCARSI:  The Court in the Concaten case, again, you

6    know, the same process of receiving information, processing

7    information, and sending out an instruction in the map is the

8    same thing as receiving the information, and processing it, and

9    then mapping it.  It's a very simple concept.

10        And to the point that the claims don't recite

11   structure, some of the things that we saw in the briefs,

12   CallWave says, for example, in their opposition, that the

13   process requires a way to locate mobile platforms using a

14   variety of different tracking systems.  It talks about the

15   intricate details involved in that.

16        But the way to locate something is not part of the

17   claims.  That's done by the remote tracking systems.  The

18   operation of that, how they operate, how they do it, it's not

19   part of the claims at all.  It's not part of a structure of the

20   claims.

21        CallWave points to the adapting, that there needs to be

22   some adapting of the tracking system to allow location of the

23   mobile platform.

24        Again, the tracking systems are adapted, according to

25   the claim, so you're dealing with a world where the tracking

1  systems are adapted and you're filtering information back and

2  forth between them.

3       Adapting the tracking systems to identify the multiple

4  platforms, that's not part of the claims.  That happened maybe

5  before the claim started, but it's not part of what the claims

6  do.

7       So, in this world, we're dealing with tracking systems

8  that already exist, and they're already adapted to find mobile

9  platforms.  We're just routing information back and forth.

10      In fact, the patent talked about, in the four corners

11  of the patent, that these tracking systems had been around, and

12  users knew how to use them, and they were adapted to find

13  things.

14      So, this is really just patent information back and

15  forth.  All of the processing is not part of the claim.  The

16  claim is just the information that goes back and forth.

17      CallWave says the subscribers connects to the website

18  to facilitate the use of the system.

19      But, again, the while the system could be used in

20  accordance with a website, a website is not required.  It's not

21  in the claim.  It's not part of the invention that's claimed.

22      CallWave tries to find structure in what it calls a map

23  server and map engine, but the map server and map engine are not

24  part of the asserted claims at all.

25      There are some other claims that are asserted, that

1    include some of these terms, but they're not part of the

2    asserted claims.  They're all sort of mapping that's done in

3    Claims 15 and 17, don't require a map server or a map engine.

4    They could be done by a person just identifying the location on

5    a map.

6           I wanted to talk a little bit about the lack of

7    inventive concept.

8           According to the patent, these remote tracking systems

9    were known to allow a vehicle, a mobile telephone, or entity to

10   be located.

11          So, there is no inventive concept in a remote tracking

12   systems they -- they would have known.

13          The subscriber accessed the remote tracking systems.

14   Again, according to the patent, that was done before the patent,

15   so the subscriber accessing the remote tracking system, that

16   can't be the defendants' concept that pulls it out.

17          The claim talks about the trained personnel that used

18   these tracking systems before.  So, again, there's nothing there

19   that creates -- that takes an abstract idea and puts enough on

20   it to make it patentable.

21          And the structure in the specification, to the extent

22   it's discussed, it's all general conventional computer

23   components.

24          We have, for example, a general purpose computer that

25   can be used in accordance with this invention to perform all of

1    the inventive steps along with a general purpose database used

2    by the computer, itself.

3           So the location's determination is just a conventional

4    computer with a database as specified in the patent.  Nothing

5    more inventive.

6           Claims 15 and 17 require a mapped database, but, again,

7    that's just a general purpose database.  There's nothing that

8    distinguishes it.

9           And here's it's shown as Item 5.  It's just a general

10   database.  There's nothing that's, you know, special or fancy

11   about it.

12          Again, the communication system and map server that are

13   shown in the figures, they're not even part of the asserted

14   claims, so they're not in this case.  None of these can be

15   structured.

16          THE COURT:  What is not part of claim?

17          MR. SCARSI:  The communication subsystem and the map

18   server that are discussed in the briefing and in the figures.

19   They're not required in the claims at all -- they're not

20   required elements of the asserted claims -- I'm sorry, your

21   Honor.

22          So, again, as far as the analysis we're asking the

23   Court to undertake -- those components are not involved at all.

24          THE COURT:  So, I understand that Claim 18, I guess, is

25   the one that was canceled in the PTO.

1          In the earlier days of this case, were there asserted

2     claims, other than 14 through 19?

3          MR. SCARSI:  Your Honor, I don't imagine so, no.

4          MR. BELANGER:  Okay.  Claim 18 was asserted earlier in

5     the case.

6          THE COURT:  No, no, I understand that.  Right.

7          Thank you, Mr. Belanger.

8          MR. SCARSI:  So, again, we're just looking at, in the

9     Dealertrack case, we're just looking generic components.

10    There's nothing sophisticated required by the patent itself.

11         Going to Claims 15 and 17 -- and I apologize for how

12    this shows up on the screen, your Honor --

13         THE COURT:  Well, it shows better here.

14         MR. SCARSI:  Yes, that's right.

15         Displaying information on a graphical map really

16    doesn't limit the abstract idea, you know, in any meaningful

17    way.

18         And there has been sort of cases, you know, from the

19    District Court in D.C., displaying a place indicated on a map,

20    indicating a location isn't an abstract idea.  It doesn't take

21    something out of the realm of the abstract.

22         And, reasonably, submitted to the Court a few days ago,

23    in the Peschke case out of E.D. Virginia, you know, a

24    hyperlinked icon in the shape of a store on a map, doesn't take

25    an abstract idea and make it inventive.

1          So, the mapping elements here of putting the location

2     on a map, don't -- don't make this thing any less abstract.

3          And as you said before, Claims 16 and 19 -- Claim 16

4     just adds computer readable code, and Claim 19, program storage,

5     readable by machine.

6          But, again, here the parties are arguing that these

7     limitations pull these claims out of the purview of the

8     abstractness of 101.

9          I want to talk a little bit about preemption.

10         The claims do preempt the abstract idea in that there's

11    no -- there's no tracking technology required.  There's no

12    particular tracking technology required.  There's no system

13    required by the claims.  The claims just require a passing

14    location request in, getting a result, and picking the right --

15    picking a system to use, and getting the result out.

16         There's nothing -- there's no boundary to that at all.

17    It could be anything of a location system.

18         For example, this isn't a case where you have to use

19    the internet, or there's some internet component to it where it

20    would limit it to an internet location.  This really applies to

21    anything at all.

22         There's no limitation on the structure that performs

23    the task of locating.  None of the claim steps requires any

24    location tracking.  None of the claim steps identify how a

25    mobile platform is determined.  None of them require the use of

1    any particular algorithm, protocol, calculations, or any type of

2    format at all.

3          And I did want to bring up the point of preemption,

4    but, obviously, preemption is not the end of the game.  That you

5    have to preempt something in order for an idea to be abstract

6    for a claim not to be patentable and under 101.  I think

7    preemption is important, but it's not necessarily the end of

8    game.

9          We just want to direct the Court's attention to the few

10   cases that made that point.

11         In the Ariosa Diagnostics case, the absence of complete

12   preemption does not demonstrate patent eligibility.

13         And there is a case from your Honor whether the claim

14   preempts all decryption is not the test for patent eligibility.

15         So, we believe there is significant preemption here,

16   and we believe that it preempts the abstract idea.

17         But even if it was some minor carve out, it doesn't

18   necessarily mean that the patent -- that the abstract concept is

19   eligible for a patent.

20         We talked about claim construction.  And, again, the

21   claim construction is done in this case, and so, there really

22   isn't any need to -- the motion is not even premature.

23         Nobody has argued in the briefing for additional claim

24   construction.  Nobody has requested the Court to do anything

25   more in that regard.

1          So the state of affairs is, the Court has construed the

2    claims and the parties are satisfied with the Court's

3    construction.

4          CallWave has indicated in its briefing that they

5    thought the defendants were going outside the pleadings.  The

6    defendants are not.

7          We were looking purely at the patent itself.  All of

8    the things that we're directing the Court to, by way of lack of

9    structure, come from looking at the patent.

10         We're not asking the Court to make any findings of fact

11   with respect to what tracking systems do and can't do.  And the

12   teacher analogy that we sort of set forth was really something

13   that's well within basic human behavior.

14         We're not asking the Court to make any finding.  I

15   don't think there's anything in what we've suggest by way of

16   analogy that would be improper for the Court to take judicial

17   notice of.

18         And, certainly, judgment on the pleadings is

19   procedurally proper, and it happens all time with respect to 101

20   Motions.

21         Counsel has talked about novelty a bit in its --

22   CallWave has talked about novelty in its materials.

23         For example, it said that the fact that if the patents

24   survives Patent Office challenges, should be relevant to the

25   Court's analysis on this motion.

1          But novelty is really a different question than Section

2     101.  That's, obviously, a lot of the cases.  Diamond v. Diehr

3     and so on.  So that's really not what we should be talking about

4     here.

5          Does your Honor have any questions on any of the

6     materials I've covered so far?

7          THE COURT:  Well, I would be happy to hear from the

8     other side.

9          MR. SCARSI:  Okay.  If I can just briefly talk about

10    the DDR case.  I just wanted to bring out -- make an important

11    distinction with that case.

12         DDR was a case that the Court held was deeply rooted in

13    computer technology to overcome a problem specifically arising

14    in the relevant computer networks.

15         And, as your Honor may recall from the DDR case, it was

16    a specific case that involved how you were presenting web pages

17    within other web pages.  It was an internet problem that was

18    solved by the patent.  It wasn't an abstract idea.

19         DDR -- and this is Claim 19 here -- it was much

20    different than the cases where there was an abstract idea that

21    was just done on the internet.  This is a case involving a

22    specific internet problem that was solved by the patent.

23         And that's why DDR is not applicable to this case --

24    this case at all.

25         If there are no further questions, I will sit down.

1          Thank you, your Honor.

2          THE COURT:  Thank you, Mr. Scarsi.

3          MR. BELANGER:  Good afternoon, your Honor.

4          THE COURT:  Good afternoon, Mr. Belanger.

5          MR. BELANGER:  I have some slides.

6          May I approach?  Did you need two copies?

7          THE COURT:  That would be good.

8          Your Honor, I will start with your question about which

9     case I would choose to --

10         THE COURT:  That's a good place to start.

11         MR. BELANGER:  All right.

12         Counsel preempted my answer by pointing you to the DDR

13    case in the Federal Circuit.

14         THE COURT:  It's interesting, because I do a lot of

15    these, because I did have a variety of different cases cited by

16    the defendant, and I only get one case cited by the plaintiff.

17         Okay.  DDR.  That's fair enough.

18         MR. BELANGER:  And the reason for pointing you to that

19    case is, I think is, it does illustrate the difference between

20    the claims at issue here, the claims at issue in the Dealertrack

21    case and the other cases that you, your Honor, and other judges

22    have found to be unpatentable.

23         And the key issue that we would direct you to focus on

24    or the DDR case would direct you to focus on -- excuse me -- is,

25    whether the claims are directed to simply an abstract concept

1   that is implemented by a special purpose computer -- excuse me

2   -- or by a general purpose computer, or conversely, as the

3   Federal Circuit found in the DDR case, whether the articulation

4   of the problem and the claimed solution to the problem is

5   something particular to the computer field, solving a particular

6   problem in a non-abstract way.

7          And I would submit to you that that's exactly the case

8   here.  And with -- with particular focus on a claim limitation

9   -- I'll get to this in a minute -- with a claim limitation that

10  I think was notable in counsel's argument.

11         He indicated several times it was not really a

12  limitation in the claim.

13         And so, if you sort of -- to summarize --

14         THE COURT:  The property that's predetermined?

15         MR. BELANGER:  It is that the remote tracking system

16  must be adapted.

17         So, it's in Claim 14, and I've highlighted in red the

18  language which we believe is of particular importance, and

19  should be the focus.

20         The claim reads, "each" -- so you've got "plurality of

21  remote tracking systems" -- and then further the claim reads,

22  "each" -- it should be "of which" -- "each of which is adapted

23  to determine the location of a respective mobile platform

24  according to a property that is predetermined for each mobile

25  platform."

1          And the reason why this is important, your Honor is --

2    if you go to the next slide -- keep on that slide -- the reason

3    why this is important, your Honor is, defendants entire argument

4    rests on the proposition that the remote tracking system was

5    something that was well known.

6          And, to the contrary, rather than complaining novelty

7    and the 101 analysis, if you look at the cases that find

8    unpatentability on the basis of 101, the claims are merely

9    implemented in something that was admittedly well known in a

10   general purpose computer.

11         Where the claim is allowed by the Patent Office, based

12   on a limitation as here, which is a unique adaptation of

13   something that was known in the patent.  Here's it's a unique

14   adaptation of remote tracking systems.

15         That overcomes the first step of the analysis, which

16   requires that the claims be directed to an abstract idea, or

17   some non-patentable concept.

18         If you go to the next slide, I think this is -- this

19   came out, I think it was further highlighting your questioning

20   -- but in the DDR case, the Federal Circuit observes that if the

21   defendants, themselves, have a hard time telling you what the

22   abstract idea is, that's a pretty good clue that the claims are

23   not actually directed to an abstract idea.

24         So, what we have here?

25         THE COURT:  Did DDR really say that?

1           MR. BELANGER:  It did, your Honor.

2           Bear with me.  I'll get you the exact quote.

3           THE COURT:  I can't imagine, if they said, you know,

4      the abstract -- you know, the defendants -- well, I can imagine

5      them saying something like that, but not meaning exactly the way

6      you just said it.

7           MR. BELANGER:  I'll read you from the Federal Circuit

8      opinion.  This is at 773 Fed 3rd at 1256, your Honor.

9           THE COURT:  Yes.

10          MR. BELANGER:  The Federal Circuit said, "Indeed,

11     identifying the precise nature of the abstract idea is not as

12     straightforward as in Alice, or some of our other recent

13     abstract idea cases.  NLGs own varying formulations of the

14     underlying abstract idea illustrate this difficulty.

15          "NLG characterizes the allegedly abstract idea in

16     numerous ways, including" -- quote "making two web pages look

17     the same," -- quote "syndicated commerce on the computer using

18     the internet," quote, and quote, "and making two e-commerce web

19     pages look alike by using licensed trademarks, logos, color

20     schemes, and layouts."

21          THE COURT:  Did DDR actually decide whether or not it

22     was or was not an abstract idea, or did they just decide that

23     there was an inventive concept?

24          MR. BELANGER:  The DDR case that we found, both.  We

25     found that it was not an abstract idea, because the claims were

1    directed to a specific solution to a problem raised in the

2    computer systems.

3           And also that it was -- it had inventive concept.

4           THE COURT:  So, they only needed to find one, but they

5    found both.

6           MR. BELANGER:  That's my reading of the case, yes, your

7    Honor.

8           THE COURT:  Okay.

9           MR. BELANGER:  I believe that's the case.

10          THE COURT:  Sorry, what was that?

11          MR. BELANGER:  I believe that that is also the case

12   here.

13          THE COURT:  Okay.

14          MR. BELANGER:  And I'll just -- this is in the brief --

15   but I think for the purposes of argument --

16          THE COURT:  Actually, hold on a moment.

17          Can you go back to the language that has the remote

18   tracking system in it?

19          MR. BELANGER:  Sure.

20          THE COURT:  So, I can recall, or I can't even recall

21   from ten minutes ago when Mr. Scarsi was talking.

22          Did I construe remote tracking systems?

23          MR. BELANGER:  You did, your Honor.

24          THE COURT:  Okay.

25          Remind me, what did I construe it as?

1          MR. SCARSI:  Your Honor, it's Slide 50.

2          THE COURT:  Okay.  Thank you.  That's what I was

3     looking for.

4          All right.

5          Now, I recall, or I don't actually recall, but I'm

6     taking Mr. Scarsi's word here that you were arguing -- and when

7     I say "you," I don't mean you personally, but the plaintiff was

8     arguing for the plain and ordinary meaning of remote tracking

9     system at claim construction.

10         And let's assume for the sake of argument, that's true,

11    too.  I assume it probably is.

12         If you had to do the claim construction over again

13    right this minute, would you say that what I construed it as is

14    a system physically separate from the mobile platform being

15    tracked that determines the location of the mobile platform, was

16    included within the plain and ordinary meaning?

17         MR. BELANGER:  Yes, your Honor.

18         And two things.

19         It was me, and we did argue the plain and ordinary

20    meaning.

21         But the crux of the dispute at Markman, without delving

22    too much into the meaning of this was, in the preferred

23    embodiment, there is called out remote tracking systems.  If I

24    --

25         THE COURT:  What I -- and I appreciate you trying to

1    answer my question -- but, usually the take on it is that the

2    plain and ordinary meaning covers, you know, a big vin diagram

3    of stuff, and the defendants construction covers a smaller vin

4    diagram of stuff.

5         Sometimes it's in the plain and ordinary meaning, as a

6    subpart of it, sometimes it's completely separate.

7         And so, really what I was just wondering is, whether

8    your view is it, in fact, a remote tracking system, because this

9    way we're going with the way I construed it, but the remote

10    tracking system is -- includes the way I've actually construed

11    it?

12         MR. BELANGER:  Yes, I agree with that, your Honor.

13         The crux of the dispute was the physically separate --

14    how do you include physically separate in the definition.

15         So, the preferred embodiment, in our view --

16         THE COURT:  So, you wanted to say it didn't have to be

17    physically separate?

18         MR. BELANGER:  There could be components that were

19    physically co-linking it, but it had to have at least part of

20    the system that was remote.

21         And they argued that the complete system was remote and

22    you agreed with that.

23         THE COURT:  And so, in the mobile platform, the plain

24    and ordinary meaning, did I include a person?

25         MR. BELANGER:  Yes, that's clear from the

1    specification.

2          And, I think, mobile platform, we agreed on that, and

3    your Honor entered -- there was briefing back and forth.  I

4    believe that was an agreed construction.

5          THE COURT:  Okay.  All right.

6          The language that you've highlighted in red here on

7    Claim 14, each of which is adapted to determine the location of

8    a respective mobile platform, according to a property, is

9    predetermined for each mobile platform.

10          You're saying that that is significant language,

11    because -- well, it comes after the because -- can you tell me

12    that again?

13          MR. BELANGER:  Because the known remote tracking

14    systems that are described in the background of the invention,

15    and the problem that's identified by the patentee, they argued

16    successfully in the Patent Office that they solved the problem

17    of multiple remote tracking systems that used different

18    technology and different protocols, not being able to

19    communicate with each other.

20          THE COURT:  They solved it by saying they can

21    communicate with each other?

22          MR. BELANGER:  They solved it by saying that each of

23    those, if you have multiple, each would use a property that's

24    unique to each of the items being tracked, and you're going to

25    use a common property across multiple remote tracking systems,

1   such that each of them is adapted to determine the location of a

2   respective mobile platform, according to a property that is

3   predetermined for each mobile platform.

4         So, it's easier -- your vehicle -- having the two GPS

5   analogies.

6         THE COURT:  Right.

7         MR. BELANGER:  If you look in the background of the

8   patent, they describe a mobile tracking system, as one example.

9         And they would say that when you call GPS Unit 1, you

10   know, has a certain type of technology and protocol, and GPS

11   Unit 2 in your analogy -- they have two different protocols, two

12   different mechanisms for locating a specific thing.

13         And so, rather than having the location determination

14   system utilized at a particular protocol of either one, they

15   adapt both of those two systems; the GPS 1 system and the GPS 2

16   system to use a predetermined property that is predetermined for

17   each of the vehicles in your example, so that you're using a

18   common property cross-systems, and that eliminated the problem

19   of having to program a special purpose interface to deal with

20   each one.

21         THE COURT:  So, the way that you do what you just said

22   is by writing some computer code to do this?

23         MR. BELANGER:  Yes, your Honor.

24         And just to give you context, that is what actually

25   happens.  Our client is a small company, and the inventor of the

1    patent, he had a small company in Israel.  He was writing

2    computer code for Iditarod (ph) and Motorola.  It's in his

3    deposition.

4         And he came across this problem, and so, he wrote a

5    computer platform, a computer program to solve the problem, and

6    release the product he was marketing.  And this patent was his

7    patent attorney's attempt to protect that product that he had

8    created.

9         So he wrote computer code and the computer platform to

10   address and solve this problem, yes.

11        THE COURT:  And so in terms of Claim 14, Mr. Scarsi

12   says it doesn't require a computer.

13        Do you agree with that?

14        MR. BELANGER:  I don't, your Honor.

15        I don't know how you would perform the step without or

16   perform the method without having a computer, particularly, the

17   fact that the system is adapted to perform the location based on

18   property that is predetermined from the mobile platform.

19        And this is the entire claim.

20        Particularly, if you read that -- the language

21   highlighted in red together with Step B where you're determining

22   for each mobile platform one of the remote tracking systems that

23   is capable of locating mobile platform.

24        Again, you're -- and it's particularly highlighted by

25   your Honor's claim construction where the remote tracking system

1    is physically separate from the item to be tracked.

2          The same would be true in our phrase where it's

3    partially separate.

4          You need some non-human communication mechanism, so

5    that you're actually performing this determination step and

6    transferring the data.

7          THE COURT:  Are you a fan of World War II movies?

8          MR. BELANGER:  I've seen some, your Honor.

9          THE COURT:  So, there are oftentimes in these movies

10   something where the allies have, you know, they're going to

11   attack, so they have different small units that are going to get

12   into various positions to do attacks against the Germans --

13   hopefully, no one is German here -- and they have some guy with,

14   you know, a walkie-talkie, or some other kind of communication

15   systems, and he's in charge of talking to platoon one, platoon

16   two, and platoon three, and are you in position, what can you

17   see?

18         In the meanwhile there is some major hurdle somewhere

19   in the back there who's not only got this guy doing his, you

20   know, battalion or whatever, but, you know, there is some other

21   guy.  And there always a Frenchman or two, so you have to

22   translate these things back and forth into French and English.

23         As, it's all being done, you know, under the direction

24   of some General back at headquarters who's getting sporadic

25   reports of where everybody is, and what they're doing.

1           And so, taking the computer out of it, does that

2      describe what's going on in the claims here?

3           MR. BELANGER:  I don't think so, your Honor,

4      particularly, when you read the claims and the background of the

5      specification.

6           So, the system that you described -- and I apologize --

7      it's not entirely clear to me what the remote tracking system

8      would be?

9           THE COURT:  Well, the person with the walkie-talkie

10     that's got multiple channels.

11          MR. BELANGER:  Right.  So, I think, the distinction

12     then that was made in the specification, and that the claims, as

13     this were prosecuted highlights it, that person isn't adapted or

14     programmed to locate the allied troops based on some property

15     that is predetermined for those troops.

16          THE COURT:  Well, Corporal Jones has walkie-talkie

17     Channel A, and Corporal Smith has walkie-talkie Channel B.

18          I mean -- but -- and so, kind of what I'm trying to do,

19     because the thought occurred to me, as I was looking at the

20     reply brief, and then I thought I saw, actually, a few pages

21     later, the defendants saying the same thing that -- because one

22     of ways that I tried to think about these Section 101 issues,

23     which seem to me the way that sometimes the Court of Appeals is

24     thinking about them, too, is whether you're taking some kind of

25     human activity that is done without a computer, and then your

1    claim is doing it with a computer.

2         And so, there's, I think, a fairly high-level of

3    abstraction in the method claim here.

4         And, as a side note, I wish somebody would compile all

5    the cases where a 101 has been granted and tell me how many of

6    those were method claims as opposed to all others.  It seems to

7    me they're all method claims, but there's a high level of

8    abstraction, which is the reason why Mr. Scarsi can talk about

9    principals, and teachers and students, and why -- and I think

10   the specification, because I kind of, you know, remembered it

11   from claim construction -- I think it has a fleet of vehicles

12   kind of example in it.

13        Plus, I have some experience with a fleet of vehicles

14   myself.  That one kind of stuck in my head.

15        But as I was thinking about the argument today, I was,

16   you know, trying to think of things, because it seemed pretty

17   clear that if you take some kind of human activity, and you

18   figure out a way to put it on the computer, that's why DDR is

19   not -- went the way it did -- you know, you would probably have

20   an unpatentable claim.

21        And so, what I'm interested in -- and so, somehow

22   saying, okay, we're not just taking a human activity and putting

23   a general computer through it, we'll have a special computer

24   that does it, I'm not sure that that actually puts you out of

25   the human activity bucket.

1          MR. BELANGER:  To answer your Honor --

2          THE COURT:  So, you could run with that in whatever

3     direction you want.

4          MR. BELANGER:  So, as to the first part of your

5     comments, I don't disagree with that.  That's probably a fair

6     summary of 101 case law.

7          But if all you're doing is taking known human activity

8     and doing it on a computer faster or better, and that's the

9     entirety of what the specification and claims are directed to,

10    it's problematic for a Section 101.  And I think that's a fair

11    characterization under the existing law.

12         What I was suggesting, and what the DDR case says is,

13    just because something is implemented on a computer, doesn't

14    make it unpatentable, and certainly not a method implemented on

15    a computer.

16         If what you're doing is solving a problem that is

17    caused in the first place by communication -- the DDR case was a

18    communication and network protocol case.

19         THE COURT:  Yes, well, I'm pretty familiar with what it

20    was.  I've got a thought, but then go ahead.

21         MR. BELANGER:  And so, that's why I believe that the

22    situation in DDR is analogous to the situation here.

23         The problem that the inventors were trying to solve was

24    not simply taking a known human activity and doing it on a

25    computer.  They were trying to solve a real problem that they

1    were experiencing with it then current remote tracking systems

2    and remote tracking services that were publicly available when

3    they filed the patent in 1999.

4           And so, it was the remote tracking system that then

5    existed that were the genesis of the problem that the patent is

6    directed to.  And solution as, as is claimed -- and this is from

7    the file history, and, you know, the same claim element in the

8    original file history, the notice of allowance, and the

9    reexamination found that if you have multiple remote tracking

10   systems, and you're specifically adapting each of them to use a

11   predetermined property of the item that you're tracking.

12          But that is a special adaptation that was not known at

13   the time, and is a specific solution to a then known problem

14   with remote tracking systems.

15          THE COURT:  And so, I partly understand what you're

16   saying.  Just try me again.

17          The problem -- and I think I recall -- maybe it's in

18   the briefing -- you know, the problem, I think, is set out at

19   the last paragraph in Column 1 of the patent where it says:

20          I can't read print on '970 patent that well.

21          But it says, "There is accordingly a need in the art to

22   simplify the process by allowing inter alia extraction of

23   information from multiple tracking service providers.

24          There is further need in the art to provide a

25   relatively simple to operate location tracking service adapted

1    for use by the common subscribers while obviating the need to

2    install and use a cumbersome vehicle tracking software."

3              That's the problem.

4              MR. BELANGER:  And we've got it on Slide 6 of our

5    slide.  I think that's sort of a distillation of the first two

6    paragraphs of the patent.

7              But they do give specific examples starting in Column

8    1, Lines 6 to 28.  The patent walks through a number of specific

9    technologies that were used at the time in order to perform this

10   remote tracking of objects.

11             And the patent goes on to describe this problem that

12   was created by using the disparate group of systems.  The

13   problem with inter-communication between them either at the

14   remote tracking system level or, as you said, at the tracking

15   service provider level.

16             Those are described as two different things in the

17   patent.

18             THE COURT:  And so, if the idea was you had -- I forget

19   what the names of two companies were that you mentioned -- but

20   they have some kind of difficulty communicating with each other,

21   or being understood by the same software program, or same

22   program.

23             The solution here is, we'll write a program, and that

24   program will look for some common thing that they all have?

25             MR. BELANGER:  Yes.  On the specific example given --

1    and this is in preferred embodiment -- it's in Figure 4 -- in

2    the description of Figure 4, your Honor.

3                At the bottom of Column 5, top of Column 6.

4                THE COURT:  Okay.

5                MR. BELANGER:  Where the inventor has described that

6    you have a number of location tracking systems, remote tracking

7    systems, 11 and 14, and they describe a common communication

8    subsystem, and then a common data format which includes -- and

9    this is directing you to Line 65, in Column 5, up to about line

10   -- I think it's about Line 10 or 11 in Column 6 where they

11   describe the data structure that they used in the preferred

12   embodiment in order to have a specific identifier that would be

13   used to identify all of the platforms, or all of the devices to

14   be tracked, and that would be used commonly across various

15   remote tracking systems.

16               THE COURT:  So, the problem is, you have remote

17   tracking systems that are, essentially, written differently, so

18   what one is looking for is not what the other is looking for,

19   and so, they have trouble communicating with each other, maybe

20   they can't communicate with each other.

21               And the solution is to write a third program that can

22   look for the same thing in both tracking -- in both tracking

23   devices?

24               MR. BELANGER:  So long as the newly claimed tracking

25   devices are adapted to use that same data field, or what's

1    called the predetermined property.

2         So, it's got to be decided in advance before you track

3    using the two systems, and those two systems need to be updated,

4    or changed, or adapted, so that they're using that approach.

5         THE COURT:  So if we just go back to my World War II

6    example, and we said, okay, the solution is no more French, only

7    speak in English, that would be a kind of the analogy?

8         MR. BELANGER:  Actually, I'm struggling for how to

9    match that analogy to -- I don't think it -- you've got the two

10   different GPS systems.  If you want to take the protocol to be

11   languages, you're not changing the two different languages,

12   you're coming up with a third language that's common.

13        THE COURT:  In Esperanza?

14        MR. BELANGER:  That you could then adapt the location

15   systems used, so that you're doing a mapping of the item to be

16   located to the various systems that are available to tracking.

17        THE COURT:  Okay.  All right.

18        I think I understand what your DDR argument is, which I

19   think is probably an accomplishment on your part.  I don't

20   imagine how you could do that.

21        What would you also like to tell me, Mr. Belanger?

22        MR. BELANGER:  So, I think -- I would just point out --

23   counsel directed you to the Dealertrack case.  I would just

24   encourage you to look at -- and, your Honor, I think pointed out

25   in a question, what is the difference between the claims in the

1    <u>Dealertrack</u> case and the claims in this case.

2    And the main difference comes back to the language that

3    I highlighted that was added during prosecution in the patent.

4    So, two things.

5    It's basic principle.  If you add a limitation to the

6    preamble, it's presumed to be a limitation on the claims.

7    Counsel's argument is that --

8    THE COURT:  That sounds right to me.

9    MR. BELANGER:  And your Honor has already entered the

10   Markman ruling finding that to be a limitation.

11   THE COURT:  Good.

12   MR. BELANGER:  And so, counsel's argument that you can

13   sort of ignore the underlying phrase, which is really not in the

14   claim --

15   THE COURT:  I don't mean to cut you off, Mr. Belanger.

16   I didn't actually think that was their argument.  I

17   thought their argument was that it was, so to speak, inherent in

18   <u>Dealertrack</u>.

19   MR. BELANGER:  Well, what I wrote down, and I don't

20   have the transcript is that the remote tracking system is not

21   part of the claim.

22   I apologize.  I'm far behind the court reporter in

23   getting an accurate account of the transcript.

24   To the extent they're arguing that the remote tracking

25   system, you don't need a remote tracking system, and you don't

1    need a remote tracking system that has been adapted to determine

2    the location, irrespective of the mobile platform according to

3    the properties that is a really determined for each mobile

4    platform, I would submit to the Court that that is, actually, a

5    limitation.

6          THE COURT:  Okay.

7          MR. BELANGER:  And that's an important distinction in

8    Dealertrack, because when counsel went through and matched claim

9    elements and generalities, he didn't address or direct his

10    arguments to that part of preamble.

11          And that is important, your Honor, because we know in

12    the case law, if you have a general purpose computer, and

13    they've argued this, it's striking in their brief.

14          So, they had one sentence where they say, there is no

15    dispute that the claims are directed to a known remote tracking

16    system.  And then two sentences later they say, you shouldn't

17    reach the question of whether a remote tracking system is novel

18    or new.

19          And I would suggest to you that the rationalization of

20    thinking is, if you look at the file history, not for purpose of

21    determining novelty, but you look at the file history to say, is

22    the claim directed to simply taking an abstract concept, and

23    applying it to known components, or is there something in the

24    claims that the Patent Office and patentee believes was new?

25          And I would suggest that if you look at the file

1    history, that's useful for determining the Patent Office and

2    patentee.  I believe that the remote tracking systems, adapted

3    in this particular way, was new and patentable.

4           And, therefore, it's not simply taking something that

5    was known and applying an abstract concept to it.  It's

6    employing something that is new or was new at the time the

7    patent was filed.

8           Your Honor, just I want to take you then to the

9    preemption arguments.

10          THE COURT:  Before you do that, I think I know the

11   answer to this, but I just want to make sure.

12          So, I take it the Dealertrack discussion of processing

13   information through a clearinghouse, you would say that has

14   nothing to do with your patent?

15          MR. BELANGER:  That's right, your Honor.

16          I mean, it does, if you take -- if you can take one or

17   two elements.

18          Basically, what they've done is taken one or two

19   elements and tried to analogize them.  But the directive of the

20   case law is, you look at the claim as a whole and not just one

21   or two elements to determine patentability.

22          And what counsel's argument avoided was the element of

23   the claim that Patent Office now, in the original prosecution,

24   found patentable.

25          THE COURT:  And the reason why you say it's not an

1    information process through a clearinghouse is, essentially,

2    what you're saying is, it's more like -- your disagreement there

3    is, essentially, there's no clearinghouse?

4            MR. BELANGER:  That's right.

5            THE COURT:  Okay.

6            MR. BELANGER:  And, also, that you're reprogramming two

7    remote tracking systems to operate differently than they did

8    before in order to make the entire system work.

9            THE COURT:  Okay.  Go ahead.

10           You were going to talk about preemption, I think?

11           MR. BELANGER:  So, a few things on the preemption

12   argument.

13           So, to point out, in terms of preempting the entire

14   field and the alleged breadth of the claim, we think it's

15   notable that the patent was allowed in the reexamination over, I

16   believe it was, 48 prior art references that the defendants had

17   cited.

18           We're not claiming to preempt all remote tracking

19   systems and all uses of this technology.  This is a much

20   narrower claim and system than anything that would remotely

21   track items or platforms.

22           So, it certainly doesn't preempt the broad concepts,

23   any of the broad concepts that counsel has articulated as

24   purporting to be the abstract idea.

25           We don't think, for example, the teacher analogy, we

1    don't read on that.  We don't believe the claims, from what I

2    could understand from your fleet analogy, the claims would not

3    read on that.  It's a simple analogy.  And there is a host of

4    prior art references that were cited during reexamination that

5    were distinguished, technically, from the claims, which is,

6    again, we have evidence that there's no preemption.

7         And I would also note that the defendants, Google, have

8    remote tracking systems.  They certainly track us.  We've argued

9    infringement.  And they have given a fairly detailed argument

10   about why they don't infringe the way the claim is structured.

11        So, the idea that we preempt all uses of tracking, they

12   certainly used the general concept they have identified, but

13   they point to the claim language to argue that there are

14   specific limitations that we don't need, which, again, we think

15   evidence that there's no preemption of the entire field.

16        THE COURT:  All right.

17        MR. BELANGER:  Unless your Honor has further questions?

18        THE COURT:  No.

19        So, actually, yes, thank you.  I did have one more

20   question.

21        You would say -- so, you would say that the claim has

22   an inventive technological aspect, which just says, change your

23   computer programs, or write a computer program that will work

24   with this adapted piece of information that each of these

25   tracking devices are going to have?

1          MR. BELANGER:  In essence, yes, your Honor.

2          You are performing a technological advance on the

3     remote tracking system are changed from what they were

4     previously, and that there's a technological advance, because

5     you're using them in a different way.

6          So, you're changing the remote tracking system by

7     adapting them in a way, and then using them in a way that is

8     also a technological advantage.

9          THE COURT:  And, in terms changes to hardware, there's

10    no claim that any of this actually changes the hardware.

11         All this changes is the software, right?

12         MR. BELANGER:  I think that's fair, yes, your Honor.

13         THE COURT:  Okay.  All right.

14         MR. BELANGER:  I would just -- I apologize -- but I

15    would take issue with Claim 15.  We do believe that meets the

16    all the limitations when it talks about a map database.

17         Your question about whether there is a need to have --

18    whether or not something is done by a computer -- excuse me --

19    by a human, I think, even if you were to find Claim 14 directed

20    to an abstract idea performed by a human, which we would

21    respectfully disagree with, but we do believe that Claim 15 does

22    add additional structure.

23         THE COURT:  I think 15, as written for sure, has to be

24    done by a computer.  I took that to be Mr. Scarsi's argument,

25    that 14 is not so clear.  The rest, I think, is computer

1    readable media.  I don't think there was really a question

2    there.

3            But getting back to the original -- one of the

4    questions I had about, you know, what sort of human activity is

5    this.  There's more force to the defendants's argument.  I think

6    Claim 14 actually doesn't even require a computer.

7            In any event, there's no question there.  Okay.

8            MR. BELANGER:  Thank you, your Honor.

9            THE COURT:  Thank you.

10           All right.

11           MR. SCARSI:  May I respond?

12           THE COURT:  Sure, Mr. Scarsi.

13           MR. SCARSI:  Briefly, your Honor.

14           When I look at Claim 14 -- and we'll pull it up in a

15   second -- the method Steps A through E, I don't think there has

16   really been any argument that that information back and forth is

17   sort of the abstract passing information back and forth.

18           That's the patented method.  The preamble sets up the

19   environment in which the method works.  And the environment in

20   which the method works are these remote tracking system that

21   have been adapted according to the --

22           THE COURT:  Are you saying that the -- that each of

23   which is adapted, the language is not actually a limitation?

24           MR. SCARSI:  I'm saying it's not.  It's the environment

25   that the claim works in.

1          So, to the extent that it's a -- to the extent that

2     it's a limitation on the method.

3          So, if you are not practicing that method in that

4     environment, you're not infringing the claim.

5          What I'm saying is that that proposal that's

6     predetermined, that happened before the claim method started,

7     and that's not what the patent is about.  The patent is not

8     about modifying the remote tracking systems.

9          I understand counsel's argument that this claim

10    language becomes the most important part of the invention and

11    the inventive step.

12         But I apprise the Court of the fact that that phrase,

13    "property that is predetermined," doesn't appear in the

14    specification.  It wasn't part of the patent as it was filed.

15    The patent was filed --

16         THE COURT:  I guess that's Mr. Belanger's point.

17         MR. SCARSI:  It wasn't disclosed or discussed in the

18    Patent Office.  This concept of modifying, or remote tracking

19    system, doesn't exist in the specification.  It wasn't added

20    until four years later when they were prosecuting the patent.

21         It's not something that is part of the invention.

22         THE COURT:  Well, it's hard to say that it's not part

23    of the invention when it's allowed in the claims.

24         MR. SCARSI:  Well, but to the point that the invention

25    was trying to solve a problem, and the inventor wrote a computer

1    program in Israel to do it, that's post -- that's -- I'm trying

2    to think of what to say.  But it's not part of invention.  It

3    wasn't in the patent.  It's not part of the patent at all.  It

4    was added years later in the prosecution.

5           The other thing that Mr. Belanger said today is, the

6    predetermined property is common across all the mobile

7    platforms.  That again is something new.  We have not heard that

8    before.  That certainly wasn't a position that was advocated

9    during claim construction.

10          The other thing he said was that the mobile

11   platforms --

12          THE COURT:  Well, he said it wasn't advocated during

13   claim construction.

14          Was it raised during the claim construction?

15          MR. SCARSI:  Well, certainly, CallWave didn't advocate

16   a claim construction position that said that those predetermined

17   properties had to be common.  That wasn't -- that was not --

18   there was nothing in the --

19          THE COURT:  What I'm trying to get at, was there a

20   dispute about it that was resolved, or are you just saying they

21   didn't bring it up at all?

22          MR. SCARSI:  Oh, what I'm saying is, it's not in the

23   claim at all and no one suggested that it be part of the claim.

24          THE COURT:  Right.  Does the each of which suggest that

25   each -- what exactly is your point?

1          MR. SCARSI:  Mr. Belanger said today that they -- that

2    there was some aspect of the predetermined property that was

3    common across all of the mobile platforms.

4          THE COURT:  Okay.  What you're pointing out is, he says

5    each of them has a predetermined property, but it doesn't say

6    anything about it being the same?

7          MR. SCARSI:  Exactly.  It doesn't say anything about

8    being common.  There's nothing there.  There's nothing that

9    requires the mobile platforms to be programmed, or to be

10   reprogrammed.

11         It sounds like the description we got today is the

12   invention is a system that would take information in different

13   formats and reformat it into a common format.

14         But, again, that is an abstract idea as well.  People

15   have been doing that for years.

16         You know, your example earlier about just English, no

17   French.  I mean, translating information from multiple sources

18   into one language, certainly is an abstract idea that wouldn't

19   rise to the level of patentability.  There's just nothing in the

20   claims, or in the specification, that requires that.

21         Mr. Belanger pointed you to the communications

22   subsystem in Figure 4.

23         But, again, there's nothing in the asserted claims that

24   require a communication subsystem at all.  The communication

25   subsystem is described in the patent, but it's not in the

1    asserted claims.  It's not part of what the Court is dealing

2    with here.

3          So, again, we're seeing the -- two things.

4          We're seeing the structure that's not part of the

5    asserted claims being used to argue that the asserted claims are

6    inventive.

7          And we're seeing a new limitation placed on the claims

8    that don't exist within the plain language of the claims.

9          And then just -- just, your Honor, briefly, you asked a

10   question about DDR.  And in DDR, the Court didn't reach the

11   issue, necessarily, of whether there was an abstract idea,

12   because the Court found that regardless of the abstract idea,

13   there was enough added to it to become -- that it had an

14   inventive concept.

15         So, the Court didn't find that there was no abstract

16   idea or that the idea was not abstract.  It just didn't need to

17   reach that point, because they found it satisfied structure.

18         THE COURT:  Yes, I suspect it might be a little unclear

19   in DDR.

20         But I think there are certain people who agree with

21   what you just said.

22         MR. SCARSI:  So, just in summary, your Honor, we don't

23   think that the predetermined property has any structure or

24   inventive concept to it.  Even if it did, even if you believe

25   everything Mr. Belanger told you, it's still a system that's

1    merely a translation system.

2         You're taking information in one format and translating

3    it to a different format for tracking systems.  Everything was

4    old in the art.  The patent describes these tracking systems ass

5    being old in the art.

6         And, really, all the patent is talking about doing is

7    having a system that will act as human that was dealing with

8    multiple tracking systems, trying to make sure they matched up

9    the inputs and the outputs.

10        So, we're taking an old idea, and we're just adding a

11   computer component to it so we can eliminate a person having to

12   do it, eliminating the switchboard operator.

13        THE COURT:  Okay.

14        MR. SCARSI:  If your Honor has no further questions,

15   I'll sit down?

16        THE COURT:  I have no further questions.  Thank you.

17        MR. SCARSI:  Thank you very much.

18        THE COURT:  I just have a general question.

19        I have sitting on my desk some stuff from one of the

20   other CallWave tracks.  And I know that another one of the

21   CallWave tracks is now starting its way through the Court of

22   Appeals.

23        This particular CallWave track, which I guess I stayed

24   for awhile while we did IPRs, how much of a -- where are we in

25   the process here?

 1          MR. SCARSI:  Right now, your Honor, we're in fact

 2     discovery, and we're at some point near the end of fact

 3     discovery.  We're not at the end, but we're getting there, and

 4     our expert discovery will pick up after that.

 5          THE COURT:  And do we have a schedule for all of this?

 6          MR. SCARSI:  Yes, we do.  We have a schedule that takes

 7     us through that portion of it.

 8          THE COURT:  All right.

 9          And after expert discovery, is there any more schedule

10     that I have after that?

11          MR. SCARSI:  There's a Summary Judgment Motion

12     scheduled, and then we'll have to do a trial setting after that.

13          THE COURT:  Okay.  All right.

14          So, Mr. Belanger wants to say something.

15          Mr. Belanger?

16          MR. SCARSI:  I had one more point.

17          THE COURT:  Why don't you make your one more point.

18          MR. SCARSI:  Just on the infringement, your Honor.

19          As you know from the case law, the parties are allowed

20     to argue in the alternate that there is no infringement despite

21     the fact that we have abstract preemptive idea.

22          THE COURT:  Yes, yes, don't worry about that.

23          MR. SCARSI:  And here one -- there is one limitation in

24     the claim, and that's the tracking the -- the remote tracking

25     system has to be remote from the item being tracked.

1          So, they have to be two separate things.

2          THE COURT:  I see.  I wrote that.

3          MR. SCARSI:  Yes, yes.  And here -- here one of the

4    things that CallWave is trying to do is to read this patent on

5    the phone, the phone tracking itself.

6          THE COURT:  All right.

7          I'm sorry, why are we talking about this right now?

8          MR. SCARSI:  Oh, it's just from a non-infringement

9    basis, your Honor.  There is a viable non-infringement

10   argument that --

11         THE COURT:  Okay.  Well, that's really not the issue

12   for today.

13         MR. SCARSI:  Thank you, your Honor.

14         THE COURT:  Mr. Belanger, did you want to say

15   something?

16         MR. BELANGER:  I just wanted to, if I could address

17   very briefly, the reading of the claim?

18         THE COURT:  Go ahead.

19         MR. BELANGER:  It's just as simple as the grammar of

20   the claim as you pointed out.  You've got each of the remote

21   tracking systems that's adapted to determine the location of a

22   respective mobile platform according to a property that is

23   predetermined.

24         And so, I was merely referring to the singular.  It

25   uses singular rather than plural to describe the properties.

1      THE COURT:  Of course, we know using the singular means

2  the plural, right, one or more properties?

3      MR. BELANGER:  But, in this context, you've got

4  multiple systems and you've got a property.

5      THE COURT:  Okay.  You know, I'm sure when we get a lot

6  further in this case, there will probably be more claim

7  construction.

8      How long ago did I do this claim construction?  I can

9  barely remember it.

10      MR. BELANGER:  About a year ago, your Honor.

11      THE COURT:  All right.

12      MR. BELANGER:  And just on the scheduling question,

13  your Honor?

14      THE COURT:  Yes, go ahead.

15      MR. BELANGER:  There were some significant discovery

16  disputes that are in front of the Special Master.  I think she

17  is on vacation and we've scheduled a hearing with her in a

18  couple of weeks to discuss what impact those discovery disputes

19  will have on the fact discovery schedule.

20      THE COURT:  Okay.

21      MR. BELANGER:  I think it's fair to say that the

22  parties have agreed to some extension of fact discovery that may

23  be necessary, but we deferred that until the Special Master can

24  get to it.

25      THE COURT:  That's the reason we have a Special Master,

1    so she can figure these things out.

2          While I don't have actually have a trial and Pretrial

3    Conference scheduled, the schedule is not a matter of concern to

4    me other than to make sure that things are going forward,

5    because you're not on my schedule.

6          All right.

7          Just the way things are right now, when does expert

8    discovery -- well, actually, the next thing is actually on my

9    schedule.

10         When, approximately, are these Summary Judgment

11    Motions?

12         MR. SCARSI:  They're in May, your Honor.

13         THE COURT:  May of 2017?

14         MR. SCARSI:  No.

15         THE COURT:  2016?

16         MR. SCARSI:  Yes.

17         THE COURT:  Oh, okay.

18         MR. BELANGER:  But we think that we'll likely agree to

19    move that by some amount of time.

20         THE COURT:  Okay.  It's Summary Judgment, and you

21    haven't finished fact discovery, and you haven't done experts,

22    and May is when the Summary Judgment Motion is supposed to be?

23         MR. BELANGER:  Yes, I think the schedule will need to

24    be adjusted.

25         THE COURT:  That sounds like a reasonable thing to say,

1    yes.

2            Okay.  As I said, it makes -- I'm pretty flexible right

3    now.

4            All right.

5            Is there anything else that you want to discuss while

6    we're all here?

7            MR. SCARSI:  Nothing from our side, your Honor.

8            MR. BELANGER:  Nothing from plaintiff, your Honor.

9            THE COURT:  Okay.

10           Well, thank you for your time.  I will take this under

11   advisement.  I have a lot of 101 opinions stacking up, so I

12   wouldn't expect to see an answer to this right away, or maybe

13   even what you think is in a prompt fashion.

14           But we'll get to it, okay?

15           MR. BELANGER:  Thank you very much.

16           MR. SCARSI:  Thank you, your Honor.

17           THE COURT:  Thank you very much.

18           Have a nice day.

19           (The proceedings adjourned at 5:12 o'clock p.m.)

20                       *  *  *  *  *

21

22

23

24

25